# No. 22-40376

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Whirlpool Corporation; Whirlpool Properties, Incorporated,

Plaintiffs - Appellees

v.

Shenzhen Sanlida Electrical Technology Company, Limited; Shenzhen Avoga Technology Company, Limited,

Defendants - Appellants

## On Appeal from
United States District Court for the Eastern District of Texas

2:22-CV-27

## EMERGENCY MOTION UNDER CIRCUIT RULE 27.3 FOR STAY OF INJUNCTION PENDING APPEAL

SUBMITTED BY:

Tianyu Ju
Glacier Law, L.L.P.
200 Park Avenue, Suite 1703
New York, NY 10166

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5ᵗʰ CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Whirlpool Corporation | Melissa Smith of Gillam & Smith, L.L.P. Marshall, TX |
| Whirlpool Corporation | Marc Lorelli of Brooks & Kushman, P.C. Southfield, MI |
| Whirlpool Corporation | Andrew Gorham of Gillam & Smith L.L.P. Tyler, TX |
| Whirlpool Properties, Incorporated | Marc Lorelli of Brooks & Kushman, P.C. Southfield, MI |
| Whirlpool Properties, Incorporated | Andrew Gorham of Gillam & Smith L.L.P. Tyler, TX |

| Appellants: | Counsel for Appellants: |
|---|---|
| Shenzhen Avoga Technology Company, Limited | Tianyu Ju of Glacier Law, L.L.P. New York, NY |
| Shenzhen Avoga Technology Company, Limited | Tao Liu of Glacier Law, L.L.P. New York, NY |
| Shenzhen Sanlida Electrical Technology Company, Limited | Tianyu Ju of Glacier Law, L.L.P. New York, NY |
| Shenzhen Sanlida Electrical Technology Company, Limited | Tao Liu of Glacier Law, L.L.P. New York, NY |

/s/Tianyu Ju
Attorney of record for Appellants

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ...................................................................... 1

INTRODUCTION ............................................................................... 4

BACKGROUND ................................................................................. 5

ARGUMENT ................................................................................... 7

   I.  Appellants are Likely to Succeed on Appeal ................................... 8

    A.  There is no Personal Jurisdiction over Appellants ....................... 8

    B.  The District Court Erred In Finding that Appellee' trademark is valid ...... 11

    C.  The Court Erred in Finding Likelihood of Confusion ................................ 13

   II.  Appellants Will Suffer Serious Irreparable Harm .......................... 16

   III.  A Stay of Injunction will Not Substantially Injure Appellees ................... 20

   IV.  The Public Interest Will be Served by a Stay ............................. 20

CONCLUSION ................................................................................ 22

CERTIFICATE OF SERVICE ................................................................. 23

CERTIFICATE OF COMPLIANCE .............................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*AtwoodTurnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
875 F.2d 1174, 1179 (5th Cir. 1989) …………………………......…..…….…19

*Cf. In re Revel AC, Inc.*,
802 F.3d 558, 566 (3d Cir. 2015) …………………………………..….……21

*Cf. Hargrove v. Underwriters at Llyod's, London*,
937 F. Supp. 595, 607 (S.D. Tex. 1996) .………...…………….…...…..……11

*Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*,
 676 F.2d 1079, 1082–85 (5th Cir. 1982) …………………………....…..….14

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
269 F.3d 270, 284 (3d Cir. 2001) …………….………………………..….…..14

*Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*,
762 F.2d at 470.……….....………………………………….……..….…......…9

*Eppendorf Netheler Hinz GmbH v. Ritter GmbH*,
289 F.3d 351, 355 (5th Cir. 2002) …………..…...……………………...12,13

*John Doe # 1 v. Veneman*,
380 F.3d 807, 818 (5th Cir. 2004) …………………….……….…....……..…18

*Johnston v. Multidata Sys. Int'l Corp.*,
523 F.3D 602, 609 (5th Cir. 2008) ………...……………….…...….…......…..9

*Murphy Bros. v. Michetti Pipe Strining, Inc.*,
526 U.S. 355, 350 (1999) ………...……………….……….………......…..8

*Nken v. Holder*,
556 U.S. 418, 425-26 (2009) ………...……………….………….……......…..7

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
803 F.2d 166, 173 (5th Cir. 1986) …………………………....…....……..…14

*Poly-Am., L.P. v. Stego Indus., L.L.C.*,
2011 U.S. Dist. LEXIS 82647, 2011 WL 3206687, at *7……..……..…..……12

*Royal Lace Paper Works, Inc. v. Pest-Guard Prods.*,
240 F.2d 814 (5th Cir. 1957).………...……….…….…2d…….…..……......…..8

1

*Sangha v. Navig8 ShipManagement Private Ltd.,*
882 F.3d 96, 102 (5th Cir. 2018) .………...……………….…...….…….......….10

*Tinnus Enters., LLC v. Telebrands Corp.,*
No.6:16-CV-0033 RWS-JDL, 2016 WL 9131960, at *2 (E.D. Tex. Nov. 21,
2016) …………. .…………………………………………………....…..…17

*Traffix Devices, Inc. v. Marketing Displays, Inc.,*
523 U.S. 23, 28 (2001) ………………………………………….….…....……12

*United States v. Baylor Univ. Med. Ctr.,*
711 F.2d 38, 39 (5th Cir. 1983) .………...……………….…..……...…….....…..7

*United States. v. Dickinson,*
465 F.2d 496, 511 (5th Cir. 1972) .………....……………….…..….…….....…..9

*Veasey v. Abbott,*
870 F.3d 387, 391 (5th Cir. 2017).………...…………….……….….…….....…..7

*Wilson v. Belin,*
20 F.3d 644, 648 5th Cir. 1994) .………...……………….…..….……....…..9

*3M Co. v. Christian Investments LLC,*
No. 1:11CV627, 2011 WL 3678144, *4 (E.D.Va. Aug. 19, 2011) .…….......…..8

**Rules**

F. R. Civ. Pro. Rule 62(c)……….….…….…......….……………………………….7

F. R. Civ. Pro. Rule 65(a)……….….…….…......….…………………………….8

28 U.S.C. § 1335……….….…….…......….……………………………………….8

Fed. R. Civ. P. 65(e)(2) ……….….…….…......….……….….……….…….8

15 U.S.C. § 1115(b)(8)..……….….…….…......….………………….….…….…..…..11

# INTRODUCTION

This Court should stay, pending complete of appellate proceedings, the district court's extraordinary injunction. That preliminary injunction requires that Appellants to recall and destroy all the products of alleged infringement which are crucial components to this case without a final judgment on the merits. The injunction took effect on June 14, 2022, when the District Court adopted Magistrate's Judge Report and Recommendation for a Preliminary Injunction. Appellants filed an emergency motion to stay with the District Court on June 23, 2022, but it was denied on August 12, 2022. Appellees are exploiting this injunction against Appellants to persuade consumers that Appellants' products are infringing Appellees' products when Appellants' products are based on their own trademarks. A stay is warranted because the district court has no personal jurisdiction over Appellants to issue a preliminary injunction since there is no dispute that service of process has never been effectuated on Appellants. Ex. 5 ("Pls.' Opp'n.") p. 4. It is well settled law that without service of process, the district court shall not exercise personal jurisdiction over any defendant merely based on the Rule 65 notice. Moreover, Appellees' marks are functional and invalid, there is no likelihood of confusion because Appellants' products bear their own trademarks. Further, a stay will not substantially injure Appellees. Rather, if the injunction is not stayed, Appellants will suffer irreparable harm for recalling and destroying their products

without a final judgment on the merits as Appellants would be forced to destroy the evidence crucial to this case. Therefore, Appellants respectfully request a prompt decision on this motion to avoid further irreparable harm to Appellants and public interest.

Time is of the essence. As required by the preliminary injunction issued by the district court, Appellants are required to recall and destroy all alleged infringing products without a final judgment on the merits. If the alleged infringing products are recalled and destroyed, Appellants will suffer irreparable harm as the crucial evidence in this case would be lost, destroyed and would not be able to be preserved or produced anymore. To prevent further irreparable harm, relief from this Court must issue by Friday, September 16, 2022, and undersigned counsel certifies that this motion qualifies for emergency treatment pursuant to Fifth Circuit Rule 27.3. This court should stay the injunction pending appeal.

## BACKGROUND

On January 31, 2022, Appellees bought this action against Appellants for trademark infringement, trade tress infringement, federal unfair competition, federal trademark dilution, trademark and trade dress infringement under the common law of Texas, injury to business reputation or trademark or trade dress under Texas Business and Commerce Code, Texas common law unfair competition, as well as unjust enrichment. On January 31, 2022, Appellees bought this action against

Appellants for trademark infringement, trade tress infringement, federal unfair competition, federal trademark dilution, trademark and trade dress infringement under the common law of Texas, injury to business reputation or trademark or trade dress under Texas Business and Commerce Code, Texas common law unfair competition, as well as unjust enrichment. On January 31, 2022, summons issued as to Appellants. However, Appellees have never perfected process of service on Appellants for the Court to acquire jurisdiction. On the same day, Appellees filed a motion for a preliminary injunction order. On March 14, 2022, Appellees requested a preliminary injunction hearing alleging that notice of this action had been emailed and provided to Appellants through a counsel in China. On March 16, 2022, Appellees' request for a preliminary injunction hearing was granted.

On April 19, 2022, a preliminary injunction hearing was held. Counsel for Appellants appeared contesting the personal jurisdiction for lack of service of process and opposing Appellees' motion for a preliminary injunction. On the same day, the Magistrate Judge released a report and recommendation recommending that the preliminary injunction be issued. On May 3, 2022, Appellants filed their objection to the report and recommendation emphasizing that the district court does not have personal jurisdiction over them to issue a preliminary injunction and that Appellees do not have likelihood of success on the merits. On June 14, 2022, the district court entered the preliminary injunction order. On June 14, 2022, Appellants

filed a notice of appeal to the preliminary injunction. On June 23, 2022, Appellants filed an emergency motion to stay preliminary injunction pending appeal pursuant to Federal Rules of Civil Procedure 62(c). On July 15, 2022, Magistrate Judge issued a report and recommendation recommending the denial of the emergency motion to stay. On July 28, 2022, Appellants filed their response and objections to the report and recommendation issued on July 15. On August 12, 2022, the District Court adopted the July 15, 2022, report and recommendation and denied Defendant's emergency motion to stay.

## ARGUMENT

In determining whether to issue a stay pending appeal, this Court considers (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits", (2) "whether the applicant will be irreparably injured absent a stay" ; (3) "whether issuance of a stay will substantially injure the other parties interested in the proceeding"; and (4) "the public interest." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)). These factors strongly militate in favor of a stay. A movant "need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (citation omitted).

# I.  Appellants are Likely to Succeed on Appeal

## A.  There is no Personal Jurisdiction over Appellants

It is well settled law that "[s]ervice of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros. v. Michetti Pipe Strining, Inc.,* 526 U.S. 355, 350 (1999). Specifically, "without personal service of process in accordance with the statue of United States or the law of state which the suit is file, the court is without personal jurisdiction to render a personal judgement against it." *Royal Lace Paper Works, Inc. v. Pest-Guard Prods.*, 240 F.2d 814 (5th Cir. 1957).

The district court erred in holding that it has personal jurisdiction over Appellants in this case. The district court relied on *Corrigan* finding that preliminary injunction pursuant to Rule 65(a) does not require service of process, however, Corrigan is distinguishable from the present case. The plaintiff in Corrigan brought an interpleader action under 28 U.S.C. § 1335, which has its own rules for preliminary injunctions. See Fed. R. Civ. P. 65(e)(2) (stating that Rule 65 does not modify "28 U.S.C. § 2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader"). *3M Co. v. Christian Investments LLC*, No. 1:11CV627, 2011 WL 3678144, *4 (E.D.Va. Aug. 19, 2011).

At the outset, it is undisputed that Plaintiffs did not effectuate service of process on Appellants prior to the preliminary injunction hearing. Ex. 3 ("Defs.'

Objection") p. 2, at ¶8. So, the District Court lacks personal jurisdiction to issue a preliminary injunction against Appellants. The "district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid jurisdiction," and an order granting an interlocutory injunction in these circumstances "is erroneous as a matter of law." *Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d at 470. The Preliminary Injunction Order should be vacated as to all Appellants. *Enterprise Int'l, Inc*. 762 F.2d at 476 (vacating injunction ordered entered against defendant before determining whether jurisdiction over defendant existed). Appellees bear the burden of making prima facie showing that the defendant has had minimum contacts with the forum state. *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3D 602, 609 (5th Cir. 2008) (citing *Wilson v. Benlin*, 20 F.3d 644, 648 5th Cir. 1994)). Appellees simply did not present any sufficient evidence at the hearing to convince the district court that they are likely to overcome Appellants' personal jurisdiction arguments.

The court issuing the injunction must enjoy subject matter and personal jurisdiction over the controversy otherwise the order is unconstitutional. *United States. v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972). *Like Dickinson*, the preliminary injunction is unconstitutional in this case because the Court has no personal jurisdiction over the Defendants. Appellants were never served in the case for the Court to acquire jurisdiction.

In addition, the district court even failed to adequately balance "(1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effect relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies." *Sangha v. Navig8 ShipManagement Private Ltd.,* 882 F.3d 96, 102 (5th Cir. 2018). This Court erroneously disregarded the burden of the foreign based Appellants to come defend themselves in Texas as well as the substantial cost and burden on Appellants of defending themselves in Texas, where they maintain no presence, particularly when weighed against the lack of any convenience or efficiency to Plaintiffs-whose interest in this forum is purely strategic of litigating this case in Texas, where Plaintiffs likewise maintains no presence. Moreover, given that neither party and none of the relevant discovery or witnesses are located in Texas, the interstate judicial system's interest in the most efficient resolution of controversies further weighs against the exercise of jurisdiction here.

Furthermore, on August 22, 2022, Magistrate Judge issued an order requiring Appellees to file Proof of Service of Process upon Appellants within 30 days of this order as required by Rule 4(l) of the Federal Rules of Civil Procedure. Ex. 6 ("Order to File Evidence of Service of Process"). It can be inferred that since Appellants had

raised these issues numerous times since the preliminary injunction hearing back in April 2022, the district court finally started to dig into the personal jurisdiction issue.

Consideration of all relevant circumstances compels a finding that the exercise of jurisdiction over Appellants does not further the goals of convenience and efficiency and would offend traditional notions of fair play and substantial justice. *Cf. Hargrove v. Underwriters at Llyod's, London*, 937 F. Supp. 595, 607 (S.D. Tex. 1996) (finding exercise of jurisdiction fair where plaintiffs were Texas residents, and defendant had "many Texas clients" and "made many business trips to Texas," providing "the most convenient and efficient resolution of the case"). Thus, Appellants are likely to succeed on the merits of their appeal.

## B.    The District Court Erred In Finding that Appellee' trademark is valid

Appellants are likely to succeed in arguing that Plaintiff's marks are functional and invalid. An incontestable trademark is subject to the defenses and defects that the mark is functional. 15 U.S.C. § 1115(b)(8). Section 32 of the Lanham Act, which applies to registered trademarks, provides that a mark registered on the principal registry is admissible and prima facie evidence of its validity "but shall not preclude another person from proving any legal or equitable defense or defect…" 15 U.S.C. § 1115(a). An incontestable trademark is subject to the nine defenses and defects listed under subsection (b), which includes that the mark is functional. *Id*. § 1115(b)(8). The presumption of validity may be rebutted by evidence that the mark

is functional. *Poly-Am., L.P. v. Stego Indus., L.L.C.*, 2011 U.S. Dist. LEXIS 82647, 2011 WL 3206687, at *7 (evidence that the trademark holder advertised utilitarian benefits nullified the presumption of validity).

District Court clearly erred in find that Appellees have registered incontestable Trademark rights simply because the design stand for over 80 years and is still a market leader today. Ex. 2 ("Report and Recommendation") p. 3, at ¶6. "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of an article." *Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002) (citing *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 523 U.S. 23, 28 (2001)). "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional." *Id*.

Appellee' marks consist of three parts, and all of the three parts are functional like any stand food mixer. Ex. 3 ("Defs.' Objection") p. 3, at ¶13. The '158 Mark consists of three parts: a base portion to hold the stand mixer, an upwardly sweeping pedestal to connect the base portion and the mixer head, and a mixer head to encase a motor and associated electronic motor controls. It is apparent that the design with a base portion and sweeping pedestal connecting the parts and to hold for the bater mixing indicates that it is the reason that the device works. The '158 mark is indisputably functional and invalid. "The availability of alternative designs is

irrelevant." *Eppendorf Netheler Hinz GmbH,* 289 F.3d 351, 355. Appellants also provided serval utility patent of Appellees to show the functionality of Appellees' marks. Ex. 3 ("Defs.' Objection") p. 3, at ¶14. However, district court overlook the arguments and held that Appellees were not functional. A closer look would actually indicate that the Appellees' mark is actually functional which would render it invalid. Thus, the mark is functional.

## C.     The Court Erred in Finding Likelihood of Confusion

In assessing Appellees' likelihood of success on the merits of their infringement claim, the district court also erred in crediting Appellees' arguments on several factors underlying their finding of a likelihood of success. First, in finding Appellees' marks were strong, the district court erred in concluding that evidence of length of use of the mark at issue (represents unrebutted evidence that third-party use by twelve competitors does not diminish the association of the mark with Appellees in the public's mind. In the English case of *Whirlpool v. Kenwood Ltd* where Whirlpool sued other businesses for infringement of its trademark, the justices rejected Whirlpool's argument of likelihood of confusion. The justices referred to that given the nature of the product, the relevant average consumer is someone willing to spend a significant sum of money on buying a kitchen mixer and influenced by the design of the product as well, no doubt, as by its functional qualities. *(1) Whirlpool Corporation (2) Whirlpool Properties Inc. (3) KitchenAid*

*Europa Inc. v Kenwood Limited, [2009] EWCA Civ 753.* Consumers would look at the design, the price, functionality, and quality of the mixers before deciding to purchase. An ordinary consumer would not simply be confused about Defendants' mixers are the same as the Plaintiffs.

Appellees' evidence, however, does not demonstrate that the public has a reasonable basis to assume that the marks at issue could only be used with approval of Appellees *Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082–85 (5th Cir. 1982) (no likelihood of confusion when, because of unauthorized third-party uses of mark, public had no reasonable basis to assume that mark could only be used with approval of mark owner).

Furthermore, in assessing the degree of care of potential purchasers, the district court erred by failing to consider Appellants' evidence regarding the parties' related licenses cost thousands of dollars, which compels potential purchasers to exercise a higher degree of care and thereby reduces the likelihood of any confusion. *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (overturning verdict of infringement in part because potential purchasers are "buying for professional and institutional purposes at a cost in the thousands of dollars," and thus "virtually certain to be informed, deliberative buyers"); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) (stating when

consumers exercise heightened care, "courts have found there is not a strong likelihood of confusion.").

Moreover, the district court also erred in finding the similarity between the two marks. First, Appellants' products bear their own trademarks "COOKLEE" and "PHISINIC". Ex. 1 ("Compl."), p. 3. Second, Appellants' products are based on its own trademark and design and is different when view in comparison with Appellees' trademarks. For example, (a) the bottom of the mixer head of Appellants' products is circular□ while the mixer head on Appellees' products is rectangular; Second, (b) the right side of the base support has more of a protruding arc surface, while Appellees' products have an indented arc; Third, (c) Appellants' products' base has a hollow structure design while Appellees' products do not incorporate such design; Fourth, (d) Appellants' mixer includes a dial-switch while Appellees' products have no such design; Lastly, (e) Appellants' mixer's head incorporate a circular ball design while Appellee's products do not.



For these reasons, at a minimum, the district court also erred in finding a likelihood of confusion and thus a likelihood of success on the merits of Appellee' infringement claim. In light of these erroneous findings, Appellants have made a strong showing of likelihood of success on appeal. Where Appellees have failed to meet its heavy burden of establishing likelihood of success, the Court's entry of a preliminary injunction was erroneous. Thus, this Court should grant Appellants' emergency motion to stay preliminary injunction.

## II.    Appellants Will Suffer Serious Irreparable Harm

Appellants will suffer irreparable harm absent a stay of enforcement of the Order. First, district court's preliminary injunction prohibits Appellants from selling their products, which they have spent many years developing, promoting, and investing in—with Appellees full knowledge—and which have consequently developed invaluable customer goodwill. Absent a stay of this injunction, Appellants

will continue to suffer loss of the valuable customer goodwill associated with their products and serious reputational harm, in addition to lost revenue from not being able to market their brand and reduced demand. *Tinnus Enters., LLC v. Telebrands Corp.,* No.6:16-CV-0033 RWS-JDL, 2016 WL 9131960, at *2 (E.D. Tex. Nov. 21, 2016 ("Loss of revenue and goodwill may also be incalculable and irreparable."), *report and recommendation adopted,* No. 6:16-CV-0033 RWS-JDL, 2017 WL 24147 (E.D. Tex. Jan. 3, 2017), *aff'd,* 708 F. App'x 1019 (Fed. Cir. 2018); For example, to comply with the preliminary injunction order, Appellants have had to contact all of its customers, including its manufacturers and product owners to recall the sold products, and requested that they remove all reference to Appellants' brand from their website, social media pages, and marketing materials. Absent a stay, it would cause irreparable damage to Appellants' customer goodwill and reputation within the industry.

Second, according to the Preliminary Injunction Order, district court ordered Appellants to "recall and destroy and provide proof to the Court of recall and destruction (or recall and deliver to the Court for destruction) all Infringing Mixers and any packaging that includes images or other materials pertaining to the Infringing Mixers". Ex. 4 ("Prelim. Inj. Order") p.2, at §2 (b). This Order is extremely disproportional as well as outside the scope of a preliminary injunction in addition to being miscarriage of justice, and not tailored to the harm that occasions

it. *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004). One of the purposes of a preliminary injunction is to preserve the status quo until the merits have been resolved. However, the preliminary injunction order in this case does not preserve the status quo but rather destroy it. As stated, the Order requires Appellants to provide proof of destruction of all alleged infringing mixers meaning all evidence would be gone prior to trial. Destroying all evidence would not only cause substantial economic loss to the Appellants but also lead to substantial injustice since Appellants cannot use any evidence for defense later on. Appellants would be left with no evidence for defenses of noninfringement and loss of business and livelihood while Appellees get to continue to dominate the mixer market with no repercussions. The loss of evidence is irreparable harm to the Appellants as well as to justice.

In addition, it is inconceivable that district court would order Appellants to recall and destroy all the products based on Appellees' likelihood of success on the merits. There has been no trial or judgment that points to Appellants' infringement. They are alleged infringement accused by Appellees, which in no way is indicative of actual infringement. If Appellants comply with the Order and recall and destroy all their products, Appellants will suffer imminent and irreparable harm as discussed above. It is also waste of judicial resource to order Appellants to destroy all the evidence without a final judgement. There is no way for Appellants to recover to loss and the products if Appellants complied with the Preliminary Injunction Order.

Ironically, this Court did not even order Appellee to post any bond to secure Appellants' loss only after Appellant raised the issue in its emergency motion to stay in the district court.

The preliminary injunction also threatens the economic viability of Appellants' business model, which also constitutes irreparable harm favoring a stay, in addition to the significant loss of revenue from not being able to use its global brand to attract or retain customers, and the loss of all the products. *AtwoodTurnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (finding irreparable harm where "the potential economic loss is so great as to threaten the existence of the movant's business"). Appellants can no longer continue their businesses even if the district court finds that there is no infringement. As a result, not only are Appellants suffering substantial economic loss discontinuing all use of their globally recognized mixer and loosing associated invaluable goodwill, but the injunction has arbitrarily ordered Appellants to destroy all of their products, Appellants are facing with imminent and irreparable harm if the injunction is not stayed.

Thus, this Court should grant Appellants' emergency motion to stay preliminary injunction. Thus, this Court should grant Appellants' emergency motion to stay preliminary injunction.

### III.   A Stay of Injunction will Not Substantially Injure Appellees

The third factor in the motion to stay analysis also compels staying the injunction where Appellees will not be harmed, let alone substantially, by such a stay. As discussed above, the district court's finding that Appellees have met their heavy burden of establishing irreparable harm on its application for preliminary injunction is conclusory and unsupported by sufficient evidence and, accordingly, bears little weight on this factor. Indeed, the parties' history belies any claim of harm to Appellees arising from a stay of the preliminary injunction. As the record reflects, Appellants' mixers have coexisted with Appellee's business model without issue, confusion, or any claimed harm for many years. A stay pending appeal, which will likely be resolved within a matter of months, will not alter these facts. Most importantly, Appellees will not be injured if Appellants do not destroy the alleged infringing products before a final judgment.

### IV.   The Public Interest Will be Served by a Stay

Finally, the public interest will also be served by staying the preliminary injunction pending appeal. Given the irreparable harm Appellants will experience absent a stay of the Order, and the lack of any identifiable harm to Appellees, the public interest here is served by staying enforcement of the preliminary injunction pending appeal. This is particularly so where Appellants have made a strong showing on the merits of their appeal, because the public has a strong interest in the

correct application of the law and the ability to redress harm through appellate review. *Cf. In re Revel AC, Inc.*, 802 F.3d 558, 566 (3d Cir. 2015).

Moreover, the larger public interest favors supporting fair competition, especially here where Appellees have attempted to use the district court's orders to interfere with Appellants' legitimate business operations. Appellants sell the accused mixers bearing their own patent. The preliminary injunction will not further the purpose inherent in patent law to foster innovation by granting an inventor a period of market exclusivity. Instead, a stay would serve the public interest in promoting fair and robust competition.

Most importantly, the public interest favors effectuating public and judicial resources. It is a complete waste of judicial resource to order Appellants to recall and destroy all the products of alleged infringement which are crucial components of this case. Destroying pieces of critical evidence not only is contrary to justice but also would indicate to the public that Appellants did infringe Appellees' mark without any support. The public interest also favored a fair litigation and trial process for both parties on the claims.

Accordingly, given that all four stay factors tip decidedly in favor of a stay of the preliminary injunction, this Court should stay enforcement of the preliminary injunction pending appeal.

# CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court

grant the Emergency Motion to Stay Injunction Pending Appeal.


SUBMITTED BY:
/s/Tianyu Ju
Tianyu Ju
Glacier Law LLP
200 Park Avenue
New York, NY 10166
iris.ju@glacier.law
Tel: +1 (323) 208-8882
Fax: +1 (312)-801-4587
Attorney for Appellants

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on September 2, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Dated September 2, 2022.

/s/*Tianyu Ju*
Tianyu Ju

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 4901 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

This document has been prepared in a proportionally spaced typeface using Microsoft word in 14-point Times New Roman.

3. I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by telephone calls to the clerk's office on September 2, 2022 and an email to opposing counsel on August 31, 2022, advising the intent to file this emergency motion. I further certify that the facts supporting emergency consideration of this motion are true and complete.

I further certify under 5th Cir. R. 27.4 that Appellees oppose this motion and plan to file a response in opposition.


Dated September 2, 2022.

/s/*Tianyu Ju*
Tianyu Ju

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **WHIRLPOOL CORP. and**<br>**WHIRLPOOL PROPERTIES, INC.**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**SHENZHEN   SANLIDA   ELECTRICAL**<br>**TECHNOLOGY CO., LTD., and**<br><br>**SHENZHEN AVOGA TECHNOLOGY**<br>**CO. LTD.**<br><br>          **Defendants.** | **Case No. _____**<br><br><br><br>**JURY DEMAND** |

## COMPLAINT AND JURY DEMAND

Whirlpool Corporation and Whirlpool Properties, Inc. (hereinafter collectively referred to as "Whirlpool" or "Plaintiff") file this Complaint against Shenzhen Sanlida Electrical Technology Co., Ltd. ("Sanlida") and Shenzhen Avoga Technology Co. Ltd. ("Avoga") (collectively, "Defendants") and in support thereof, allege as follows:

## INTRODUCTION

1.      The American system of free enterprise encourages and rewards creativity, innovation, investment and hard work. That system relies on fair competition, the bounds of which are protected by law and the Courts.

2.      Defendants violated these basic tenets of fair competition by trading on the goodwill that Whirlpool enjoys among the consuming public for its best-selling KITCHENAID® brand stand mixers. That goodwill exists as a result of Whirlpool's innovation, investment, marketing and hard work over many years.

3.      Whirlpool is a leading global developer of home appliances and accessories under the KITCHENAID brand. Whirlpool Properties, Inc., a wholly-owned subsidiary of Whirlpool Corp., licenses the KITCHENAID trademark to Whirlpool Corp. for kitchen appliances, and to other third parties for kitchen accessories, cookware, culinary tools, and textiles, among other products.   Whirlpool is a creative and innovative company. It has developed premium appliance products that it markets under creative and distinctive trademarks, including trademarks related to its stand mixers.

4.      Whirlpool has made significant investments in the design and development of its premium appliances and innovative, distinctive marks to distinguish its products from those of its competitors.

1

5.      Whirlpool and its predecessors-in-interest have used the well-known KITCHENAID trademark in connection with home appliances and accessories, including household stand mixers, in the United States since 1919.

6.      What has become the iconic shape of KITCHENAID stand mixers evolved from the first model in 1919 to the current model first introduced as the "Model K" in 1937, a distinctive, innovative design created to appeal to a broader scope of consumers and distinguish it from other mixers on the market ("the KITCHENAID Stand Mixer design"). Shown below, the KITCHENAID Stand Mixer design is most widely known and recognized today for its sleek design, rounded edges, signature bullet-shaped head, protruding attachment hub, sloped neck and rounded base:



7.      Rather than create their own distinct stand mixer designs, Defendants recently introduced stand mixer designs nearly identical to the iconic KITCHENAID Stand Mixer design and have been selling them throughout the United States, including the State of Texas.

8.     Defendant Sanlida introduced the stand mixers shown below, which it has been selling on popular online marketplaces such as Amazon and Wayfair, in direct competition with the KITCHENAID Stand Mixer design.





9.     Defendant Avoga introduced the stand mixer shown below, which it has been selling on popular online marketplaces such as Amazon and Wayfair, in direct competition with the KITCHENAID Stand Mixer design.



10.     In an effort to capitalize on Whirlpool's continued success in the marketplace, Defendants offer products that mimic Whirlpool's distinctive KITCHENAID Stand Mixer design and utilize its widely known and recognized shape, including its sleek design, rounded edges, signature bullet-shaped head, protruding attachment hub, sloped neck and rounded base.

11.     Rather than develop their own unique aesthetic from all the design possibilities available, Defendants chose and intended to imitate Whirlpool's iconic and distinctive KITCHENAID Stand Mixer design.  Defendants' copying is an intentional and unfair attempt to trade on the goodwill of Whirlpool and confuse consumers.

12.     Whirlpool and consumers are being harmed, and will continue to be harmed, by the confusing similarity between the Defendants' recently introduced stand mixer designs and the distinctive KITCHENAID Stand Mixer design used by Whirlpool for over 80 years.

13.     Whirlpool prays that the Court enjoin Defendants from continuing its trademark and trade dress infringement, trademark dilution, and acts of unfair competition as set forth herein.

## THE PARTIES

14.     Plaintiff Whirlpool Properties, Inc. is a Michigan corporation having its principal place of business at 500 Renaissance Drive, Suite 101, Saint Joseph, Michigan 49085. Whirlpool Properties, Inc. owns the U.S. trademark registrations at issue in this action.

15.     Plaintiff Whirlpool Corp. is a Delaware corporation, having its principal office and place of business at 2000 N M-63, Benton Harbor, Michigan 49022.   Whirlpool Corporation is a licensee of the registered trademarks and trade dress that are at issue in this action and which are owned by Whirlpool Properties, Inc.   Whirlpool Properties, Inc. and Whirlpool Corp. shall be collectively referred to as "Whirlpool" or "Plaintiff" herein.

16.     On information and belief, Defendant Shenzhen Sanlida Electrical Technology Co., Ltd. ("Sanlida") is a Chinese corporation.  According to information provided to Amazon, Sanlida has a registered principal place of business at Room 101, Building A, No. 27, Jiangjunmao Residence Community, Long Gang Street, Long Gang District, Shenzhen City, Guangdong Province, China.

17.     On information and belief, Defendant Shenzhen Avoga Technology Co. Ltd. ("Avoga") is a Chinese corporation.  According to information provided to Amazon, Avoga has a registered principal place of business at 17B-11, Building No. 3, Block 2, Da Chong Business Center (Area 1), No. 9676 Shen Nan Road, Nanshan District, Shenzhen City, Guangdong Province, China.

18.     Sanlida's and Avoga's infringing stand mixers are available for sale throughout the United States, including in the Eastern District of Texas.

19.     Whirlpool products bearing the KITCHENAID Stand Mixer design are also available for sale throughout the United States, including in the Eastern District of Texas and

the same channels through which Defendants offer their stand mixers.

## NATURE AND BASIS OF ACTION

20.    This is an action for trademark and trade dress infringement, dilution, and unfair competition in violation of Sections 32(1), 43(a) and 43(c) of the federal Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a) and (c), and under the laws of the State of Texas.  Whirlpool seeks, among other things, temporary, preliminary, and permanent injunctive relief, actual damages, an accounting of Defendants' profits, enhanced damages, and recovery of Whirlpool's reasonable costs and attorneys' fees.

## JURISDICTION

21.    Plaintiff asserts the following federal claims: Count I, Federal Trademark Infringement (15 U.S.C. § 1114(1)); Count II, Trade Dress Infringement (15 U.S.C. § 1125(a)); and Count III, Federal Unfair Competition (15 U.S.C. § 1125(a)), Count IV, Federal Dilution, (15 U.S.C. § 1125(c)), and Counts V-VIII, related Texas State law claims.

22.    This Court has jurisdiction over the subject matter of this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337 and 1338, and has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Whirlpool's claims under Texas law.

23.    This Court has personal jurisdiction over Defendants based on their sale of goods that infringe on Whirlpool's trademarks and trade dress in the Eastern District of Texas, causing injury to Whirlpool in this state and district.

24.    If either Defendant – both foreign entities – contends it cannot be sued in the forum state and fails to identify facts supporting jurisdiction in any other state where suit is possible, this Court also has jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2) because: (i)

Whirlpool's claims arise, in part, under federal law; (ii) Defendants each have sufficient contacts with the United States because Defendants import their products into the United States and offer them for sale to United States consumers; and (iii) exercising jurisdiction over Defendants is consistent with due process.

25.     Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b) and (c).  Moreover, Defendants are Chinese corporations with no offices within the United States and, therefore, may be sued in any federal court, including this judicial district.

## FACTUAL BACKGROUND

### Whirlpool and Its Business

26.     Whirlpool sells products bearing the KITCHENAID Stand Mixer design to consumers through an online retail store at www.kitchenaid.com as well as Amazon.com, Wayfair.com, and other online retailers. Products bearing the KITCHENAID Stand Mixer design are also sold in brick-and-mortar stores through distributors and major third-party retailers, including Williams-Sonoma, Bed Bath and Beyond, Home Depot, Walmart, Target, Crate and Barrel, and Best Buy.

27.     Whirlpool widely and prominently advertises products bearing the KITCHENAID Stand Mixer design in the marketplace, including television, print media, retail displays, online (e.g. www.kitchenaid.com, Amazon.com, and the websites of major retailers and distributors), and social media (e.g. Facebook, Twitter, and Instagram).

28.     Currently, Whirlpool's KitchenAid brand social media accounts, which frequently promote the KITCHENAID Stand Mixer design, have over 800,000 followers on Facebook (https://www.facebook.com/KITCHENAID/), over 400,000 followers on Instagram (https://www.instagram.com/kitchenaidusa/), and over 89,000 followers on Twitter

(https://twitter.com/KITCHENAIDUSA).

29.     Whirlpool has sold millions of units bearing the KITCHENAID Stand Mixer design, generating billions of dollars in revenues.

30.     Whirlpool has expended hundreds of millions of dollars in advertising its KITCHENAID brand, the majority of which prominently featured and displayed the KITCHENAID Stand Mixer design.

31.     The Whirlpool KITCHENAID Stand Mixer design appears prominently in numerous top-rated shows such as Magnolia Network's Magnolia Table with Joanna Gaines, NetFlix's Nailed It!, Bravo's Top Chef, and the Kelly Clarkson Show.   The Whirlpool KITCHENAID Stand Mixer design appears in publications and social media from celebrity chefs and leading cooking influencers, such as the Barefoot Contessa, Ina Garten.

32.     For decades, the KITCHENAID Stand Mixer design has received unsolicited, third-party media attention that references the iconic shape and design, as well as numerous industry awards and recognitions, including from publications such as the Smithsonian.

**Whirlpool's Asserted Rights**

33.     In order to protect the extensive goodwill Whirlpool enjoys in the KITCHENAID Stand Mixer design, Whirlpool applied to register it with the U.S. Patent and Trademark Office ("USPTO").  After Whirlpool submitted substantial evidence to the USPTO showing that the KITCHENAID Stand Mixer design is recognized by consumers and the trade as signifying high quality goods originating exclusively from Whirlpool, it was approved for registration. Accordingly, U.S. Trademark Registration No. 1,711,158 ("the '158 Registration") was issued for the KITCHENAID Stand Mixer design mark for use in connection with "electric beating and mixing machines and attachments for such machines, in International Class 7."  This registration

issued September 1, 1992 and remains in full force and effect (Ex. A) (hereinafter referred to as the "3D Trademark").



34.     Pursuant to 15 U.S.C. §§ 1065 and 1115(b), this registration became "incontestable" after five years of continuous use, a status the USPTO acknowledged in 1998. The incontestable status of the '158 Registration constitutes *conclusive* evidence of: (a) the validity of the 3D Trademark; (b) Whirlpool's ownership of the 3D Trademark; and (c) Whirlpool's exclusive right to use the 3D Trademark in commerce.  15 U.S.C. §§ 1057(b) and 1115(b).

35.     Whirlpool additionally owns U.S. Trademark Registration No. 5,510,871 ("the '871 Registration) for the two-dimensional silhouette of its KITCHENAID Stand Mixer design for use in connection with "[m]achines for use in the processing or preparation of food and beverage," in International Class 7.  This registration issued July 10, 2018, and remains in full force and effect (Ex. B) (hereinafter referred to as the "2D Trademark").  The 2D and 3D trademark registrations are collectively referred to as "the Trademarks."



36.     Whirlpool also owns unregistered trade dress rights in its widely known and recognized shape for its KITCHENAID Stand Mixer, including its sleek design, rounded edges, signature bullet-shaped head, protruding attachment hub, sloped neck and rounded base (hereinafter "the Trade Dress").

37.     The Trademarks and Trade Dress for the KITCHENAID Stand Mixer design are inherently distinctive, serving to identify and indicate the source of Whirlpool's stand mixers to the consuming public, and to distinguish its products from those of others.

38.     The Trademarks and Trade Dress are non-functional and serve to identify to consumers that the origin of the product is Whirlpool.

39.     Additionally and alternatively, as a result of Whirlpool's extensive usage and promotion over decades, the Trademarks and Trade Dress have become distinctive to designate Whirlpool's stand mixers, to distinguish Whirlpool's products from the products of others, and to distinguish the source or origin of Whirlpool's products.

40.     As a result, the Trademarks and Trade Dress have become well-known and widely recognized by consumers in the State of Texas and throughout the United States to indicate the source of Whirlpool's stand mixers.

41.     The Trademarks and Trade Dress are distinctive and famous under 15 U.S.C. § 1125(c) and Texas Business and Commerce Code § 16.103.

42.     Consumers know and respect the Trademarks and Trade Dress as a symbol of quality, premium stand mixers.

43.     As a result of Whirlpool's extensive, continuous use and promotion of the Trademarks and Trade Dress in interstate commerce, Whirlpool has developed valuable goodwill and strong common law rights.

44.     As a result of Whirlpool's efforts, consumers have come to identify and recognize the Trademarks and Trade Dress as an indicator of the source of Whirlpool's stand mixer products.

**Defendant Sanlida's Activities**

45.     Defendant Sanlida is in the business of manufacturing and distributing kitchen and other appliances, including stand mixers.

46.     The illustration below shows an exemplary image of one of Sanlida's stand mixer designs (the "Sanlida Infringing Mixer").  As noted above, Defendant Sanlida sells this mixer design under the CookLee name as well as Sanlida.



47.     Defendant Sanlida's Infringing Mixer is sold in the same or similar channels of trade as the KITCHENAID Stand Mixer design. Sanlida's Infringing Mixer is advertised and sold throughout the United States on the Internet and distributed throughout the United States, including throughout Texas.

48.     The Sanlida Infringing Mixer do not have the same premium quality as the KITCHENAID Stand Mixer designs.

49.     Defendant Sanlida could have selected from or developed a virtually infinite number of alternative stand mixer designs instead of the Sanlida Infringing Mixer, which would not be confusingly similar to Whirlpool's Trademarks or Trade Dress.

50.     Defendant intentionally chose a stand mixer design that is confusingly similar to Whirlpool's Trademarks and Trade Dress in an effort to trade on the goodwill of Whirlpool's hugely successful KITCHENAID Stand Mixer design.

51.     Defendant Sanlida's use of the confusingly similar stand mixer design began well after Whirlpool's Trademarks and Trade Dress had acquired great strength and consumer recognition in the marketplace.

52.     Upon information and belief, Defendant Sanlida was aware of Whirlpool's Trademarks and Trade Dress (including the '158 Registration) before it recently began use of the confusingly similar stand mixer design complained of herein.

53.     Defendant Sanlida's commercial use of the Trademarks and Trade Dress is in interstate commerce and is without the permission or authority of Whirlpool.

54.     Defendant Sanlida's Infringing Mixer is a reproduction, counterfeit, copy, or colorable imitation of Whirlpool's Trademarks and Trade Dress and is sold within and distributed throughout the State of Texas.

55.     Defendant Sanlida's unauthorized commercial use of the Infringing Mixer is likely to cause confusion, or mistake, or deceive consumers and potential consumers as to the affiliation, connection, or association of Defendant Sanlida with Whirlpool, or as to origin, sponsorship or approval of Defendant Sanlida's goods, or commercial activities of Whirlpool.

56.     Defendant Sanlida's unauthorized use of its confusingly similar Sanlida Infringing Mixer falsely indicates to the purchasing public that Defendant Sanlida, its business, and its goods or services originate with Whirlpool, or are affiliated, connected, or associated with Whirlpool, or are sponsored, endorsed, or approved by Whirlpool, or are in some manner related to Whirlpool or its goods and services.

57.     Defendant Sanlida's unauthorized use of its confusingly similar Infringing Mixer falsely designates the origin of Defendant's goods, and falsely or misleadingly describes and represents facts with respect to Defendant and its goods.

58.     Defendant Sanlida's unauthorized use of its confusingly similar Infringing Mixer enables Defendant Sanlida to trade on and receive the benefit and goodwill built up at great labor and expense by Whirlpool, and to gain acceptance for Defendant Sanlida's goods based on the reputation and goodwill of Whirlpool, its goods, and its Trademarks and Trade Dress.

59.     Defendant Sanlida's unauthorized use of its confusingly similar Infringing Mixer, a reproduction, counterfeit, copy, or colorable imitation of the KITCHENAID Stand Mixer design and Trade Dress, enables Defendant Sanlida to palm off its goods on the unsuspecting public as those of Whirlpool.

60.     Defendant Sanlida's unauthorized use of its confusingly similar stand mixer design removes from Whirlpool the ability to control the nature and quality of goods and

services associated by consumers with its marks and places the valuable reputation and goodwill of Whirlpool in the hands of Defendant, over whom Whirlpool has no control.

61.    As a result of Defendant Sanlida's unauthorized use of its confusingly similar Sanlida Infringing Mixer, Defendant Sanlida is being unjustly enriched at the expense of Whirlpool and the public.

62.    Defendant Sanlida has damaged Whirlpool's goodwill and reputation and is continuing to damage Whirlpool's goodwill and reputation by its illegal acts. Unless Defendant is restrained by this Court, Defendant will continue to cause irreparable injury to Whirlpool and the public for which there is no adequate remedy at law.

63.    Defendant Sanlida's acts complained of herein have been deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of Whirlpool's rights.

64.    In view of the egregious nature of Defendant Sanlida's actions, this is an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

**Defendant Avoga's Activities**

65.    Defendant Avoga is in the business of manufacturing and distributing kitchen and other appliances, including stand mixers.  Upon information and belief, Defendant Avoga is related to Defendant Sanlida through common ownership in China.

66.    The illustration below shows an exemplary image of one of Avoga's stand mixer designs, which it markets under the name Phisinic (the "Infringing Phisinic Mixer".)



67.     Upon information and belief, the products bearing the Infringing Phisinic Mixer and the Sanlida Infringing Mixer are manufactured at the same facility and/or according to the same or similar specifications.

68.     Defendant Avoga's Infringing Phisinic Mixer is sold in the same or similar channels of trade as KITCHENAID Stand Mixer design. Avoga's Infringing Phisinic Mixer is advertised and sold throughout the United States on the Internet and distributed throughout the United States, including throughout Texas.

69.     The Infringing Phisinic Mixer does not have the same premium quality as the KITCHENAID Stand Mixer designs.

70.     Defendant Avoga could have selected from or developed a virtually infinite number of alternative stand mixer designs, instead of the Avoga Infringing Phisinic Mixer, which would not be confusingly similar to Whirlpool's Trademarks or Trade Dress.

71.     Defendant intentionally chose a stand mixer design that is confusingly similar to Whirlpool's Trademarks and Trade Dress in an effort to trade on the goodwill of Whirlpool's hugely successful KITCHENAID Stand Mixer design.

72.     Defendant Avoga's use of the confusingly similar stand mixer design began well after Whirlpool's Trademarks and Trade Dress had acquired great strength and consumer recognition in the marketplace.

73.     Upon information and belief, Defendant Avoga was aware of Whirlpool's Trademarks and Trade Dress (including the '158 Registration) before it began use of the confusingly similar stand mixer design complained of herein.

74.     Defendant Avoga's commercial use of the Trademarks and Trade Dress is in interstate commerce and is without the permission or authority of Whirlpool.

75.     Defendant Avoga's Infringing Phisinic Mixer is a reproduction, counterfeit, copy, or colorable imitation of Whirlpool's Trademarks and Trade Dress and is sold within and distributed throughout the state of Texas.

76.     Defendant Avoga's unauthorized commercial use of the Infringing Phisinic Mixer is likely to cause confusion, or mistake, or deceive consumers and potential consumers as to the affiliation, connection, or association of Defendant Avoga with Whirlpool, or as to origin, sponsorship or approval of Defendant Avoga's goods, or commercial activities of Whirlpool.

77.     Defendant Avoga's unauthorized use of its confusingly similar Infringing Phisinic Mixer falsely indicates to the purchasing public that Defendant Avoga, its business, and its goods or services originate with Whirlpool, or are affiliated, connected, or associated with Whirlpool, or are sponsored, endorsed, or approved by Whirlpool, or are in some manner related to Whirlpool or its goods and services.

78.     Defendant Avoga's unauthorized use of its confusingly similar Infringing Phisinic Mixer falsely designates the origin of Defendant's goods, and falsely or misleadingly describes and represents facts with respect to Defendant and its goods.

79.     Defendant Avoga's unauthorized use of its confusingly similar Infringing Phisinic Mixer enables Defendant Avoga to trade on and receive the benefit and goodwill built up at great labor and expense by Whirlpool, and to gain acceptance for Defendant Avoga's goods based on the reputation and goodwill of Whirlpool, its goods, and its registered KITCHENAID Stand Mixer design and Trade Dress.

80.     Defendant Avoga's unauthorized use of its confusingly similar Infringing Phisinic Mixer, a reproduction, counterfeit, copy, or colorable imitation of the KITCHENAID Stand Mixer design and Trade Dress. enables Defendant Avoga to palm off its goods on the unsuspecting public as those of Whirlpool.

81.     Defendant Avoga's unauthorized use of its confusingly similar design removes from Whirlpool the ability to control the nature and quality of goods and services associated by consumers with its marks and places the valuable reputation and goodwill of Whirlpool in the hands of Defendant, over whom Whirlpool has no control.

82.     As a result of Defendant Avoga's unauthorized use of its confusingly similar Infringing Phisinic Mixer, Defendant Avoga is being unjustly enriched at the expense of Whirlpool and the public.

83.     Defendant Avoga has damaged Whirlpool's goodwill and reputation and is continuing to damage Whirlpool's goodwill and reputation by its illegal acts. Unless Defendant is restrained by this Court, Defendant will continue to cause irreparable injury to Whirlpool and the public for which there is no adequate remedy at law.

84.     Defendant Avoga's acts complained of herein have been deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of Whirlpool's rights.

85.     In view of the egregious nature of Defendant Avoga's actions, this is an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

86.     The Sanlida Infringing Mixer products and Avoga's Infringing Phisinic Mixer products are collectively referred to herein as the "Accused Products."

### COUNT I: Federal Trademark Infringement

87.     Whirlpool repeats the allegations above as if fully set forth herein.

88.     The acts of Defendants complained of herein constitute trademark infringement, use in commerce of a reproduction, counterfeit, copy, or colorable imitation of Whirlpool's federally registered trademarks (U.S. Registration Nos. 1,711,158 and 5,510,871) on or in connection with the sale, offering for sale, distribution, or advertising of goods or services in violation of 15 U.S.C. § 1114(1).

89.     Whirlpool has been damaged by Defendants' acts in violation of 15 U.S.C. § 1114(1). Whirlpool is entitled to injunctive relief, and Whirlpool is entitled to recover at least Defendants' profits, Whirlpool's actual damages, enhanced damages/profits, costs, and reasonable attorney fees under at least 15 U.S.C. §§ 1116, and 1117.

90.     In view of the nature of Defendants' acts in violation of 15 U.S.C. § 1114(1) complained of herein, and/or Defendants' willfulness and bad faith, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

## COUNT II: Trade Dress Infringement

91.     Whirlpool repeats the allegations above as if fully set forth herein.

92.     The acts of Defendants complained of herein constitute trade dress infringement in violation of 15 U.S.C. § 1125(a). Defendants' use of Whirlpool's Trade Dress and/or reproductions, counterfeits, copies, or colorable imitations thereof is likely to cause confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendants with Whirlpool and as to the origin, sponsorship, and/or approval of the infringing products, at least by creating the false and misleading impression that the infringing products are manufactured by, authorized by, or otherwise associated with Whirlpool.

93.     Whirlpool's Trade Dress is entitled to protection under the Lanham Act. Whirlpool's Trade Dress includes unique, inherently distinctive and non-functional designs. Whirlpool has extensively and continuously promoted and used its Trade Dress in commerce in the United States. Through that extensive and continuous use, Whirlpool's Trade Dress has become a well-known indicator of the origin and quality of Whirlpool's stand mixer products. Whirlpool's Trade Dress has also acquired substantial secondary meaning in the marketplace. Moreover, Whirlpool's Trade Dress acquired this secondary meaning before Defendants commenced their unlawful use of Whirlpool's Trade Dress in connection with the infringing products.

94.     Whirlpool has been damaged by Defendants' unlawful use of Whirlpool's Trade Dress and, unless enjoined, Defendants' unlawful use of Whirlpool's Trade Dress will continue to cause substantial and irreparable injury to Whirlpool for which Whirlpool has no adequate remedy at law. The injury to Whirlpool includes at least substantial and irreparable injury to the

goodwill and reputation for quality associated with Whirlpool, Whirlpool's Trade Dress, and Whirlpool's stand mixer products.

95.     Defendants' use of Whirlpool's Trade Dress has been intentional, willful, and malicious. Defendants' bad faith is evidenced at least by the similarity of the infringing product design to Whirlpool's Trade Dress, as demonstrated above, *see for example* paragraphs 6-9.

96.     Whirlpool is entitled to injunctive relief, and Whirlpool is entitled to recover at least Defendants' profits, Whirlpool's actual damages, enhanced damages/profits, costs, and reasonable attorney fees under at least 15 U.S.C. §§ 1125(a), 1116, and 1117.

97.     In view of the nature of Defendants' acts in violation of 15 U.S.C. § 1125(a) complained of herein, and/or Defendants' willfulness and bad faith, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

### COUNT III: Federal Unfair Competition

98.     Whirlpool repeats the allegations above as if fully set forth herein.

99.     Defendants have used and continue to use Whirlpool's Trade Dress in commerce, or counterfeits, reproductions, copies, or colorable imitations thereof.

100.    The acts of Defendants complained of herein constitute trademark and trade dress infringement, false designations of origin, false or misleading descriptions or representations of fact on or in connection with goods or services, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

101.    Whirlpool has been damaged by Defendants' acts in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) complained of herein.

102.     The nature of Defendants' acts in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) complained of herein and/or Defendants' willfulness and bad faith, make

this an exceptional case under 15 U.S.C. § 1117.

## COUNT IV: Federal Trademark Dilution

103.    Whirlpool repeats the allegations above as if fully set forth herein.

104.    Defendants, directly or through intermediaries, began selling, offering for sale, distributing, or advertising the Accused Products after one or more of the Trademarks became famous and distinctive.

105.    Defendants have used and continue to use Whirlpool's Trade Dress in commerce, or counterfeits, reproductions, copies, or colorable imitations thereof in connection with the advertising, promotion, and sale of Defendants' products.

106.    Defendants unauthorized use in commerce of each Trademark in connection with the Accused Products removes from Whirlpool the ability to control the nature and quality of products provided under each of the Whirlpool Trademarks and places the valuable goodwill and reputation of Whirlpool, Whirlpool's stand mixers, and each of the Whirlpool Trademarks in the hands of Defendants, over whom Whirlpool has no control.

107.    Defendants' unauthorized use in commerce of each Trademark in connection with the Accused Products is likely to cause dilution by blurring or dilution by tarnishment of each of the famous and distinctive Whirlpool Trademarks.

108.    Defendants' acts complained of herein constitute dilution of each of Whirlpool's famous and distinctive Whirlpool Trademarks in violation of 15 U.S.C. § 1125(c).

109.    Defendants' dilution of each of Whirlpool's famous and distinctive Whirlpool Trademarks in violation of 15 U.S.C. § 1125(c) as complained of herein has been, and continues to be, willful, rendering this case exceptional under 15 U.S.C. § 1117(a).

110.    Defendants' acts complained of herein have damaged Whirlpool in an amount to be proven at trial, but no less under 15 U.S.C. § 1117 than up to three times either Defendants'

profits or Whirlpool's actual damages from Defendants' wrongful acts, whichever amount is greater, together with Whirlpool's reasonable attorneys' fees and costs.

111.    Unless Defendants' acts complained of herein are restrained by this Court, those acts will continue and will continue to cause irreparable injury to Whirlpool and to the public for which there is no adequate remedy at law.

## COUNT V: Trademark and Trade Dress Infringement Under the Common Law of Texas

112.    Whirlpool repeats the allegations above as if fully set forth herein.

113.    The acts of Defendants complained of herein constitute trademark and trade dress infringement in violation of the common law of Texas

114.    Whirlpool has been damaged by Defendants' acts of common law trademark and trade dress infringement.

## COUNT VI: Injury to Business Reputation or Trademark or Trade Dress Under Texas Business and Commerce Code

115.    Whirlpool repeats the allegations above as if fully set forth herein.

116.    The acts of Defendants complained of herein are likely to cause injury to Whirlpool's business reputation and to dilute the distinctive quality of Whirlpool's Trademarks and Trade Dress, in violation of Texas Statute, Tex. Bus. & Com. Code § 16.29, regardless of whether there is competition between the parties or confusion as to the source of the goods or services.

117.    The acts of Defendants complained of herein are likely to cause injury to Whirlpool's business reputation and to dilute the distinctive quality of Whirlpool's Trademarks and Trade Dress, in violation of Texas Anti-Dilution Statute, Tex. Bus. & Com. Code § 16.103.

118.    Defendants' acts have caused injury to Whirlpool's business reputation and

dilution of the Whirlpool Trademarks and Trade Dress in violation of the Texas Injury to Business Reputation and the Texas Anti-Dilution statute.

<u>**COUNT VII: Texas Common Law Unfair Competition**</u>

119.    Whirlpool repeats the allegations above as if fully set forth herein.

120.    The acts of Defendants complained of herein constitute trademark and trade dress infringement, false designations of origin, false advertising, dilution and other unfair competition in violation of Texas common law.

121.    Whirlpool has been and continues to be damaged by Defendants' conduct in an amount to be determined at trial.

122.    Upon information and belief, Defendants' conduct is willful, deliberate, intentional and in bad faith.

123.    By reason of the foregoing acts, Defendants have caused, and unless enjoined will continue to cause, irreparable harm to Whirlpool.  Whirlpool has no adequate remedy at law to address these injuries.

<u>**COUNT VIII: Unjust Enrichment**</u>

124.    Whirlpool repeats the allegations above as if fully set forth herein.

125.    Defendants have been and continue to be unjustly enriched at the expense of Whirlpool by Defendants' acts complained of herein.

126.    Specifically, Defendants have taken unfair advantage of Whirlpool by trading on and profiting from the goodwill and reputation of each of the Whirlpool Trademarks and Trade Dress, all of which were developed and are owned by Whirlpool and its predecessors, resulting in Defendants wrongfully obtaining a monetary and reputational benefit for its own business and products.

127.    Defendants' acts complained of herein constitute unjust enrichment at Whirlpool's expense in violation of Texas state common law.

128.    Whirlpool has been damaged by Defendants' acts of unjust enrichment.

## JURY DEMAND

Whirlpool demands a jury trial in accordance with Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Whirlpool requests entry of judgment against Defendant as follows:

1.    That Defendants violated 15 U.S.C. §§ 1114, 1125(a), 1125(c), and the Texas Common Law;

2.    A determination that the case is "exceptional," under 15  U.S.C. § 1117(a).

3.    Preliminarily and permanently enjoining and restraining Defendants, their affiliates, subsidiaries, related companies, and all those acting in concert or participation with them from:

    (a)    using (i) the confusingly similar Sanlida Infringing Mixer, (ii) Avoga Infringing Phisinic Mixer, (iii) any other stand mixer design that is similar to (i) or (ii), and (iv) any other stand mixer design that is likely to cause confusion with Whirlpool's Trademarks or Trade Dress;

    (b)    otherwise competing unfairly with Whirlpool in any manner, including, without limitation, unlawfully adopting or using any other stand mixers shaped or designs that are likely to cause confusion with Whirlpool's Trademarks or Trade Dress;

    (c)    committing any acts or making any statements calculated, or the reasonably foreseeable consequence of which would be, to infringe or likely to dilute Whirlpool's registered Trademarks or Trade Dress, or to confuse, mislead, or deceive consumers as to the affiliation,

connection, or association of Defendants with Whirlpool or as to the origin, sponsorship, or approval of Defendants' goods or commercial activities by Whirlpool; and

(d)    conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a), (b), and (c) above;

4.    That Defendants, their affiliates, subsidiaries, related companies, and all those acting in concert or participation with them be ordered to:

(a)    remove from all websites any depiction of references to the Sanlida Infringing Mixer and/or the Avoga Infringing Phisinic Mixer;

(b)    recall and destroy (or deliver to the Court for destruction) all products and packaging consisting of, involving, or related to the infringing stand mixer designs and provide proof to the Court of the same; and

(c)    destroy (or deliver to the Court for destruction) any and all advertising or promotional or other materials pertaining to the infringing stand mixer designs and all product utilizing the infringing stand mixer designs, regardless of the medium on which such advertising, promotional, or other materials are contained and provide proof to the Court of the same;

5.    That Defendants be required to file with this Court and serve upon Whirlpool within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants complied with the injunction;

6.    That Defendants be required to account for, and turn over to Whirlpool, all profits realized as a result of its infringement and other unlawful acts, such award of profits to be enhanced as the Court finds just under the circumstances of this case;

7.      That Whirlpool be awarded its actual and/or statutory damages and Defendants' profits and that said damages/profits be trebled pursuant to 15 U.S.C. § 1117 or other applicable law based on Defendants' counterfeiting.

8.      That Whirlpool be awarded its attorney's fees pursuant to 15 U.S.C. § 1117(a) or other applicable law;

9.      That Whirlpool be awarded its costs of this action, and prejudgment and post-judgment interest;

10.     That Whirlpool be awarded exemplary damages; and

11.     That Whirlpool be granted such other and further relief, at law or in equity, as the Court may deem just and proper.

**DATED** this 31st day of January, 2022.

Respectfully submitted,

*/s/ Melissa R. Smith*
Melissa Richards Smith
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

Marc Lorelli (Michigan Bar No. P63156)
LEAD ATTORNEY
Chanille Carswell (Michigan Bar No. P53754)
**BROOKS KUSHMAN P.C.**
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone: (248) 358-4400
Facsimile: (248) 358-3351
Email: mlorelli@brookskushman.com
        ccarswell@brookskushman.com

*Counsel for Plaintiffs*

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION and WHIRLPOOL PROPERTIES, INC., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 2:22-CV-00027-JRG-RSP |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO., LTD. and SHENZHEN AVOGA TECHNOLOGY CO. LTD., | § § § § | |
| *Defendants*. | § § | |

**REPORT AND RECOMMENDATION**

Pursuant to Rule 65 of the *Federal Rules of Civil Procedure*, Plaintiffs Whirlpool Corp. and Whirlpool Properties, Inc. filed a motion requesting the Court enter a preliminary injunction preventing Defendants Shenzhen Sanlida Electrical Technology Co. Ltd., and Shenzen Avoga Technology Co. Ltd. (collectively "Defendants") from manufacturing, selling, or offering for sale stand mixers that infringe upon Plaintiffs' rights in the KitchenAid Mixer Design protected by U.S. Trademark Registration No. 1,711,158 (hereinafter "Plaintiffs' Trademark."). Dkt. No. 6.

On March 16, 2022, the Court set a preliminary injunction hearing and ordered Whirlpool to notify Defendants of the hearing. Dkt. No. 10. On March 29, 2022, Whirlpool filed their notice of compliance with the Court's Order. On April 19, 2022, the Court held the preliminary injunction hearing. At the hearing, an attorney for Defendants appeared for the first time. The Court permitted Defendants' attorney to electronically file a notice of appearance and proceed with oral argument.

Defendants did not dispute the evidence presented by Whirlpool. Defendants instead presented several arguments to persuade the Court that a preliminary injunction should be denied: (1) a preliminary injunction is invalid without perfected service of process on Defendants, (2) Whirlpool's trademark is invalid, (3) and the relevant facotrs do not point to a likelihood of confusion. The Court is unpersuaded by any of Defendants' arguments.

The KitchenAid Mixer Design is presented below.



Registration No. 1,711,158 appears below next to the mixers sold by the Defendants in the United States.



The term "Infringing Mixers" is used to refer to both the Phisinic and Cooklee mixers pictured above.

The basis and reasons supporting Plaintiffs' motion for injunctive relief, are set forth more fully in Plaintiffs' Brief In Support Of Its Motion For a Preliminary Injunction, in the Complaint on file herein, and by the exhibits thereto. In summary, Plaintiffs have registered incontestable Trademark rights that protect the KitchenAid Mixer Design – a design that pioneered stand mixers for home use over 80 years ago and is still a market leader today. Plaintiffs demonstrate that Defendants' newly introduced Infringing Mixers cause confusion in the marketplace with consumers believing Defendant's mixers are made by or affiliated with Plaintiffs.

Specifically, by this motion, Plaintiffs seek the following relief:

1.      That Defendants, their affiliates, subsidiaries, related companies, all those acting in concert or participation with them, and anyone that received actual notice of this order, be immediately and preliminarily enjoined and restrained from:

(a)      importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting, displaying or otherwise using the Infringing Mixers including any mixer that is similar to the Infringing Mixers;

(b)      importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting, using or displaying any service or product using any simulation, reproduction, counterfeit, copy, or colorable imitation of the Plaintiffs' Trademark;

(c)      otherwise competing unfairly with Plaintiffs in any manner, including, without limitation, unlawfully adopting or using any design or image that imitates, copies, or is otherwise likely to cause confusion with Plaintiff's Trademark;

(d)      committing any acts or making any statements calculated, or the

reasonably foreseeable consequence of which would be, to infringe or likely to dilute Plaintiff's Trademark, or to confuse, mislead, or deceive consumers as to the affiliation, connection, or association of Defendants with Whirlpool or as to the origin, sponsorship, or approval of Defendants' goods or commercial activities by Plaintiffs; and

(e)     conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a), (b), (c) and (d) above.

2.     That, Defendants, their affiliates, subsidiaries, related companies, and all those acting in concert or participation, and anyone that received actual notice of this order, be ordered to:

(a)     remove from all websites any depiction of references to Defendants' Infringing Mixers;

(b)     recall and destroy and provide proof to the Court of recall and destruction (or recall and deliver to the Court for destruction) all Infringing Mixers and any packaging that includes images or other materials pertaining to the Infringing Mixers; and

(c)     destroy and provide proof of destruction to the Court (or deliver to the Court for destruction) any and all advertising or promotional or other materials pertaining to the Infringing Mixers and all products bearing the design of the Infringing Mixers, regardless of the medium on which such advertising, promotional, or other materials are contained.

3.     Within three (3) days of the entry of this Order, Defendants shall provide this Order to each retailer, distributor, and customer of a Infringing Mixer in the United States.

The entry of a preliminary injunction as outlined above against Defendant is necessary to prevent Whirlpool from continuing to be irreparably harmed by Defendants' unauthorized use of Plaintiffs' Trademark.

The Court finds that the above requested order is appropriate and therefore recommends that it be entered herein.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); see *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendations [cv, resposth]" or it may not be considered by the District Judge.

**SIGNED this 19th day of April, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR TH EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRPOOL CORPORATION AND | § | |
| WHIRPOOL PROPERTIES, INC., | § | CASE No: 2:22-CV-00027-JRG-RSP |
| | § | |
| *Plaintiffs*, | § | Honorable Judge: Rodney Gilstrap |
| | § | |
| v. | § | |
| | § | |
| SHENZHEN SANLIDA ELECTRICAL | § | |
| TECHNOLOGY CO., LTD. and HENZHEN | § | |
| AVOGA TECHNOLOGY CO. LTD., | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATIONS**
**GRANTING PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

Without waiving any Rule 12(b) defenses, pursuant to Federal Rules of Civil Procedure 72(b)(2) and Local Rule 72(b), Defendants Shenzen Sanlida Electrical Technology Co., Ltd. and Shenzhen Avoga Technology Co. Ltd., (together "Defendants") hereby files the objections to the Report and Recommendations of United States Magistrate Judge filed on April 19, 2022 (the "Magistrate's Report") (Dkt.18).

## INTRODUCTION

Defendants object to the Magistrate's Report for the following reasons: **1)** service of process by email was insufficient because it does not comport with the Hague Service Convention and was not authorized by this Court. Consequently, the Court lacks personal jurisdiction over Defendant to issue a preliminary injunction. **2)** Plaintiffs' marks are functional and invalid. **3)** there is no likelihood of confusion because an ordinary consumer would not be confused by the shape of the accused products and the marks.  Therefore, Plaintiffs' motion for a preliminary injunction should be denied. At minimum, Defendants should be allowed the opportunity to conduct reasonable preliminary injunction discovery and fully brief their oppositions to Plaintiffs' motion.

## PROCEDURAL BACKGROUND

On January 31, 2022, Plaintiffs Whirpool Corporation and Whirpool Properties, Inc. ("Plaintiffs" or "Whirlpool") filed a Complaint against Defendants for trademark infringement of Trademark No. 1,711,158 ("the '158 Mark") and No. 5,510,871 ("the '871 Mark"), trademark dilution, and unfair competition under the Lanham Act and Taxas Law. (Dkt. 1, ¶20).

On the same day, Plaintiffs filed their motion for a preliminary injunction. (Dkt. 6).

On April 19, 2022, Magistrate Judge Payne held the preliminary injunction hearing and issued the Magistrate's Report, recommending that Plaintiffs' Motion for Preliminary Injunction be granted. Defendants duly file the objections based on the reasons stated below.

1

## <u>ARGUMENTS</u>

### A.  Standard of Review

Federal Rule of Civil Procedure 72(b)(3) provides that "the district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." *See United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).

### B.  Defendants' Specific Objections

1. <u>Objection to the finding that "[t]he Court is unpersuaded by Defendants' argument that a preliminary injunction is invalid without perfected service of process on Defendants."</u> (Magistrate's Report, p. 2, ¶3-5)

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros. v. Michetti Pipe Strining, Inc.,* 526 U.S. 355, 350 (1999) "Without personal service of process in accordance with a statute of the United States or the law of the state in which the suit is filed, the court is without jurisdiction to render a personal judgment against a party." *Royal Lace Paper Works, Inc. v. Pest-Guard Prods.*, 240 F.2d 814, 816 (5th Cir. 1957), *see also Audio Enters., Inc. v. B & W Loudspeakers of Am*., 957 F.2d 406, 410 (7th Cir. 1992) (preliminary injunction vacated due to insufficient service).

It is undisputed that service of process did not occur prior to the preliminary injunction hearing. *See Hearing Tr.*, p.7, at ¶¶7-12, 19-25, p.13, at ¶¶7-21, p.15, at ¶¶3-11. Plaintiffs did not serve foreign Defendants through the Hague Convention as prescribed under Fed. R. Civ. P 4(f)(1) or apply to the Court for service of process by alternative means under Rule 4(f)(3).

Plaintiffs' unauthorized service of process by email on Defendants does not comport with the Federal Rules. *See Decl. of Chelsea Pasquali,* pp. 3-4, at ¶¶7-13. (Dkt. 9-1). Since service of process was not effectuated and Defendant contested the insufficient service, this Court lacks personal jurisdiction to issue a preliminary injunction order against Defendants.

2. <u>Objection to the finding that "[t]he Court is unpersuaded by Defendants' argument that Whirlpool's trademark is invalid."</u> (Magistrate's Report, p. 2, at ¶¶4-5)

While "Plaintiffs have registered incontestable trademark rights," an incontestable trademark is subject to the defenses and defects, including "that the mark is functional." 15 U.S.C. § 1115(b)(8). "The 'functionality doctrine' prevents a producer from using trademark law to inhibit legitimate competition by controlling a useful product feature." *Qualitex Company v. Jacobson Products Company, Inc*., 514 U.S. 159, 162 (1995).

"A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of an article." *Eppendorf Netheler Hinz GmbH v. Ritter GmbH,* 289 F.3d 351, 355 (5th Cir. 2002) (citing *Traffix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 28 (2001)). "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional. The availability of alternative designs is irrelevant." *Id*.

Furthermore, "trademark and trade dress law cannot be used to evade the requirements of <u>utility patents</u>," *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed. Cir. 2002). "<u>*A utility patent is strong evidence that the features therein claimed are functional*</u>." *Traffix*, 523 U.S. at 29.

Here, Plaintiffs' marks, like any stand food mixer, comprise of **a)** a mixer head; and **b)** an L-shaped pedestals including a base portion (which holds the mixing bowl) and an upstanding support arm (which connects the base to the mixer head). The features are functional because the two components are the exact reasons a stand food mixer works.

Multiple utility patents have disclosure the utilitarian advantages of the designs. *See* attached **<u>Exhibit 1</u>** ('155 Patent) and **<u>Exhibit 2</u>** ('505 Patent). Specifically, in the '155 patent, when the stand food mixer was first introduced in 1939, the principal object of the invention was "to provide a small, compact, lightweight, readily portable food handling device…" *See* Ex. 1, ¶¶3-5.

Consequently, the features are functional because of the utilitarian advantage of the design -- "small, compact, lightweight, readily portable."  *See Valu Eng'g, Inc.* 278 F.3d at 1274. (*De jure* functionality means that the product has a particular shape "because it works better in this shape.").

3.  <u>Objection to the finding that "[t]he Court is unpersuaded by Defendants' argument that the relevant factors do not point to a likelihood of confusion."</u>
    (Magistrate's Report, p. 2, at ¶¶4-5)

The preliminary injunction is not warranted because there is no likelihood of confusion to the consumers between Plaintiffs' marks and the accused products. "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). When assessing the likelihood of confusion, we consider a nonexhaustive list of so-called "digits of confusion." *Id*. No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors. *Id*.

Here, not only do the accused products bear their own trademarks "COOKLEE" and "PHISINIC" (Dkt 1, pp.3-4), but they are sold at different price range, over 45% lower than Plaintiffs' Stand Mixer. *See Hearing Tr.*, p 9:25-p 10:7. The accused products also have slightly elevated base and sizable adjusting knobs on the side, which are substantially different from Plaintiffs' marks. While Plaintiffs' products can be seen in all major retail stores, the accused products are distributed exclusively online. Defendants never intend to confuse customers since the accused products are promoted and sold under Defendants' own brands, bearing distinct logos.

Furthermore, Plaintiffs marks are figurative. An average consumer, exercising reasonable case, will not confuse the accused products with Plaintiffs marks only based on their shapes.

Identical issues were decided in *Whirlpool v. Kenwood Ltd.*, ([2009] EWCA Civ 753 (23 July 2009)) by the England and Wales Court of Appeal. Whirlpool brought identical trademark infringement actions against Kenwood, a manufacturer of stand mixer. *See* attached **Exhibit 3**.

The England and Wales Court of Appeal held that there can be no likelihood of confusion, because "average consumers are _not_ in the habit of making assumptions about the origin of products on the basis of their shape or the shape of their packing in the absence of any graphic or word element' in a market such as this, where consumers would be alive to the potential for variations in appearance to be indicative of differences in trade origin. It _requires no real effort_ to appreciate that the Artisan is a KitchenAid product and that the kMix is a Kenwood product. No one who was actually contemplating the possibility of spending more than £300 on the purchase of either product would be under any misapprehension as to their true trade origin." _Id_.

Here, similarly, since the accused products bear Defendants' own brand names, an ordinary consumer would not be confused by the shapes, without considering the graphic or brand names.

4. Defendants should be allowed an opportunity to conduct reasonable preliminary injunction discovery and fully brief their oppositions to Plaintiffs' motion

The purpose of noticing a preliminary injunction motion is to allow Defendants an opportunity to conduct reasonable search and fully brief their oppositions. An entry of preliminary injunction without Defendants' fully briefed oppositions would cause substantial prejudice.

As foreign entities, Defendants had limited access to U.S. legal representation, and only retained counsel one day before the hearing. _See Hearing Tr._, p.4, at ¶¶14-15. Defendants' counsel did not have the opportunity to draft an opposition to Plaintiffs' motion. Therefore, Defendants respectfully request an opportunity to fully brief their oppositions to Plaintiffs' motion.

**Conclusion**

For the reasons set above, a preliminary injunction is unwarranted. At minimum, Defendants should be allowed an opportunity to conduct a preliminary injunction discovery and fully brief their position. Therefore, Defendants respectfully requests the Court sustain the objection to the Magistrate's Report and deny Plaintiffs' application for preliminary injunction.

5

Dated: <u>May 2, 2022</u>                              Respectfully Submitted,

                                              By:     <u>/s/ Tianyu Ju</u>
                                                      Tianyu Ju, Esq.
                                                      Glacier Law LLP
                                                      200 Park Ave, Suite 1703
                                                      New York, NY 10166
                                                      iris.ju@glacier.law
                                                      Tel: +1 (312) 448-7772
                                                      Fax: +1 (312)-801-4587
                                                      ***Attorney for Defendants***

# Exhibit 1

Case 2:22-cv-00027-JRG-RSP   Document 20-1   Filed 05/03/22   Page 2 of 10 PageID #: 848

Dec. 26, 1939.                   D. A. MEEKER ET AL                    2,185,155

                                 FOOD HANDLING APPARATUS

                                  Filed Nov. 2, 1937              3 Sheets—Sheet 1



_Fig. 2_

_Fig. 1_

INVENTORS
David A. Meeker &
BY Russell C. Geiger
Maréchal & Noe
ATTORNEYS

Dec. 26, 1939.          D. A. MEEKER ET AL          2,185,155

FOOD HANDLING APPARATUS

Filed Nov. 2, 1937          3 Sheets—Sheet 2



*Fig. 3*

*Fig. 7*

INVENTORS
*David A. Meeker &*
BY *Russell C. Geiger*
*Marchal & Noe*
ATTORNEYS

Dec. 26, 1939.  D. A. MEEKER ET AL  2,185,155

FOOD HANDLING APPARATUS

Filed Nov. 2, 1937  3 Sheets—Sheet 3



*Fig. 4*

*Fig. 5*

*Fig. 6*

INVENTORS
David A. Meeker &
BY Russell C. Geiger
Marshal & Hoe
( ATTORNEYS

**Patented Dec. 26, 1939**

**2,185,155**

# UNITED STATES PATENT OFFICE

## 2,185,155

### FOOD HANDLING APPARATUS

David A. Meeker and Russell C. Geiger, Troy, Ohio, assignors to The Hobart Manufacturing Company, Troy, Ohio, a corporation of Ohio

Application November 2, 1937, Serial No. 172,396

7 Claims.   (Cl. 259—102)

This invention relates to food handling apparatus.

It is the principal object of the invention to provide a small, compact, lightweight, readily portable food handling device having a wide range of speed and power and adapted for the preparation of various foodstuffs in the domestic kitchen.

It is a further object to provide a device of this character which is easy to operate and in which a mixing bowl is held in operative position on a base by a simple rotating movement and in which the power drive means carrying the rotating beater is mounted for pivotal movement into and out of the bowl.

It is a further object to provide in a food handling device a pivotally mounted drive means which operates a beater with a planetary motion in a bowl, the bowl being fastened in operative position by a simple rotating movement, and in which the beater element in any position thereof may be directly placed in and withdrawn from the bowl upon pivotal movement of the drive means.

It is a further object to provide simple and effective means for fastening the bowl to the supporting base of the device.

It is a still further object to provide a power drive means conveniently enclosed in a casing making for easy assembly and repair and having a decorative and attractive outer appearance.

Other objects and advantages will be apparent from the following description, the accompanying drawings, and the appended claims.

In the drawings—

Fig. 1 is a view partially in section and partly in elevation showing a food handling device constructed in accordance with the present invention.

Fig. 2 is a horizontal sectional view on the line 2—2 of Fig. 1.

Fig. 3 is a view in side elevation showing the assembled device and with a portion thereof broken away to show the latching construction.

Fig. 4 is a plan view looking upwardly into the upper part of the housing of the power drive device which has been removed from the lower part of the casing.

Fig. 5 is a plan view looking down upon the lower part of the casing with the top part removed, a portion of the bowl being broken away to show the base construction.

Fig. 6 is a detail view showing a part of the speed control device, and

Fig. 7 is a schematic view showing the circuit connections for the speed control arrangement.

Referring now to the drawings which disclose a preferred embodiment of the invention, there is shown at 10 a base structure within which are fixed a number of rubber or other resilient pads 11 adapted to firmly support the device slightly above a supporting surface, and to hold it firmly in place during operation. A pedestal 12 formed integrally with the base extends upwardly at 10 one side thereof. At the opposite side a platform 13 is provided for the reception of the mixing bowl. This platform is formed with a plane top surface, with a number of upwardly extending bosses 14 positioned thereon. As shown, six such bosses are provided, being located around the periphery of a circle such that they lie directly beneath the base portion 15 of the bowl flange 16, the inturned portion 15 providing for the seating of the bowl upon the several bosses. Being machined to a uniform height, a level and firm support for the bowl is thus provided.

Located centrally of the platform is a locking screw 20 formed with a tapered upstanding end and having a threaded shoulder portion 21 of enlarged diameter. The shank of the screw extends downwardly through an aperture in the platform 13 and at its lower portion is provided with a cross pin 22 which extends between downwardly projecting flanges 23, formed integrally with the base member. This structure is such that the threaded screw portion 21 cannot drop through the aperture, but may be drawn upwardly a limited distance while rotation thereof is prevented by means of the pin and flange construction.

The bowl proper is shown at 25 and is preferably formed as an integral spun metal unit, entirely free of projections or attaching means on its side wall or top. Thus it is symmetrical when viewed from any angle, and does not require positioning upon the device in any predetermined angular position. The lower flange 16 is welded to the base of the bowl and is formed to receive a central apertured member 26 to which is fastened, by means of screws 27, a threaded socket 28 adapted to receive the threaded portion 21 of the locking screw 20. A raised portion 29 is formed upon the interior of the bowl at the bottom so that even a small quantity of material may be properly treated.

In the operation of placing the bowl upon the base, the bowl is first placed over the screw 20 so that the threaded end is received within member 55

**2**                                                     **2,185,155**

28, the flange 15 in this position resting upon the several bosses 14. In the initial positioning of the bowl, screw 20 occupies its lowermost position, and thus does not lift the bowl materially above the supporting bosses, the bowl occupying a position only slightly raised above its final operative position. The bowl is then given a rotating movement, causing the threads of member 28 to engage the threaded portion of the locking screw, thereby upon continued rotation drawing the locking screw upwardly. After engagement of the threads, and rotation to a sufficient extent to provide proper holding action, the locking screw is pulled up against cross pin 22, and the bowl thereby firmly locked in definite and predetermined position. Being supported around the periphery of the base on the several bosses, and being firmly locked centrally, the bowl is definitely locked in proper and desired operating position. In practice it has been found that a turn of less than half a revolution is adequate to provide for the proper threading and locking engagement of the bowl upon the locking screw. And by reason of the fact that the locking screw occupies its lowermost position at the time the bowl is placed thereon, it is not possible for the bowl to be tilted materially away from the horizontal position, and therefore assurance is provided that the screw threaded part will not be jammed in fastening the bowl in position, and that proper engagement of the threaded parts will consistently take place.

The pedestal 12 provides for pivotally supporting the power drive unit which extends in overhanging relation with respect to the base and the bowl positioned thereon. For this purpose the top of the pedestal is curved in an arcuate manner as shown and is provided with a centrally arranged aperture for the reception of the tongue 30 formed integrally with the lower casing member 31 of the power unit. Tongue 30 receives the pivot pin 32 which extends on either side thereof into the wall of the pedestal 12 for rotation therein. Set screw 33 provides for locking the pin 32 in the tongue so that the pin will be caused to rotate at the spaced supports in the side wall of the pedestal.

A projection 34 is provided adjacent the lower end of the tongue and is adapted to abut the inner wall of the pedestal when the assembly is rotated to lift the beater element 35 from the bowl, this projection serving as a limit means for determining the uppermost position. This position is such that the center of gravity lies to the left of the pivot axis as shown in Fig. 1 so that the device will remain in that position under gravity.

Means are also provided for limiting the lowermost position of the device, to secure accurate location of the beater with respect to the bottom of the bowl. This means comprises a screw 36 threadedly mounted in a portion of the tongue 30 above the pivot axis 32. The end of the screw 36 extends into a recess 37 in the tongue within which is located a spring tension member 38 which serves to yieldably retain the screw in any predetermined position of adjustment. The head of the screw is adapted to abut against the upper portion of the side wall of the pedestal, as shown in Fig. 1, to determine and limit a downward movement of the power device. Adjustment of the screw is effected in the raised position of the device at which time access may be secured to the screw through the aperture in the pedestal which receives tongue 30.

It is important in a device of this character adapted for performing a range of beating and mixing operations that the beater closely approach both the side walls and the bottom of the bowl. This is important not only in the treating of a small quantity of material, but also in the treating of lumpy materials, such as in the creaming of butter, the mashing of potatoes and the like. Where the beater does not closely approach the wall, the materials are improperly and incompletely beaten or treated, and it is not possible to secure complete and uniform treatment of the entire mass of the material. If the operation is merely continued for an extended period of time in order to secure some treatment of all portions of the material, it is usually found that excessive beating of the more readily treated parts has taken place. Accordingly the present device is so constructed and arranged that by means of setting the screw 36, the beater 35 may be caused to closely approach the bottom of the bowl, the beater preferably being shaped to conform to the shape of the bowl, so that there will be substantially no untreated material in the bottom of the bowl, and so that in each cycle of its planetary movement the beater will closely approach the wall of the bowl over its entire extent.

The power unit which provides for the driving of the beater element is formed of two separable casing parts. The lower part 31 as already described is formed integrally with the supporting tongue 30, and the upper part 40 is preferably formed as an integral unit separable from the lower part, but attached thereto by a plurality of attaching means indicated at 41. Both of these castings are preferably formed of lightweight metal as single die cast units, thereby facilitating the construction and assembly of the completed device. An end cap 42 is positioned in place over the end of the device and held in place thereon by means of attaching screw 43 extending into a rib 44.

The motor unit is entirely contained within the upper housing portion 40, thereby providing for the assembly of this device as a unit, and also for the removal of the upper casing part from the remainder of the device, for repair and the like, thereby avoiding the necessity of dismantling the assembled motor unit when access is desired to other parts of the mechanism. The motor stator 46 comprising a series of laminated plates is mounted directly in the casing portion 40 which itself serves as the motor frame. The plates are bolted in position by means of bolts 47 which extend into the casing and through a web 48 mounted therein, and on which is formed the rib 44. A disc 49 of thin metal or the like is positioned over bolts 47 and is formed with a central apertured part to provide for the passage of cooling air into the interior of the motor casing under the action of cooling fan 50. Springs 51 provide for resiliently holding the disc 49 in proper position and avoiding undesired chattering thereof.

The rotor 52 carries the fan 50 at one end, and a commutator 53 at the other, brush holders 54 extending outwardly of the motor and through apertures in the side wall of the casing 40 providing access to the brushes and the commutator for cleaning and repair. One end of the motor shaft 55 is mounted in a ball bearing 56 positioned in an integrally formed web 57 of the casing 40, the other end of the motor shaft being supported by a composition bearing 58 supported from web 48. Suitable packing saturated with

2,185,155 **3**

lubricant is provided for the bearing, the packing being held in place by cover 59 thereby providing a bearing which does not require additional lubrication in operation.

The end cap 42 is provided with a series of openings 60 through which air is drawn by the fan 50, the air passing around the motor parts and being discharged downwardly through an additional series of apertures 61 positioned below the apertures 60. A web 62 formed integrally with upper housing member 40 is provided with a central and two side openings 63 adjacent the end of the motor remote from the air admission and discharge openings, thereby forcing the cooling air stream to pass over the entire body of the motor and other parts subject to the heat developed therein. The air then passes down through the several openings 63 and toward the rear of the casing for discharge through apertures 61. A piece of insulating paper material 64 is held in place between the two portions of the housing and extends between the two series of apertures thereby requiring the air to traverse the cooling path as described above.

Control means are provided for causing the motor to operate under desired conditions of speed and load such that the maximum power output will be developed and under predetermined speed conditions. In the food handling art the normal operations to be performed by a device of this character vary materially with regard to the desired speeds and the necessary loads. In accordance with the present invention a control system is provided which assures the proper operation of the device under all normal conditions of use, and which further provides for developing the maximum output of the motor at the predetermined speed selected. It further provides for maintaining a predetermined speed condition such that changes taking place in the load during a mixing operation or the like do not objectionably affect the speed of operation, and such that the operator may confidently leave the device in operation with the assurance that it will continue to operate at the selected speed. The invention further provides for the adjustment of the device to operate at predetermined speeds so that a recipe book may be arranged with instructions for the setting of the device at predetermined speed positions, with assurance that all devices in use will operate at substantially that desired speed condition, even irrespective of normal fluctuations in the voltage of the power supply, and proper food handling operations will consistently result.

For this purpose a universal series type motor is utilized having a wound rotor and embodying a commutator. A resistor 65 is connected in series with the motor windings, and a pair of contacts 66, 67 are arranged to short circuit said resistor under the control of a speed responsive device, to thereby vary the power input to the motor, and to regulate the speed of operation thereof to predetermined values. Condenser means 68 shunted across the contacts 66, 67 overcomes objectionable arcing at the contacts and is resiliently held between the stator and the casing 40.

The speed responsive means comprises a plurality of pairs of centrifugal elements 70 pivoted to each other, the inner ends of which are attached respectively to an inner disc 71 and an outer disc 72. Disc 72 is fastened to shaft 55 and disc 71 floats thereon. Spring means 73 tends to space the discs from each other, this tendency being overcome by the centrifugal action of the

weighted members 70 which under the operation of the motor tend to move the inner disc 71 against the action of spring 73 axially of the motor shaft. Attached to disc 71 is a cage structure 74 which supports an operating pin 75 located substantially axially of the motor shaft. Pin 75 is thus adapted to move axially in accordance with the speed at which the motor shaft is revolving. It has bearing engagement with a contact block 76 fastened to the tongue 77 of a W-shaped spring member 78 supported by the outer legs from frame 79. The inner leg 77 carries the contact 66, the contact 67 being fixedly carried by the frame 79 in cooperating position therewith. The frame assembly 79 is carried by bolts 80 which extend from the flange 48 of the casing, and are provided with springs 81 which yieldingly press the frame outwardly against the head of the bolts, while permitting angular shifting in the position thereof. The lower end of the frame 20 carries a set screw 82 and a plurality of spring means 83 provide for drawing the lower end of the frame inwardly toward the motor and against stops 84, thereby bringing the tongue 77 closer toward the operating pin 75.

In order to secure variation in the speed of operation of the motor the position of the frame, and the spacing of tongue 77 with respect to pin 75 is varied. This is accomplished by means of a slide bar 85 having an upturned end 86 adapted to engage against the set screw 82. Slide bar 85 is carried in the upper housing portion and lies above the web 62, its inner end being attached to pivoted lever 87. A curved spring member 88 presses against the slide bar and overcomes the tendency thereof to vibrate in use. Lever 87 is pivoted at 89 to the web 62 and extends between the two housing sections to the exterior of the casing through a slot where an operating knob 90 is positioned. The casing part 40 is also provided with a plurality of notches 91 and a projection is formed on the lever 87, providing for yieldably retaining the same in position in the notches from which it can be removed by a downward and forward movement. Suitable indexing means shown at 92 are provided on the exterior of the casing indicating an off position for example, and three operating positions of different speeds. In response to the movement of lever 87, slide bar 85 is caused to engage set screw 82 in the frame 79, and to thereby pivot the frame, increasing the spacing of the central tongue 77 from pin 75.

A motor switch 93 is arranged to interrupt the circuit to the motor and means are provided for actuating the switch from the same lever 87 which actuates the speed control mechanism. For this purpose link 94 is attached to lever 87 and is formed at its end with an upstanding pin 95 adapted to be received in yoke 96 formed on the switch operating lever. A guide plate 97 is fastened to the web 62 of the casing 40 and link 94 carries a guide pin 98 which follows a slot 99 of predetermined configuration formed in the guide plate 97. The configuration of the slot is such that when the lever is moved from the off position as illustrated in Fig. 4, pin 95 engages the yoke 96 to cause movement of the switch lever to closed position; thereafter pin 95 is withdrawn from the yoke 96, and does not reengage the same until the lever is again returned from an off operating position to the off position, whereupon the switch is thrown to the off position. Access to the speed control mechanism without disassembling the entire device is secured by removal of end cap 42.

4                                      2,185,155

The operation of the control will thus be clear from the foregoing. When the speed control switch is moved from the off to one of the operating positions, the initial movement causes the 5 closing of motor switch 93. The motor is then placed in operation, and upon coming up to a predetermined speed condition, the speed responsive members 70 effect the openings of contacts 66, 67, thereby placing the resistance 65 in circuit 10 with the motor. Immediately upon inclusion thereof in the circuit the motor speed tends to drop, and speed responsive device then causes closing of the short circuiting contacts again with the effect that the resistance is again cut 15 out of circuit. This cycle of action takes place rapidly and the operating speed of the motor is held to a narrow operating range. Upon adjustment of the speed control lever for instance from the number 1 position to the number 3 position, 20 slide bar 85 is caused to engage the lower end of the frame moving it away from the motor, and effecting a greater spacing between the contact pin 75 and the contact block 76. As a result, the motor will come up to a higher speed condition 25 before the contact pin again effects the opening of contacts 66, 67. Similar regulation of the operating speed of the motor will thereupon take place at a higher speed range.

It will be noted that the speed of operation 30 thus is not dependent upon fluctuations in the load or in the characteristics of the power supply within normal operating variations, but is regulated at predetermined actual speed conditions which may be selected with certainty at the time 35 of manufacture, so that satisfactory operating characteristics as regards maintenance of speed under varying load conditions, as well as a definite predetermining of speeds, is assured.

Eccentrically of the tongue 30, the pedestal is 40 provided with an aperture 100 through which there extends a locking finger 101. This finger is pivotally mounted at 102 at the lower casing portion 31 and is arranged to be actuated by link 103 attached to a pivoted locking lever 104. 45 This lever as shown in Fig. 5 is pivotally mounted at 105 upon the lower casing portion 31, and is formed with an outwardly extending handle 106, extending outwardly through a slot between the two casing portions, and located upon the side 50 of the device opposite that which carries the speed control member. This lever has a locking and an unlocking position, the parts being shown in Fig. 3 in the locking position in which the power device is prevented from being rotated about the 55 pedestal. In the unlocking position the lever is thrown in the opposite direction, withdrawing the tongue from the aperture, and permitting free pivotal movement of the power unit casing, to effect the lifting of the beater out of the bowl. 60 It will be noted that lever 104 being mounted upon the lower casing section and lever 87 upon the upper, and both levers extending outward through slots formed along the parting line of the two casing sections, each casing assembly is 65 completely self-contained and the device may thus be assembled and disassembled readily. The rearward edge of finger 101 which bears against the edge of the slot in locking position is slightly eccentric with respect to pivot 102. This pro- 70 vides a camming action so that a firm locking connection will be established notwithstanding differences in the position of the power drive with respect to the pedestal as determined by the adjustment of limit screw 36. 75

The inner end of the motor shaft 55 is formed with a worm 110 which is adapted to engage with a worm gear 111. The worm gear, preferably formed of molded material in order to reduce the noise of operation thereof, is mounted in a bracket 112 which is bolted to the lower casing struc- 5 ture 31. The assembly comprises the worm gear 111, a vertical shaft 113 which is driven thereby, and a lower pinion 114, driven from the shaft. It will be understood that upon separation of the two portions of the casing this entire assembly is 10 withdrawn from the recess formed in the upper housing portion, and remains attached to the lower housing portion.

Meshing with pinion 114 is a large diameter gear 115 which is fixed to the drive shaft 116. 15 The shaft 116 is supported in a lower bearing 117 formed in the lower casing portion 31, and its upper end is guided in a bearing 118 formed in the upper housing portion 40, from which bearing the shaft is freely withdrawable in a down- 20 ward direction upon separation of the parts of the casing. The shaft 116 also carries a bevel gear 120 meshing with another bevel gear 121 which provides for driving a non-circular socket 122 extending outwardly from the forward end of 25 the device for the attachment of any desired device such as juice extractor, ice cream freezer, and the like. Set screw 123 provides for the retaining of such attachment in proper driving engagement with the socket 122. 30

Shaft 116 also provides for the driving of a rotating planetary head 125 which is pinned to shaft 116 and in which the planetary shaft 126 is journaled. Upon the upper end of shaft 126 is mounted pinion 127 which engages a stationary 35 ring gear 128 formed integrally with the lower casing structure 31. This structure provides for the rotation of shaft 126 in a planetary manner upon rotation of the drive shaft 116 through the gearing as just described. Annular flange 40 129 fitting over the lower end of the planetary head serves to present a finished decorative appearance and to prevent downward seepage of lubricant and the like. Access to the attaching screws 41 for attaching the upper casing and the 45 lower casing together is afforded by slipping off flange 129, followed by the removal of the pin for holding the planetary head in place, to effect the dropping of the planetary head from shaft 116.

The beater element 35 is attached to the lower 50 end of the planetary shaft 126 by means of a bayonet type attachment, spring means 130 providing for retaining the beater in assembled position. To provide for the close approach of the beater to all parts of the bowl throughout its 55 extent of movement, and to secure free and unobstructed removal thereof from the bowl, the radius of curvature of the edge of the beater is made substantially equal to that of the wall of the bowl, with only sufficient difference to pro- 60 vide the clearance necessary in operation. This provides for the close approach and substantially uniform spacing of the beater with respect to the bowl in all positions of operation. The center of curvature of the bowl is the same as that of 65 the edge of the beater in its forwardmost position in the bowl, such center being located slightly above the pivot axis 32. As a result, when the device is tilted to inoperative position, the beater moves out of the bowl to such extent that re- 70 moval of the bowl is possible without objectionable interference from the beater. If the device stops with the beater in the position shown in dotted lines in Fig. 1, it moves upwardly along the side wall of the bowl with the spacing grad- 75

2,185,155   5

ually increasing as the beater is withdrawn until a final clearance and inoperative position is reached in which the lowermost part of the beater stands above the rim of the bowl, so that the bowl may be quickly and readily moved into and out of its operative position. If the beater stops in the full line position, the lowermost portion of the beater is sufficiently close to the top of the bowl and is so spaced inwardly from the rim that the bowl may likewise be readily removed and replaced; and in any other position of the beater, the conditions are intermediate those described so that no objectionable interference occurs at any position.

In order to provide a finished and attractive appearance for the assembled device, a trim strip 132, preferably of a bright metal appearance, is fastened to the upper casing portion 40. The strip has a width of such dimension as to contribute to the overall attractiveness of the device and may conveniently serve to carry suitable lettering such as the trade-mark or the like, and also the indexing means for cooperation with the speed control lever 90 and the latching lever 106. As shown in Fig. 3 the indicia 92 are formed upon the strip 132 at the proper positions. The strip is provided with a right angularly bent portion at one end which is fastened in place by screw 133 at a recess at the rear of the casing, extends entirely around the casing and its other end similarly formed is fastened by screws 134 at a similar recess on the opposite side of the casing. The strip is so positioned that its lower edge is substantially flush with the bottom of casing portion 40, and thus it abuts lower casing 31 in assembled position, effectively concealing the joint and avoiding unsightly appearance of the assembled housing so that it presents an attractive and overall finished appearance.

In the operation of the device the latching lever 106 is thrown to the unlocking position and the power drive unit is tilted to raise the planetary shaft 126 to convenient position for attaching beater element 35. The bowl is then placed over fastening screw 20 as previously described and locked in position thereon, the beater being raised sufficiently above the level of the bowl in inoperative withdrawn position so that adequate clearance is provided and the beater does not materially impede the rapid and easy positioning of the bowl. The motor may then be started or the beater may first be lowered into the bowl, and locked in place. The beater then operates with its highly effective planetary action throughout the entire contents of the bowl. The rotation of the beater is such that by reaction on the work material in the bowl there is a tendency to tighten the bowl upon the fastening screw 20 so that even if not secured firmly at the time of its positioning on the base, it will in operation be caused to more securely attach itself. At the end of the operation, the power drive unit may be unlatched and tilted to withdrawn position regardless of the location of the beater element, and the bowl then removed by rotation to unscrew the same from the threaded member 20. The threaded member 20 drops by gravity so that when released from the bowl, the bowl is only slightly raised above the plane supporting surface formed by bosses 14, and no objectionable tilting thereof occurs.

While the form of apparatus herein described constitutes a preferred embodiment of the invention, it is to be understood that the invention is not limited to this precise form of appa-

ratus, and that changes may be made therein without departing from the scope of the invention which is defined in the appended claims.

What is claimed is:

1. In a food handling apparatus of the character described the combination of a base, a pedestal at one end of said base, a power drive unit, means for pivotally mounting said power drive unit on said pedestal, said power drive unit comprising a lower casing part and an upper casing part, means detachably fastening said casing parts together with adjacent edges thereof forming a substantially closed joint, and a relatively thin narrow trim strip fastened to one of said casing parts and overlapping the other of said casing parts in assembled position to conceal the joint between said parts and to provide a finished and attractive appearance.

2. In a food handling apparatus of the character described the combination of a base, a pedestal at one end of said base, a power drive unit, means for pivotally mounting said power drive unit on said pedestal, said power drive unit comprising a lower casing part and an upper casing part, motor drive means mounted in one of said casing parts and entirely supported thereby, transmission gearing for said drive means supported in the other of said casing parts, means detachably fastening said casing parts together with adjacent edges thereof forming a substantially closed joint, and a relatively thin narrow trim strip fastened to said upper casing part and extending slightly below the lower edge thereof to overlap and conceal the joint between the two parts of said casing when in assembled position.

3. In a food handling apparatus of the character described, the combination of a base, a pedestal at one end of said base, a power drive unit, means for pivotally mounting said power drive unit on said pedestal, said power drive unit comprising a lower casing part and an upper casing part detachably fastened thereto, means for controlling the speed of operation of said drive unit, a speed control member extending through said casing substantially at the parting line between said two casing parts, means for locking said drive unit in operative position upon said pedestal, and a locking control member also extending through said casing substantially at the parting line between said two casing parts.

4. In a food handling apparatus of the character described, the combination of a base, a pedestal at one end of said base, a power drive unit, means for pivotally mounting said power drive unit on said pedestal, said power drive unit comprising a lower casing part and an upper casing part detachably fastened thereto, means for controlling the speed of operation of said drive unit mounted in said upper casing part and extending through said casing substantially at the parting line between said two casing parts, means for locking said driving unit in operative position upon said pedestal, and a locking control member mounted in said lower casing part and extending through said casing substantially at the parting line between said two casing parts.

5. In a food handling apparatus of the character described, the combination of a base, a pedestal at one end of said base, a power drive unit comprising an elongated lower casing part and an elongated upper casing part, means for pivotally mounting said lower casing part on said pedestal, motor drive means entirely supported by said upper casing part and having the shaft of the motor extending longitudinally of the cas-

Case 2:22-cv-00027-JRG-RSP   Document 20-1   Filed 05/03/22   Page 10 of 10 PageID #:  856

**6**                                **2,185,155**

ing part, transmission gearing for driving a beater element supported in said lower casing part adjacent one end thereof, said transmission gearing extending upwardly into a position in which it is telescopically received within said upper casing part and is directly exposed in assembled relation upon separation of said casing parts, means on said motor shaft adapted to engage said gearing and provide a driving connection therewith in the assembled position of said casing parts, said connecting means providing for the free separation of the drive means and the gearing upon separation of the casing parts, and means for fastening said casing parts together to form a complete housing swingable about the pedestal and with the motor shaft in driving engagement with said gearing.

6. In a food handling apparatus of the character described, the combination of a base, a pedestal at one end of said base, a power drive unit, means for pivotally mounting said power unit on said pedestal, said power drive unit comprising a lower casing part and an upper casing part detachably fastened thereto, motor drive means supported in said upper casing part, means for controlling the speed of operation of said motor drive means mounted in said upper casing part, transmission gearing for driving a beater element supported in said lower casing part, locking means for locking said driving unit in operative position upon said pedestal mounted in said lower casing part, means providing a driving connection between said motor drive means and

said transmission gearing in the assembled position of said casing parts, and means extending through said casing substantially at the parting line between said two casing parts for controlling the operation of said speed control means and said locking means.

7. In a food handling apparatus of the character described, the combination of a base, a pedestal at one end of said base, a lower casing part having a tongue depending therefrom, means in said pedestal for receiving and pivotally mounting said tongue to provide for swinging movement of said casing about said pedestal, a planetary head carried by said lower casing part in overhanging relation with respect to said base, gearing supported in said lower casing part providing for driving said planetary head, an upper casing part, a motor drive means mounted in said upper casing part and supported thereby, said motor drive means including means extending into a position for direct cooperative engagement with said gearing in the assembled position of said casing parts to provide a driving connection between said motor drive means and said gearing, said connecting means providing for the free separation of the drive means and the gearing upon separation of the casing parts, and means for fastening said casing parts together to form a complete housing swingable about said pedestal and with the motor drive means in driving engagement with said gearing.

DAVID A. MEEKER.
RUSSELL C. GEIGER.

# Exhibit 2

US010098505B2

(12) **United States Patent**
Roberts et al.

(10) **Patent No.:**     **US 10,098,505 B2**
(45) **Date of Patent:**          **Oct. 16, 2018**

(54) **DAMPER MECHANISM FOR TILT-HEAD STAND MIXER**

(71) Applicant: **Whirlpool Corporation**, Benton Harbor, MI (US)

(72) Inventors: **Erica L. Roberts**, Stevensville, MI (US); **Mark J. Sherman**, Hudsonville, MI (US); **Daniel A. Altenritter**, Kalamazoo, MI (US); **Steve C. Drees**, Stevensville, MI (US); **Stuart W. Athey**, Arcanum, OH (US); **Everett S. Kettle**, Portage, MI (US); **Arren J. McCormick**, Benton Harbor, MI (US)

(73) Assignee: **Whirlpool Corporation**, Benton Harbor, MI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 617 days.

(21) Appl. No.: **14/706,029**

(22) Filed: **May 7, 2015**

(65) **Prior Publication Data**

US 2016/0324367 A1    Nov. 10, 2016

(51) **Int. Cl.**
| *A47J 43/00* | (2006.01) |
| *A47J 43/07* | (2006.01) |
| *A47J 43/044* | (2006.01) |
| *B01F 7/16* | (2006.01) |
| *F16F 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ......... *A47J 43/0705* (2013.01); *A47J 43/044* (2013.01); *B01F 7/1615* (2013.01); *F16F 9/00* (2013.01); *A47J 2043/04454* (2013.01); *A47J 2043/04481* (2013.01)

(58) **Field of Classification Search**
CPC ........ F16F 9/00; A47J 43/0705; A47J 43/044; A47J 2043/04454; A47J 2043/04481; B01F 7/1615
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 8,336,166 B2 * | 12/2012 | Kim | ...................... E05F 5/006 16/82 |
| 2010/0313701 A1 * | 12/2010 | Lu | ...................... A47J 43/0705 74/527 |
| 2013/0068055 A1 | 3/2013 | Blagotinsek et al. | |
| 2013/0125679 A1 | 5/2013 | Blagotinsek et al. | |

FOREIGN PATENT DOCUMENTS

WO        2008132429        11/2008

* cited by examiner

*Primary Examiner* — Anshu Bhatia
(74) *Attorney, Agent, or Firm* — Price Heneveld LLP

(57) **ABSTRACT**

A damper mechanism for a stand mixer includes a swing body coupled to a pivot pin and operable along an actuation path between first and second positions. A piston damper is configured to provide a damping effect to a downward movement of a mixer head and is coupled to the swing body. The piston damper includes a damper housing and a piston rod, wherein the piston rod is operable between extended and compressed positions relative to the damper housing. The piston damper provides a damping effect along a portion of the actuation path of the swing body as a mixer head moves towards the closed position relative to a pedestal of the stand mixer.

**14 Claims, 7 Drawing Sheets**





FIG. 1



FIG. 2

U.S. Patent        Oct. 16, 2018        Sheet 3 of 7        US 10,098,505 B2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

FIG. 7



FIG. 8



FIG. 9

FIG. 10



FIG. 11

US 10,098,505 B2

# 1

## DAMPER MECHANISM FOR TILT-HEAD STAND MIXER

### FIELD

The present concept relates to a damper mechanism for use with a stand mixer, and more particularly, to a damper mechanism configured to dampen a closing movement of a mixer head in a tilt-head stand mixer.

### BACKGROUND

Stand mixers are known in the art and have been adapted to provide a broad range of food processing functions. A tilt-head stand mixer generally includes an articulating mixer head which pivots between open and closed positions relative to a pedestal. Such mixer heads are known to be a relatively heavy component of a stand mixer as they often include cast metal parts and house several heavy components, such as motors, transmissions, planetary drives, motor controls, locking mechanism, and other such features of the stand mixer. Given the weight of the mixer head, the movement of the mixer head from the open position towards the closed position can be sudden, loud and jarring, particularly, if the mixer head is allowed to free-fall from the open position downwards towards the closed position. Damper mechanisms have been included in stand mixers to help dampen this downward movement, however, a number of these damper mechanisms are complicated and often allow for recoil or rebound of the mixer head when the mixer head is moved to the closed position, and unnecessarily dampen the full range of motion of the mixer head. Thus, a controlled and dampened movement of a portion of the actuation path of the mixer head from the open position to the closed position is desired in a manner that does not produce any rebound or recoil and is consistent in its delivery of a damping effect.

### SUMMARY

One aspect of the present disclosure includes a damper mechanism for a stand mixer, wherein the stand mixer includes a mixer head and a pedestal. The mixer head is pivotally coupled to the pedestal via a pivot pin between open and closed positions relative to the pedestal. The damper mechanism includes a swing body coupled to the pivot pin and operable along an actuation path between first and second positions. A piston damper is configured to provide a damping effect to a downward movement of the mixer head and is coupled to the swing body. The piston damper includes a damper housing and a piston rod, wherein the piston rod is operable between extended and compressed positions relative to the damper housing. The piston damper provides the damping effect along a portion of the actuation path of the swing body as the mixer head moves towards the closed position.

Another aspect of the present disclosure includes a damper mechanism for a stand mixer, wherein the stand mixer includes a mixer head and a pedestal. The mixer head is pivotally coupled to the pedestal between open and closed positions. The damper mechanism comprising includes a swing body operably coupled between the mixer head and the pedestal, wherein the swing body is operable along an actuation path between first and second positions as the mixer head moves between the open position to the closed position, respectively. A piston damper is coupled to the swing body and operable between extended and compressed

# 2

positions. The piston damper is in the extended position when the mixer head is in the open position and the piston damper is in the compressed position when the mixer head is in the closed position. Thus, the piston damper moves from the extended position to the compressed position as the mixer head moves from the open position to the closed position to dampen a portion of a downward movement of the mixer head.

Yet, another aspect of the present disclosure includes a stand mixer having a pedestal which includes a pedestal cavity. A mixer head is pivotally coupled to the pedestal, such that the mixer head moves from an open position to an angled position to a closed position in a downward motion. A damper mechanism is disposed in the pedestal cavity of the pedestal and is further coupled to a portion of the mixer head. The damper mechanism configured to dampen a portion of the downward motion of the mixer head as the mixer head moves to the closed position from the open position.

These and other features, advantages, and objects of the present device will be further understood and appreciated by those skilled in the art by reference to the following specification, claims, and appended drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings:

FIG. 1 is a front perspective view of a stand mixer having a damper mechanism coupled between a mixer head and a pedestal, wherein the mixer head is shown in a closed position;

FIG. 2 is a front perspective view of the stand mixer of FIG. 1 showing the mixer head in an open position;

FIG. 3 is an exploded front perspective view of a lower gearcase, a damper mechanism, and a pedestal;

FIG. 4 is a fragmentary view of a mixer head in an open position and a pedestal shown in phantom to reveal a damper mechanism in a first position disposed therein;

FIG. 5 is a cross-sectional view of the pedestal and damper mechanism of FIG. 4;

FIG. 6 is a cross-sectional view of the damper mechanism of FIG. 5 with the mixer head being moved towards the closed position;

FIG. 7 is a fragmentary view of a mixer head in the closed position with the pedestal shown in phantom to reveal a damper mechanism in a second position;

FIG. 8 is a cross-sectional view of the pedestal and damper mechanism of FIG. 7;

FIG. 9 is a rear perspective view of a piston damper;

FIG. 10 is a front perspective view of a swing body; and

FIG. 11 is a front perspective view of a bumper assembly.

### DETAILED DESCRIPTION

For purposes of description herein, the terms "upper," "lower," "right," "left," "rear," "front," "vertical," "horizontal," and derivatives thereof shall relate to the device as oriented in FIG. 1. However, it is to be understood that the device may assume various alternative orientations except for expressly specified to the contrary. It is also to be understood that the specific devices and processes illustrated in the attached drawings, and described in the following specification are simply exemplary embodiments of the inventive concepts defined in the appended claims. Hence, specific dimensions and other physical characteristics relat-

US 10,098,505 B2

3

ing to the embodiments disclosed herein are not to be considered as limiting, unless the claims expressly state otherwise.

Referring now to FIG. 1, reference numeral 10 generally designates a countertop stand mixer appliance 10 (herein-after "stand mixer"). The stand mixer 10 of FIG. 1 generally includes an articulating mixer head 12 and an L-shaped pedestal 14, wherein the L-shaped pedestal 14 includes a base portion 16 and an upstanding support arm 18. The pedestal 14 is a weighted member, made from a cast metal material, such as die cast zinc, which supports the mixer head 12 in a pivoting manner as further described below. The mixer head 12 includes an upper housing 20 and a lower gearcase 22 which together encase a number of parts of the stand mixer 10, including, but not limited to a motor 24 and associated electronic motor controls 26. A primary drive assembly 28 and a secondary drive coupling hub 30, as wells as any number of gear assemblies and transmission components used to power the primary and secondary drives 28, 30 via the motor 24, are also supported from and pivot with the mixer head 12. The upper housing 20 and lower gearcase 22 are generally comprised of a cast metal material, such as die cast zinc, thereby making the mixer head 12, along with the internal parts thereof, a relatively heavy component of the stand mixer 10. An assembled mixer head, without attach-ments, can weigh approximately 5 to 7 pounds, and this weight is substantially increased as processing tools are coupled to the primary drive assembly 28 or accessories are coupled to and extend outwardly from the secondary drive coupling hub 30.

The base portion 16 of the pedestal 14 defines a landing for supporting a mixing vessel 32, shown in FIGS. 1 and 2 as a mixing bowl, and further includes an engagement feature 34 for locking the mixing vessel 32 in place on the stand mixer 10. The primary drive assembly 28 includes a drive shaft 40 used to process ingredients or contents of the mixing vessel 30 in a mixing procedure using any one of a variety of mixing tools adapted to couple to the drive shaft 40. The secondary drive coupling hub 30 is used for cou-pling and powering an accessory of the stand mixer 10. As noted above, both the primary drive assembly 28 and the secondary drive coupling hub 30 are powered by the motor 24 of the stand mixer 10. As shown in FIG. 1, the stand mixer 10 is a tilt-head stand mixer, such as the KSM154 Stand Mixer available from KitchenAid® of St. Joseph, Mich. Thus, the mixer head 12 is an articulating mixer head configured to pivot between an operational or closed posi-tion A (FIG. 1) and an open position B (FIG. 2) relative to the pedestal 14 at pivot point 50 along a path as indicated by arrow 52. As used throughout this disclosure, the stand mixer 10 or the mixer head 12 may be referred to as being in an open or closed position. In the embodiments shown in this disclosure, the stand mixer 10 is in the open position B, when the mixer head 12 is rotated upward as shown in FIG. 2. The stand mixer 10, in the disclosed embodiments, is in the closed position or operational position A, when the mixer head 12 is rotated downwards towards the mixing bowl 32, as shown in FIG. 1, and ready for a mixing procedure. As noted above, pivot point 50 coincides with a coupling of the pedestal 14 and mixer head 12 using a pivot pin 54. Specifically, the lower gearcase 22 includes a support stem 56 (FIG. 3) which extends downwardly from the lower gearcase 22 into a pedestal cavity 58 defined within the upstanding support arm 18 of the L-shaped pedestal 14. The upstanding support arm 18 includes a front wall 60, a rear wall 62, and opposing sidewalls 64, 66 (FIG. 2) which specifically define the pedestal cavity 58. As shown in FIG.

4

1, sidewall 64 includes a mounting aperture 68 which is configured to receive pivot pin 54 therethrough at pivot point 50. As best shown in FIG. 3, sidewall 66 also includes a mounting aperture 70 which is also configured to receive pivot pin 54 therethrough.

As further shown in FIG. 1, the stand mixer 10 includes a user control 72 which is illustratively embodied in FIG. 1 as a sliding speed control knob 72 mounted to a side of the mixer head 12. The user may choose a desired speed setting with the control knob 72, and the motor controls 26 will generally attempt to operate the motor 24 at the desired speed. It will be appreciated that in other embodiments the user control 72 may be any type of analog or digital user interface operable to input a desired speed setting for the stand mixer 10.

Referring now to FIG. 2, the mixer head 12 is shown in the open position B as pivoted from pivot point 50 relative to the upstanding pedestal 14 along the path as indicated by arrow 52. As shown in FIG. 2, with the mixer head 12 in the open position B, a receptacle portion 32A of the mixing bowl 32 is accessible for a user to introduce ingredients into the mixing bowl 32. Further, the drive shaft 40 of primary drive assembly 28 is also accessible for attaching or remov-ing mixing tools thereto. As further shown in FIG. 2, the mixer head 12 includes a lock mechanism 80 disposed on an opposite side of the mixer head 12 relative to the speed control knob 52, shown in FIG. 1. The lock mechanism 80 is configured to lock the mixer head 12 in the operational position A, as shown in FIG. 1.

As noted above, the mixer head 12 is a relatively heavy component of the stand mixer 10, such that movement from the open position B (FIG. 2) to the closed position A (FIG. 1) can be sudden and jarring if not sufficiently controlled by a user. With reference to FIGS. 1 and 2, a damper mecha-nism 80 is shown disposed in the pedestal cavity 58. The damper mechanism 80 is coupled to the support stem 56 of the lower gearcase 22 and further coupled to the upstanding support arm 18 of pedestal 14 via pivot pin 54. As coupled to the pivot pin 54, the damper mechanism 80 is configured to dampen the downward movement or downward motion of the mixer head 12 from the open position B (FIG. 2) to the closed position A (FIG. 1) along a closure path indicated by arrow 52. The damper mechanism 80 may also be coupled between the mixer head 12 and the pedestal 14 in another manner, so long as the damper mechanism 80 is suitably positioned to dampen a portion of the downward movement of the mixer head 12 relative to the pedestal 14. The damper mechanism 80 is configured so that it does not interfere with the upward opening movement of the mixer head 12 from the closed position A (FIG. 1) to the open position B (FIG. 2) along path 52. Further, the damper mechanism 80 is configured to only impart a damping effect on a select portion of the downward movement of the mixer head 12, so as to limit the footprint of the damper mechanism 80 to the user, as further described below.

Referring now to FIG. 3, the lower gearcase 22 is shown exploded away from the pedestal 14 with the damper mechanism 80 shown exploded away from the pedestal cavity 58 of the pedestal 14. As shown in FIG. 3, the lower gearcase 22 includes an upper surface 23A and a lower surface 23B with the support stem 56 extending downwardly from the lower surface 23B. The support stem 56 includes a mounting aperture 57, through which the pivot pin 54 is received in assembly. In this way, the lower gearcase 22 pivots from the mounting aperture 57 of the support stem 56 via the pivot pin 54 in moving between the open and closed positions described above. As shown in FIG. 3, the damper

5

mechanism **80** includes a swing body **82** having upwardly extending first and second arms **84**, **86** which are spaced-apart to define a gap **88** in which the support stem **56** is received in assembly. The first and second swing arms **84**, **86** are disposed on opposite sides of the swing body **82** and have upper pivot apertures **90**, **92** which are configured to align with mounting aperture **57** of the support stem **56** in assembly. Thus, when the support stem **56** of the lower gearcase **22** is received within the gap **88** formed between the first and second swing arms **84**, **86**, the pivot apertures **90**, **92** align with the mounting aperture **57** of the support stem **56** on opposite sides thereof, such that the pivot pin **54** is received therethrough. As described above, the pivot pin **54** is further received in the mounting apertures **68** (FIG. **1**) and **70** of the upstanding support arm **18** of the pedestal **14**. Thus, as assembled, the damper mechanism **80** is configured to pivot with the lower gearcase **22** as coupled to the support stem **56**. The damper mechanism **80** further includes a piston damper **94** having a head portion **96** and a piston rod **98** which is slideably received in the swing body **82** between extended and compressed positions. In FIG. **3**, the piston damper **94** is shown in the extended position E. The piston damper **94** is configured to abut an inner wall of the upstanding support arm **18** in use to dampen the movement of the lower gearcase **22**, or mixer head **12**, by compressing the piston damper **94**. It is contemplated that the piston damper **94** is a biased member, such that the piston rod **98** and piston head **96** are biased outwardly towards the extended position E by hydraulic means, spring-biased means, or other biasing mechanism. For the purposes of this disclosure, the piston damper **94** will be described as a hydraulic piston damper providing a controlled damping of the lower gearcase **22** (or mixer head **12**) towards the closed position A along the path as indicated by arrow **52**. The swing body **82** further includes a bumper portion **93** disposed on an opposite side of the swing body **82** relative to the piston damper **94**.

Referring now to FIG. **4**, the damper mechanism **80** is shown disposed within the pedestal cavity **58** of the upstanding support arm **18** of the pedestal **14**. The mixer head **12** is shown in the open position B which correlates to the damper mechanism **80** being in a first position **100**. The damper mechanism **80** pivots with the mixer head **12** between the first position **100** and a second position **102** along an actuation path indicated by arrow **104**. When the damper mechanism **80** is in the second position **102** along the actuation path **104**, as shown in FIGS. **7** and **8**, the damper mechanism **80** is considered to have dampened the movement of the mixer head **12** to the closed position A. The actuation path **104**, which indicates the movement of the damper mechanism **80** between the first position **100** and second position **102**, includes identifiers F, D1 and D2 along the length thereof. The identifiers F, D1 and D2 represent a condition of the damper mechanism **80** as the damper mechanism **80** moves along the actuation path **104**. Thus, it is contemplated that with the damper mechanism **80** in the first position **100**, which corresponds to an open position B of the mixer head **12**, the damper mechanism **80** is also at position F on the actuation path **104**. From position F to position D1, the damper mechanism **80** moves freely within the pedestal cavity **58** along a first portion **106** of actuation path **104**. At position D1, it is contemplated that the piston head **96** has abutted an inner wall of the upstanding arm **18** of the pedestal cavity **58**, such that position D1 indicates the initiation of a damping of the movement of the mixer head **12** moving from the open position B towards the closed position A along the path as indicated by arrow **52**. At

6

position D2, the damper mechanism **80** is considered to be in the second position **102** which corresponds to the mixer head **12** being in the closed position A, as shown in FIG. **1**. Thus, it is contemplated that the damper mechanism **80** dampens between positions D1 and D2 along actuation path **104** to define a second portion **108** of the actuation path **104**. Thus, it is contemplated that the mixer head **12** moves freely from the open position B towards the closed position A during the first portion **106** of the movement of the damper mechanism **80** along actuation path **104**, until the damper mechanism **80** gets to position D1 along the actuation path **104**, wherein the damping of the movement of the mixer head **12** begins. It is contemplated that when the damping of the movement of the mixer head **12** occurs at position D1 along the actuation path **104**, the mixer head **12** may be in an angled position D along the path indicated by arrow **52**, wherein the position D is at an angle **12**D from horizontal H. When the mixer head **12** is in the angled position D, wherein damping by the damper mechanism **80** is initiated, it is contemplated that the mixer head **12** will be disposed at an angle **12**D which is preferably in the range of about 10 degrees to about 20 degrees from horizontal H. More preferably, the angle **12**D corresponds to the mixer head **12** being disposed at 12 degrees from horizontal H. In this way, the damper mechanism **80** allows for free movement of the mixer head **12** along the first portion **106** of the actuation path **104** until the mixer head **12** reaches angled position D along its opening and closing path indicated by arrow **52**, wherein damping by the damper mechanism **80** is initiated and sustained from position D1 to D2 along the actuation path **104**, also identified as second portion **108** of the actuation path **104**. Therefore, it is contemplated that the user can move the mixer head **12** towards the closed position A from the open position B, wherein the mixer head **12** will slow its movement beginning at angled position D in a slow and controlled manner provided by the soft-close damping effect of the damper mechanism **80**.

Referring now to FIG. **5**, the mixer head **12** is shown in the open position B and the upstanding support arm **18** of the pedestal **14** is shown in a cross-sectional view with the damper mechanism **80** and the support stem **56** of the lower gearcase **22** also shown in a cross-sectional view. With regards to the support stem **56**, pivot pin **54** is shown received in mounting aperture **57** thereof. The damper mechanism **80** is shown in the first position **100** and the bumper portion **93** of the swing body **82** is shown in an abutting position against an inner surface **60**A of front wall **60** of the upstanding support arm **18**. Thus, when the damper mechanism **80** is in the first position **100**, which corresponds to an open position B of the mixer head **12**, the bumper portion **93** of the damper mechanism **80** will be in contact with the inner surface **60**A of front wall **60** of the upstanding support arm **18** within the pedestal cavity **58**. It is contemplated that the bumper portion **93** can itself be a resilient member, or have a resilient member affixed thereto, such that the contact between the damper mechanism **80** and the inner surface **60**A of front wall **60** at bumper portion **93** is silent or otherwise negligible. As further shown in FIG. **5**, the damper mechanism **80** includes a receiving cavity **83** in which a damper housing **99** is received. The damper housing **99** is contemplated to contain a damping means, such as hydraulic fluid, and receives the piston rod **98** as the piston damper **94** moves from the extended position E to the compressed position C.

Referring now to FIG. **6**, the damper mechanism **80** is shown at position D1 along actuation path **104**, wherein the piston damper **94** has made contact with an inner surface

US 10,098,505 B2

7

62A of rear wall 62 of upstanding support arm 18 of pedestal 14. The initial contact is shown as an abutting contact between the piston head 96 and the inner surface 62A of rear wall 62. It is at this position, D1, where the damper mechanism 80 begins to dampen the downward movement of the mixer head 12 towards the closed position A along the path as indicated by arrow 52. Thus, the mixer head 12 is shown in position D along the path 52 where, as noted above, the damping effect of the damper mechanism 80 is initiated. From this position D, the movement of the mixer head 12 will be damped as the piston rod 98 is received in the damper housing 99 in a controlled manner as the piston damper 94 moves to the compressed position C. As shown in FIG. 6, it is contemplated that the mixer head 12 is disposed at an angle 12D which, as noted above, is within a range of 10-20 degrees from horizontal, and more preferably, 12 degrees.

Referring now to FIGS. 7 and 8, the damper mechanism 80 is shown in the second position 102, such that the damper mechanism is at position D1 along the actuation path 104. Thus, from FIG. 6 to FIGS. 7 and 8, the damper mechanism 80 moved along the second portion 108 of the actuation path 104 to dampen the downward movement of the mixer head 12 towards the closed position A. Thus, in FIGS. 7 and 8, the piston damper 94 is shown in the compressed position C, wherein the piston rod 98 is fully received within the damper housing 99. Thus, it is contemplated that the mixer head 12 was brought from position D (FIG. 6) to position A (FIGS. 7 and 8) in a slow and controlled manner, even with the relatively heavy nature of the mixer head 12.

Referring now to FIG. 9, the piston damper 94 is again shown having the piston rod 98 and piston head 96 in the extended position E to which these parts are biased by biasing means, such as hydraulic fluid, contained within the damper housing 99 in a manner known in the art. The piston damper 94 is configured to compress as the piston head 96 abuts the inner surface 62A of rear wall 62 during the movement of the mixer head 12 and damper mechanism 80, as described above. In this way, the piston rod 98 moves between the extended position E and compressed position C, wherein the piston rod 98 is substantially received within the damper housing 99 in the compressed position C. Movement between the extended position E and the compressed position C is shown along the path indicated by arrow 97 in FIG. 9, such that the piston rod 98 is axially movable within the damper housing 99. It is contemplated that the damping effect of the piston damper 94 can be controlled by tuning the damping means of the damper mechanism 80, such as by using different hydraulic means of varying viscosity. It is also contemplated that the damping means used in conjunction with the present disclosure ensures that the mixer head 12 will move to the fully closed position A without any spring back or rebound effect from the damper mechanism 80, and further that the mixer head 12 will remain in the fully closed position, such that the piston damper 94 does not have enough power to overcome the weight of the mixer head 12 while still being biased toward the extended position E. Thus, the piston rod 98 and piston head 96 will only move to the extended position E, as biased thereto, when a user moves the mixer head 12 towards the open position B.

Referring now to FIGS. 10 and 11, another embodiment of a damper mechanism is shown, wherein a swing body 110 is shown in FIG. 10 and a bumper assembly 112 is shown in FIG. 11. With specific reference to FIG. 10, the swing body 110 includes a lower portion 114 having a generally centrally disposed receiving channel 116 for receiving a damper mechanism, such as damper mechanism 94 as described

8

above with reference to FIG. 9. The swing body 110 further includes an upper portion 118 having first and second retainers 120, 122 which are configured in a spaced-apart relationship to define a gap 124 therebetween. The retainers 120, 122 are configured to receive a pivot pin, such as pivot pin 54 (best shown in FIG. 3). In this way, the swing body 110 can couple to the pedestal and mixer head, such as pedestal 14 and mixer head 12 described above, at pivot point 50, shown in FIG. 1. It is contemplated that a portion of the pedestal stem 56 (FIG. 3) can be received in the gap 124 formed between the first and second retainers 120, 122 which are configured to receive pivot pin 54. With specific reference to FIG. 11, the bumper assembly 112 is contemplated to be received or otherwise coupled to the swing body 110 (FIG. 10) to accommodate for the abutting configuration of the bumper assembly 112 with an inner surface, such as inner surface 60A, of front wall 60 of pedestal 14 when the mixer head 12 is in the open position B. The bumper assembly 112 includes a main body 126 and an outwardly extending bumper 128 having a substantially planar abutment portion 130 disposed on an end thereof.

For purposes of this disclosure, the term "coupled" (in all of its forms, couple, coupling, coupled, etc.) generally means the joining of two components (electrical or mechanical) directly or indirectly to one another. Such joining may be stationary in nature or movable in nature. Such joining may be achieved with the two components (electrical or mechanical) and any additional intermediate members being integrally formed as a single unitary body with one another or with the two components. Such joining may be permanent in nature or may be removable or releasable in nature unless otherwise stated.

It is also important to note that the construction and arrangement of the elements of the device as shown in the exemplary embodiments is illustrative only. Although only a few embodiments of the present innovations have been described in detail in this disclosure, those skilled in the art who review this disclosure will readily appreciate that many modifications are possible (e.g., variations in sizes, dimensions, structures, shapes and proportions of the various elements, values of parameters, mounting arrangements, use of materials, colors, orientations, etc.) without materially departing from the novel teachings and advantages of the subject matter recited. For example, elements shown as integrally formed may be constructed of multiple parts or elements shown as multiple parts may be integrally formed, the operation of the interfaces may be reversed or otherwise varied, the length or width of the structures and/or members or connector or other elements of the system may be varied, the nature or number of adjustment positions provided between the elements may be varied. It should be noted that the elements and/or assemblies of the system may be constructed from any of a wide variety of materials that provide sufficient strength or durability, in any of a wide variety of colors, textures, and combinations. Accordingly, all such modifications are intended to be included within the scope of the present innovations. Other substitutions, modifications, changes, and omissions may be made in the design, operating conditions, and arrangement of the desired and other exemplary embodiments without departing from the spirit of the present innovations.

It will be understood that any described processes or steps within described processes may be combined with other disclosed processes or steps to form structures within the scope of the present device. The exemplary structures and processes disclosed herein are for illustrative purposes and are not to be construed as limiting.

US 10,098,505 B2

9

It is also to be understood that variations and modifications can be made on the aforementioned structures and methods without departing from the concepts of the present device, and further it is to be understood that such concepts are intended to be covered by the following claims unless these claims by their language expressly state otherwise.

What is claimed is:

**1**. A damper mechanism for a stand mixer, the stand mixer having a mixer head and a pedestal, wherein the mixer head is pivotally coupled to the pedestal via a pivot pin between open and closed positions relative to the pedestal, the damper mechanism comprising:

a swing body coupled to the pivot pin and operable along an actuation path between first and second positions, wherein the swing body includes a receiving channel disposed on a first side of the swing body and at least one upwardly extending arm having an aperture disposed at an upper portion of the arm;

a bumper positioned on a second side of the swing body, wherein the second side of the swing body is in an opposed position relative to the first side of the swing body; and

a piston damper having a damper housing and a piston rod, wherein the piston damper is received within the receiving channel of the swing body, and further wherein the piston rod is operable between extended and compressed positions relative to the damper housing and extends outwardly from the first side of the swing body; and further wherein the piston damper provides a damping effect along a portion of the actuation path of the swing body as the mixer head moves towards the closed position.

**2**. The damper mechanism of claim **1**, wherein the actuation path of the swing body includes a first portion and a second portion.

**3**. The damper mechanism of claim **2**, wherein the downward movement of the mixer head is not dampened during the first portion of the actuation path of the swing body.

**4**. The damper mechanism of claim **3**, wherein the downward movement of the mixer head is dampened during the second portion of the actuation path of the swing body.

10

**5**. The damper mechanism of claim **4**, wherein the at least one arm includes first and second arms extending outwardly from the swing body and coupled to the pivot pin.

**6**. The damper mechanism of claim **5**, wherein the first and second arms are spaced-apart from on another and disposed on third and fourth opposed sides of the swing body.

**7**. The damper mechanism of claim **2**, wherein the dampening effect of the piston damper begins when the mixer head is at an angled position and the swing body is in the second portion of the actuation path.

**8**. The damper mechanism of claim **7**, wherein the angled position of the mixer head includes an angle of the mixer head relative to the pedestal in a range from about 10 degrees to about 20 degrees.

**9**. The damper mechanism of claim **8**, wherein the angled position of the mixer head includes an angle of the mixer head relative to the pedestal of about 12 degrees.

**10**. A stand mixer damper mechanism comprising a swing body having front and rear sides and a receiving channel disposed in the swing body and opening at the rear side thereof;

a bumper positioned on the front side of the swing body; and

a piston damper received in the receiving channel of the swing body, the piston damper including a piston rod that is operable between extended and compressed positions, wherein the piston rod is biased towards the extended position by a biasing mechanism.

**11**. The damper mechanism of claim **10**, including:

first and second arms upwardly extending from the swing body.

**12**. The damper mechanism of claim **11**, wherein each of the first and second arms are disposed on opposite side portions of the swing body.

**13**. The damper mechanism of claim **12**, wherein the piston damper is a hydraulic damper, and further wherein the piston rod is axially movable between the extended and compressed positions.

**14**. The damper mechanism of claim **13**, wherein the first and second arms each include apertures disposed at upper portions thereof.

* * * * *

# Exhibit 3



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Whirlpool Corporation & Ors v Kenwood Ltd [2009] EWCA Civ 753 (23 July 2009)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2009/753.html*
Cite as: [2010] ETMR 7, [2009] EWCA Civ 753, [2010] RPC 2

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2009] EWCA Civ 753**

Case No: A3 2008/2419

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMMUNITY TRADE MARK COURT**
**INTELLECTUAL PROPERTY**
**MR GEOFFREY HOBBS Q.C.**
[2008] EWHC 1930 (Ch)

Royal Courts of Justice
Strand, London, WC2A 2LL

23 July 2009

B e f o r e :

**LORD JUSTICE RIX**
**LORD JUSTICE LLOYD**
**and**
**LORD JUSTICE WILSON**

_____

Between:

**(1) WHIRLPOOL CORPORATION**
**(2) WHIRLPOOL PROPERTIES INC**
**(3) KITCHENAID EUROPA INC**

**Claimants**
**Appellants**

**- and –**

**KENWOOD LTD**

**Defendant**
**Respondent**

_____

**(Transcript of the Handed Down Judgment of**
**WordWave International Limited**
**A Merrill Communications Company**
**165 Fleet Street, London EC4A 2DY**
**Tel No: 020 7404 1400, Fax No: 020 7404 1424**
**Official Shorthand Writers to the Court)**

_____

**James Mellor Q.C. and Thomas Moody-Stuart**
**(instructed by Lewis Silkin LLP) for the Appellants**
**Iain Purvis Q.C. Andrew Lykiardopoulos and Iona Berkeley**
**(instructed by Field Fisher Waterhouse LLP) for the Respondent**
**Hearing dates: 1 to 3 April 2009**

_____

**HTML VERSION OF JUDGMENT**
_____

Crown Copyright ©

**Lord Justice Lloyd:**

**Introduction**

1. The Claimants produce and sell kitchen equipment, including a stand mixer called the KitchenAid Artisan. This item has been made and sold in the United States since the 1930's, with very little change in the design. It has been introduced to the European market, including the UK, over the past 15 years or so. The KitchenAid Artisan is sold for £300 or more. In 2007 the Defendant, Kenwood, started selling a rival product of its own, called the kMix, which is also a stand mixer, and also sells for £300 or more. By these proceedings the Claimants seek to prevent sales of the kMix, unless it is adapted so as to be differentiated clearly from the KitchenAid Artisan. They relied at trial on trade mark infringement, on two different bases, and on passing-off. The claim came to trial before Mr Geoffrey Hobbs Q.C., sitting as a Deputy Judge of the High Court, in May 2008. By his judgment handed down on 4 August 2008, [2008] EWHC 1930 (Ch), he dismissed all three claims. The appeal is against the dismissal of one of the trade mark infringement claims.

2. The Claimants, to whom I will refer as Whirlpool (there being no need to distinguish among them), have the benefit of a Community Trade Mark (CTM), number 2, 174, 761, in Class 7: electric beating and mixing machines and attachments for such machines. The registered description of the mark is as follows:

> "The mark consists of a fanciful electric beating and mixing machine configuration upon which the word KitchenAid appears."

3. The graphic representation of the mark shows an outline of the mixer viewed from three different angles, thus:



4. Because the trade mark is registered under the Community system, its incidents are defined by Council Regulation 40/94 of December 20 1993, on the Community trade mark (the CTMR). The rights conferred by a CTM are set out in article 9. The appeal arises under article 9(1)(c), but it is convenient that I set out the whole of article 9.1:

> "1. A Community trade mark shall confer on the proprietor exclusive rights therein. The proprietor shall be entitled to prevent all third parties not having his consent from using in the course of trade:
>
> (a) any sign which is identical with the Community trade mark in relation to goods or services which are identical with those for which the Community trade mark is registered;
>
> (b) any sign where, because of its identity with or similarity to the Community trade mark and the identity or similarity of the goods or services covered by the Community trade mark and the sign, there exists a likelihood of confusion on the part of the public; the likelihood of confusion includes the likelihood of association between the sign and the trade mark;
>
> (c) any sign which is identical with or similar to the Community trade mark in relation to goods or services which are not similar to those for which the Community trade mark is registered, where the latter has a reputation in the Community and where use of that sign without due cause takes unfair advantage of, or is detrimental to, the distinctive character or the repute of the Community trade mark."

5. The sign complained of is the shape of the kMix. Thus, although the goods for which the CTM is registered are the same as to those for which the sign complained of is used, the sign is not identical, so paragraph (a) does not apply. The judge held that there was no likelihood of confusion on the part of the public, and therefore rejected the claim based on paragraph (b). On the face of paragraph (c) it does not apply, because of the identity of the goods for which the CTM is registered with those for which the sign is used, but in *Davidoff & Cie SA v Gofkid Ltd* Case C-292/00 [2003] 1 WLR 1714, the European Court of Justice held that the equivalent provision in the First Council Directive 89/104 on trade marks (article 5(2)) extends not only to the case of dissimilar goods or services but also to cases where the sign in question is used for goods or services identical or similar to those covered by the registered mark. The same applies under the CTMR.

6. Thus, Whirlpool had to prove that the CTM had a reputation in the Community, that the sign used by the Defendant in relation to the kMix was similar to the CTM, and that the Defendant's use of that sign (without due cause) took unfair advantage of, or was detrimental to, the distinctive character or the repute of the CTM.

7. The judge said that, as between the shapes of the two mixers, there was "clearly enough similarity for each to remind people of the other", but not to lead the average consumer to think that one is the other, whether seen together or separately. The judge accepted that the appearance of the kMix was a "sign", but rejected the case based on a likelihood of confusion as to trade origin.

8. In relation to the issue of similarity, sufficient for the purposes of article 9(1)(c), the application of the article to the case of similar goods and services has been held by the ECJ to be legitimate if the degree of similarity between the mark with a reputation and the sign has the effect that the relevant section of the public establishes a link between the sign and the mark: see *Adidas AG v Marca Mode II* Case C-102/07 paragraph 41. The judge held that it was sufficient to establish such a link that the one product called the other to the mind of the average consumer. However, he rejected the claim by Whirlpool that the link would result in the kMix taking unfair advantage of the CTM, and that it would be detrimental to the distinctive character or repute of the CTM.

9. Whirlpool contend that the judge made two errors of law in coming to this last conclusion, and that it can be seen that, but for those errors, he would and must have decided in their favour. Kenwood deny any error of law on the part of the judge in this respect, but submit by a Respondent's Notice that others of his conclusions unfavourable to them were not justified. In resolving the issues so arising, we were assisted by written and oral submissions of conspicuous ability on both sides, for which I am grateful.

**The facts in outline**

10. The KitchenAid Artisan as now sold is substantially similar in its design to a product originally introduced in the US in 1937 and then protected by a US design patent. Whirlpool acquired the KitchenAid business in 1985. The mixer has been called the Artisan since about 2004. It is part of a range of kitchen appliance products. (There may therefore be other items which are known as KitchenAid Artisan, but when I use that phrase in this judgment I refer only to the stand mixer.) There may have been

sales of the KitchenAid Artisan in the UK before 1994, but hard evidence of sales is only available from that date, with sales since then also in France and Germany, and to a lesser extent in Italy, the Netherlands, Austria and Belgium. Promotion of the KitchenAid Artisan has been through in-store, point of sale, online and public relations promotions rather than by paid-for press or television advertising. The judge said in paragraph 29 that he was satisfied:

> "that Whirlpool's promotional efforts resulted in good levels of public awareness among such consumers in the United Kingdom (and, I would accept, in France and Germany)."

11. To take a particular example of such promotions, in a series on Christmas cooking broadcast by BBC Television in December 2006 and again in 2007, the KitchenAid Artisan featured as the mixer of choice of the celebrity chef Nigella Lawson.

12. Examples of the KitchenAid Artisan have been or are to be seen in museums as an example of good design. It has been described as a classic design icon of the 20th century. A liking for the design is seen as a major factor in the appeal of the product to potential consumers. The judge quoted from a report commissioned by Kenwood as to customer perceptions:

> "Kitchen Aid consumers love the design of their machine. They view it as a statement of them and their stylish, discerning lifestyle. A piece of equipment to show off."

13. Kenwood is known as a major manufacturer of kitchen appliances sold in the UK and elsewhere. Until the introduction of the kMix, however, Kenwood did not sell a mixer characterised by a high standard of design and a correspondingly high retail price, as the KitchenAid Artisan is. Kenwood had a large share of the UK market for kitchen appliances, including for mixers, but Whirlpool's sales were proportionately higher in terms of value than as regards units. The judge referred to the respective figures in the UK market for the three years 2004 to 2006 being accepted to be roughly that Kenwood's sales were 70%, 70% and 75% of the market by volume, to Whirlpool's 29%, 25% and 25%, whereas Kenwood's share by value was 68%, 64% and 61% to Whirlpool's 31%, 34% and 38%. Mixers of other brands are available on sale, but none has a significant share of the market, according to the evidence at trial.

14. The judge referred to the process by which the design of the kMix was developed. Whirlpool had alleged that the kMix was intended to compete directly with the KitchenAid Artisan in terms of price and target market, but not that it was actually designed to deceive or mislead people. Nor did Whirlpool make any other relevant allegation as regards Kenwood's intentions in respect of the design of the kMix. He heard evidence as to the design process, which he reviewed at paragraph 7. He commented that "the suggestion is that there was a miscalculation as to what would be an acceptable design to adopt", and he accepted that this could and should be considered. Having done so, he said that he found that:

> "the kMix is indeed what it appears to be. It is the means by which Kenwood intended to move into the premium price sector of the market occupied by the Artisan mixer and make sales to design conscious consumers as best they could by matching the KitchenAid offer. Kenwood

undoubtedly had the KitchenAid Artisan mixer in its sights at all material stages of the process leading up to the finalisation of the design of the kMix."

Having referred to the evidence as to the design process relating to the kMix, he said this:

"there was colour matching, with the red and almond colours used for the kMix being brought up tight against the red and almond of the Artisan. Whilst the KENWOOD branding beneath the dial could easily have been larger, I do not regard it as inappropriately small. In my view there was a calculated decision to proceed with the finalised design of the kMix in the sense only that it was thought to be an acceptable design with which to compete head on with the KitchenAid mixer. It was not, on the evidence before me, chosen for that purpose by reason of any anticipated propensity to deceive or mislead."

15. The kMix was launched in July 2007. Whirlpool issued these proceedings in August 2007. On 13 November 2007, on an application for expedition and case management directions, Lightman J ordered disclosure of details of any process undertaken by the Claimants by way of a survey or a witness-gathering exercise, if witnesses were to be called for the Claimants as a result. Whirlpool's solicitors had already started to undertake such an exercise, approaching potential witnesses in a variety of ways. We were told that there had been difficulty in obtaining a kMix at the start of the proceedings, but by November 2007 a number had been obtained which were used in the process of identifying possible witnesses on behalf of Whirlpool. Although Kenwood is a well-known brand and mark, the kMix itself was not well known at that time.

16. The CTM is not limited by colour. According to the evidence each of the KitchenAid Artisan and the kMix is available in several different colours or finishes. The judge said of the KitchenAid Artisan (at paragraph 5):

"The mixers are available in a variety of rich colours, the most popular in recent years having been red, almond and white. They are also available in an all-metallic finish. On the evidence before me it is clear that the selection of colour (or an all-metallic finish) is made with care by purchasers buying for domestic use. People buy these mixers for their style and presentation as well as for their functional qualities."

17. The kMix is available in a red similar to that used for the KitchenAid Artisan, as well as in other colours including almond and white. However, colour only features on the upper part of the kMix, whereas the whole body of the KitchenAid Artisan is in colour. These images of the KitchenAid Artisan are taken from the judgment:



18. The KitchenAid Artisan has the word KitchenAid in black on a silver band below the protruding nose of the mixer, as is included in the CTM as registered, and it also has the word Artisan in black on each side of the word KitchenAid on that band.

19. This is the kMix, also as illustrated in the judgment:



20. On one side of the upright part of the stand, there is a dial. Below this is the word Kenwood. On each side of the upper part of the mixer there appears the word kMix, not in a contrasting colour but inset from the surface of the mixer.

21. Whirlpool's concerns at the impact on its market made by the kMix were increased by one particular development. The KitchenAid Artisan had been sold in shops dedicated to the sale of Aga range cookers, under specific arrangements between Aga and Whirlpool. These arrangements were overtaken by a new collaboration between Aga and Kenwood, whereby the kMix was sold in Aga shops, in a special version: in place

of Kenwood on the side of the upright part, it has AGA, and on the back it has "Special edition by Kenwood". Whirlpool amended its Particulars of Claim in 2008 to complain of this specifically. The judge held that no separate point arose from this version of the kMix: see paragraph 82. This is not challenged on appeal.

22. The issues of fact before the judge which are relevant on this appeal were, first, whether the shape of the KitchenAid Artisan was sufficiently distinctive to function as an indication of trade origin in relation to the average consumer, secondly, if so, whether the shape of the kMix was sufficiently similar to that of the KitchenAid Artisan for the necessary link to be established between the CTM and the sign consisting of the shape of the kMix, in the mind of the average consumer, and thirdly whether, if so, the sale of the kMix with that shape, and without further differentiation from the KitchenAid Artisan, amounted to either or both of taking unfair advantage of the distinctive character or repute of the CTM, or causing detriment to that distinctive character or repute.

23. The average consumer of the relevant goods is to be taken as being reasonably well-informed and reasonably observant and circumspect. Given the nature of the product, the relevant average consumer is someone willing to spend a significant sum (£300 or more) on buying a kitchen mixer and influenced by the design of the product as well, no doubt, as by its functional qualities. As the judge said at paragraph 69, both mixers are "premium priced products targeted at design conscious consumers".

**The evidence**

24. In order to prove its case on the factual issues, Whirlpool called witnesses of several different kinds. There were 23 witnesses identified through the witness-gathering exercise to which I have referred. Seven of these were cross-examined; the witness statements of the others were read without challenge. The disclosed documents included material emanating from others approached during the exercise who did not make witness statements; the judge referred to some of this. They also called two other witnesses to give evidence of mis-identification, but the judge found these of no assistance, and I need not refer further to them (see paragraphs 56 to 58 of the judgment). Whirlpool called three of their employed demonstrators, who worked at department stores (two at John Lewis stores and one at Fenwicks). They also called an expert witness, Mr Piers Schmidt, but the judge found his evidence to be of no value (paragraphs 65-66). Kenwood called evidence about reports from their own demonstrators, and also called an expert witness, Mrs Trudy Watson, whom the judge found helpful.

25. Whirlpool did not put forward their 23 witnesses from the public as representing the product of any kind of survey such that any extrapolation could be made from the results. As the judge said at paragraph 34:

"No attempt was made to attach statistical significance either to the results of the exercise as a whole or to the evidence of the 23 interviewees who provided witness statements."

They were simply witnesses each of whom was said to be of the relevant type of consumer, whose evidence was put forward for what is was worth on an individual basis. I will refer to them as survey witnesses, in order to distinguish them from other

witnesses, but without any implication that they are, or were put forward as being, in any way representative of opinions other than their own.

26. The judge devoted some time to describing the survey process and the resulting evidence. In all, 660 questionnaires were obtained through the surveys, 26 from an exercise initiated by telephone and the others from questioning members of the public at a BBC Good Food Show in London, and at various other venues in, outside or near places associated with cooking, and also through a request for volunteers at Leith's School of Food and Wine.

27. Of the 634 members of the public approached otherwise than by telephone who provided answers to questions recorded on a questionnaire, only 112 gave contact details. Whirlpool followed these up and 14 of them attended the offices of Whirlpool's solicitors for further questioning. Ten of these gave witness statements which were served in the proceedings. Three of these ten witnesses were cross-examined, and the other seven witness statements were admitted without challenge.

28. Twenty-six people out of those who were approached by telephone by a market research agency attended the solicitors' offices. All of these answered questions recorded on questionnaires. Seventeen proceeded to a further stage of the operation at the offices, and thirteen of them gave witness statements, of whom four were cross-examined; the other witness statements were admitted without challenge.

29. A preliminary stage in the case of each person approached was to show her one of four flashcards with an image of the kMix. The judge included the flashcard images in his judgment (and pointed out salient features of each) at paragraph 38. Whether or not because flashcard 1 shows clearly the trade mark Kenwood and the product name kMix, no-one to whom that card was shown proceeded to the later stage of the exercise, at the solicitors' offices. The judge set out the questionnaire used in connection with flashcards 2 and 3 at paragraph 39, with some apt critical comments about the questions and therefore about the value of the answers.

30. Those who were approached by telephone fell into two categories. Some had recently purchased a KitchenAid Artisan; others were drawn from a list of names known to the agency as potentially interested in purchasing kitchen stand mixers. They were asked questions aimed at limiting the witnesses to those who either were interested in purchasing a mixer for £300 or more, or owned a KitchenAid Artisan mixer already. We were shown the instructions given to those who carried out the telephoning exercise, but it is unnecessary to go into further detail as to this. The 26 people approached who were asked, and agreed, to take the process further attended the solicitors' offices where they were shown the fourth flashcard, and were asked questions according to another questionnaire, set out at paragraph 45 of the judgment. For nine out of the 26 this was the end of the process. Seventeen went through the next part of the exercise, which was the same as for the 14 drawn from the other part of the survey process. This is what was known as the "box exercise", and is described in paragraph 41 of the judgment. In summary, those participating in the exercise were shown, in turn, a debranded red KitchenAid Artisan, that is to say a real KitchenAid Artisan but with the words KitchenAid and Artisan concealed, then two kMix mixers, one in red and the other in white, and last two KitchenAid Artisan mixers, also one in red and the other in white. At each stage they were asked questions about what they were shown. Whirlpool took the position (which Kenwood

did not challenge) that, after the initial questionnaires in each case, the process was covered by litigation privilege, so that no disclosure was given of the process or results of the questioning once potential witnesses had started on the "box exercise". Witness statements were then prepared on the basis of the record made at the time of the comments made in relation to the mixers shown.

31. The judge said a number of things which indicate that he regarded the evidence obtained in this way as of limited value. At paragraph 36 he made the basic point that, unless the research work which is the basis for the survey provides a sufficient basis for extrapolation, "the responses of individual interviewees can really only be taken into account for what they may individually be thought to be worth. That may be little or nothing." Later, at paragraph 68, he said that, in assessing the issues of distinctiveness and similarity in the light of the evidence, he had taken account "of the need for circumspect evaluation of the evidence of the witnesses who passed through the special filter of the 'witness gathering exercise'." He also commented individually on some of the witnesses, and set out in summary the questionnaire responses of all 26 people who had attended Whirlpool's solicitors' offices following a telephone approach.

32. In the course of submissions by each side on the appeal, reference was made to the evidence of a number of the survey witnesses, both those who gave oral evidence and some others. For that reason it is necessary that I should say something about some of them, which I will do later in this judgment.

33. On behalf of Kenwood, a criticism was made of the selection process that it favoured unduly those who already owned a KitchenAid Artisan. Although such a person could reasonably be taken to be design conscious and to have been sufficiently interested to acquire an expensive appliance, it was suggested that she would be pre-disposed by familiarity to find that the shape of the KitchenAid Artisan was distinctive, and to find a novel product similar in shape to that of the KitchenAid Artisan. Moreover such a person is not likely to be interested in acquiring another such mixer, having one already. It was submitted that more relevant consumers would be those who did not own or use a KitchenAid Artisan but who might be interested in acquiring an expensive, well-designed stand mixer. The effect of the shape of the respective products on the economic behaviour of such a consumer is one of the principal issues in dispute.

34. Of the 23 survey witnesses, only seven did not own or use a KitchenAid Artisan. In addition, of the 13 respondents to the telephone survey process for whom we have only questionnaires, not witness statements, nine did not own or use a KitchenAid Artisan.

35. Reference was made to the evidence of these witnesses on two points: first to assess the meaning and significance of a comment by the judge in paragraph 80 of his judgment, and secondly in relation to the challenge in the Respondent's Notice to the judge's finding of a sufficient link. I will deal with these points in due course as necessary.

36. Mr Mellor Q.C. for Whirlpool also relied on the evidence of the Whirlpool demonstrators. Both parties use demonstrators employed by them, but working in department stores, to help sell their products within those stores. At and after the

time of the launch of the kMix, each sought to monitor public reaction, including by asking their respective demonstrators to report relevant comments from the public. Kenwood's demonstrators reported some comments which showed perceptions of similarity, but no instance of confusion: see paragraph 59 of the judgment. Three of Whirlpool's demonstrators gave evidence. Mrs Champion, in a witness statement made in February 2008, from memory rather than contemporary notes, recorded some comments showing a perception of similarity. The judge did not find her evidence a reliable source of information as to what individual customers had said at the time (paragraph 61). Mrs Pollock worked until January 2008 as a Whirlpool demonstrator at the John Lewis store at Bluewater, Kent. She gave evidence in her witness statement that customers had made a number of comments to her, of which she gave examples, which suggested that they were confused as between the KitchenAid and kMix mixers. The judge accepted this evidence, though she said that she had probably reported instances of confusion to her manager, but it turned out that she had not done so (paragraph 62). Mrs Evans, a Whirlpool demonstrator at Fenwicks in Brent Cross, reported on some customer comments as to similarity, but also gave evidence of one specific instance. Fenwicks did not stock the kMix, so that, unlike at John Lewis, there could not be a side-by-side comparison. In March 2008, after she had made her first witness statement, a customer came to the KitchenAid section of Fenwicks and asked about a promotional offer of a free blender. She had come from the nearby John Lewis store, where she had learned of this promotion. It was not a KitchenAid promotion, but one associated with sales of the kMix. The customer was told of this, and went back to John Lewis, where this was confirmed. Then she returned to Fenwicks and bought a KitchenAid Artisan there, telling Mrs Evans that she had been confused about the mixers and thought they were the same. Unfortunately the customer's name was not known, and the instance came to light only very shortly before the trial, too late for the customer to be traced. The judge said, at paragraph 63:

> "It must, I think, be recognised that although the customer's apparent confusion may have been attributable to perceptions and recollections of shape and appearance as indications of trade origin, that is not an inevitable inference from the evidence I have received."

37. In addition Mr Mellor relied on some of the comments of Mrs Watson, Kenwood's expert witness. I can take the main points of this from paragraph 67 of the judgment:

> "In cross-examination she agreed that the shape of the KitchenAid mixer is distinctive. She agreed that the brand name KitchenAid would be 'the handle for everything else', including the shape in terms of which design conscious purchasers would naturally be inclined to think of the mixer. She agreed that there is a distinct competitive advantage in being an iconic brand when selling to consumers moving from initial interest through to purchase in this sector of the market. She thought that consumers 'might fleetingly associate the KitchenAid stand mixer with the Kenwood KMix or vice versa' and also that having a similar 'look appeal' potentially attracts customers who would not have looked at the Kenwood Chef, but expected the initial reaction to be very quickly dispelled when potential customers looked properly at the products and observed the differences in style, specification and branding. In circumstances where the kMix had been

introduced and sold in the same premium market and to the same type of customers as the KitchenAid mixer she thought that there would have been lots of comment by customers talking to in-store demonstrators about the two products comparatively and was surprised that there were not more comments than there appeared to be from the evidence before the Court. Mrs. Watson gave her evidence fairly. She gave the kMix a reasonably good character reference on the basis of her experience as a commercial buyer. I take note of what she said, without regarding it as decisive of the issues I must determine from the perspective of the relevant average consumer."

### The judgment

38. Having introduced the dispute in the case, the CTM and the rival products, and considered evidence as to the design process for the kMix, the judge dealt in some detail with the requirements for registration of a three-dimensional shape as a trade mark, and with the process which led to the registration of the instant CTM. He expressed some reservations as to the process which had led to this registration, but he reminded himself that the mark is presumed to be valid under article 95 of the CTMR, and there was no subsisting challenge to its validity. He said at paragraph 24:

" ... the question whether the rights of the proprietor are infringed by the use of another sign must be answered with reference to the registered trade mark as a whole, taking account of the likely perceptions and recollections of the relevant public at the time when the other sign began to be used."

39. He then referred to evidence of marketing and sales of the KitchenAid Artisan in the UK and elsewhere in Europe, and came to the survey evidence. He made some comments about survey evidence generally, and then referred to the evidence in the present case in detail. He next considered the evidence of two other witnesses for Whirlpool said to have been confused, then the demonstrators and last the expert witnesses.

40. At paragraph 68 he came to the issues of distinctiveness and similarity. He said this:

"My assessment takes account of the evidence and materials that were to be taken as read, as I have previously described. It also takes account of the need for circumspect evaluation of the evidence of the witnesses who passed through the special filter of the 'witness gathering exercise'. I do not accept that the bodywork or finished appearance of the KitchenAid Artisan mixer can to any real extent be regarded as fanciful or capricious. That said, there is in my judgment a degree of specific individuality in the finished appearance of the KitchenAid Artisan mixer which is sufficient, albeit with relatively little scope for deviation from the paradigm form, to render it thereby distinguishable from mixers of a different trade origin in the minds of design conscious consumers. Whirlpool have successfully capitalised on that by making the finished appearance of the Artisan a point of reference for such consumers in the stand mixer market. So much so that the more familiar they are with the mixer, the more likely they are to perceive and remember the finished appearance of it as an indication of trade origin."

41. Later in the same paragraph he held that Whirlpool had proved that the finished appearance of the KitchenAid Artisan functions as an indication of trade origin among design conscious consumers in the UK, even without assistance from the word KitchenAid, and that the same was true of the shape represented by the CTM as registered.

42. Then he considered whether the issue of infringement was to be decided by reference to design conscious consumers, or to all consumers in the market for all types of mixer within Class 7, and held that the narrower class was relevant, rather than the wider (paragraph 69):

> "The ECJ has confirmed that it is the circumstances characterising the allegedly infringing use which must be considered in order to determine the question of liability for infringement. It is necessary to conduct a risk assessment. The tribunal must assess the likelihood of the conduct in question giving rise to consequences of the kind proscribed. The 'average consumer' test standardises the approach to assessment. It does so by requiring the tribunal to judge the matter from the viewpoint of a consumer exercising neither too low nor too high a degree of perspicacity. It does not permit or require the tribunal to exclude any relevant factors from the assessment of risk. The Artisan and the kMix are both premium priced products targeted at design conscious consumers. It follows, in my view, that the question of liability for infringement can properly be determined by taking the presumed expectations of such consumers into account. To hold otherwise would be to apply a test divorced from the actualities of the case."

43. He went on in paragraph 70, in a passage on which some reliance was placed on the appeal, to say this:

> "In my view, the average consumer is meant to be a person of the type whose mindset and behaviour patterns conform to the norm among reasonably well-informed and reasonably observant and circumspect people in the market for the goods or services in question. That appears to me to bring into consideration the real world thought processes of real people. I therefore think that the appropriate scope of protection should in each case be determined with as great a sense of reality as the circumstances of the case will allow. Empirical evidence should therefore not be ignored. That is the basis on which I am proceeding in this case."

44. In paragraph 71 he applied this approach. The paragraph expresses an important part of the judge's reasoning and conclusions:

> "In the context of my findings as to distinctiveness, I consider that the presence of a mark identical or similar to the denomination KitchenAid is not essential for a finding that the rights conferred by the Community trade mark registration have been infringed. And I think there is a likelihood that in the United Kingdom (and other Member States where the Artisan mixer was likewise known and recognised) a mixer replicating the finished appearance of the Artisan would, for that reason, be thought to have a commercial origin linked to that of the KitchenAid product, whether or not

it carried a denomination that was identical or similar to the denomination KitchenAid. However, the kMix is not a replica of the Artisan. It is, as one of the survey respondents observed when shown Flashcard 3, 'KitchenAid-ish' in its appearance. There is clearly enough similarity for each to remind people of the other. On the other hand, there does not appear to me to be sufficient similarity in terms either of their bodywork or their finished appearance to lull the relevant average consumer into thinking one is the other on seeing them together or separately at different times or in different settings. What is the effect of consumers being aware that the product they are looking at is not the product it reminds them of? If (and I emphasise the word if) they are interested in the provenance of the mixer they are looking at, their natural reaction would be to refer to the badges of origin in the form of the word and device marks conventionally used in relation to the products for the purposes of source identification. That reflects the position that 'average consumers are not in the habit of making assumptions about the origin of products on the basis of their shape or the shape of their packing in the absence of any graphic or word element' in a market such as this, where consumers would be alive to the potential for variations in appearance to be indicative of differences in trade origin. It requires no real effort to appreciate that the Artisan is a KitchenAid product and that the kMix is a Kenwood product. No one who was actually contemplating the possibility of spending more than £300 on the purchase of either product would be under any misapprehension as to their true trade origin. KENWOOD is a strong and well-established trade mark for mixers. I can see no likelihood of confusion occurring during the process leading from selection through to purchase of a kMix product."

45. The quotation as to the attitudes of average consumers is of text used in judgments of the ECJ in relation to shapes sought to be registered as trade marks, such as *Develey Holding GmbH v OHIM* Case C-238/06, paragraph 80.

46. Then the judge recited relevant parts of article 9, and part of article 12 of the CTMR as well. He addressed Kenwood's argument that the kMix did not embody any sign to which the infringement claim could apply. He rejected that, on the basis that the bodywork of the kMix at least makes "a non-verbal statement to the effect that the kMix is a mixer". Despite accepting that part of Whirlpool's argument, he rejected the claim based on article 9(1)(b) because he held that there would not even be initial confusion on the part of a relevant average consumer, that is to say a likelihood of confusion unless and until the branding of the kMix as a Kenwood impinged on the consciousness of an interested consumer. He said at paragraph 75:

"However, I do not accept that in the present case there will be any initial confusion in the mind of the relevant average consumer. There will, in my view, be nothing more than an awareness that the product they are looking at is not the one it reminds them of. I am not persuaded otherwise by the evidence of the KitchenAid demonstrators. Their evidence relating to the incidents to which they refer provides no firm basis for concluding that there is similarity between the bodywork of the Artisan and that of the kMix sufficient to give rise to a risk that the relevant public might believe the

mixers come from the same undertaking or, as the case may be, from economically linked undertakings."

47. Thus he held that there was no sufficient likelihood of confusion, at any stage, on the part of a relevant average consumer, and that the article 9(1)(b) claim must therefore fail.

48. Then he turned to article 9(1)(c), and accepted, for reasons given in paragraph 76, that the CTM had a reputation in the Community, that is to say in a substantial part of the Community, the UK being sufficient for that purpose.

49. He went on to refer to the judgment of the ECJ in *Adidas v Marca Mode II*, Case C-102/07, to which I will return, and to the necessary element of a link between the sign and the mark in the mind of the relevant public. In paragraph 78, in a passage much relied on by Mr Mellor in support of the appeal, he said this:

> "When making the required assessment in a case such as the present it is appropriate to bear in mind that the registration of a Community trade mark cannot validly deprive third parties of the right to use signs of the kind specified in Article 7(l)(e). That Article absolutely excludes from protection by registration:

> > (e) signs which consist exclusively of:

> > > (i) the shape which results from the nature of the goods themselves; or

> > > (ii) the shape of goods which is necessary to obtain a technical result; or

> > > (iii) the shape which gives substantial value to the goods;

> It seems to me that the policy considerations underlying the sub-paragraphs of Article 7(1)(e) also have a role to play in the determination of the question whether there is similarity between the bodywork of the Artisan and kMix mixers such that the latter without due cause takes <u>unfair advantage</u> of, or is <u>detrimental</u> to, the <u>distinctive character</u> or the <u>repute</u> of the former."

50. Mr Mellor submits that this reference to article 7(1)(e), not relied on by Kenwood at trial, was heretical on the judge's part, and infected his later conclusion.

51. At paragraph 79 the judge directed himself correctly that distinctiveness and similarity are different concepts, each of which must be considered separately in making the global assessment necessary to decide whether there is a sufficient link. He pointed out that a lesser degree of similarity to a more strongly distinctive mark may be just as objectionable under Community trade mark law as a greater degree of similarity to a less strongly distinctive mark.

52. His conclusion on the article 9(1)(c) claim is set out in paragraph 80. This is a long paragraph with several important discrete parts. I will set the whole out here. For

clarity I have inserted subdivisions identified as (1), (2) and (3), and also letters (a) to (n) in order to facilitate reference to particular sentences within the text:

> "*(1) (a)* As I have said, I consider there is enough similarity between the bodywork of the kMix and that of the Artisan for each to remind people of the other whilst leaving them aware that the one they are looking at is not the one it reminds them of. *(b)* Is that 'similarity between the sign and the mark' resulting in 'the establishment of a link? *(c)* Left to my own devices I would have regarded it simply as a calling to mind, rather than the establishment of a link. *(d)* However, in view of the approach to cross-referential use recently adopted by the ECJ and taking account of the observations of Advocate General Sharpston in her recently delivered Opinion in the *Intel* case, I think the mnemonic effect I have described should be taken to involve 'the establishment of a link'.
>
> *(2)* Is it a link which is liable
>
>> to take unfair advantage of the distinctive character or repute of the trade mark represented by the bodywork of the Artisan mixer?
>>
>> to be detrimental to the distinctive character of repute of the [trade mark] represented by the bodywork of the Artisan mixer?
>
> *(e)* I cannot see that it is. *(f)* The reminder appears to me to leave the distinctive character and repute of the trade mark represented by the bodywork of the Artisan mixer completely untouched. *(g)* It is apt to erode the market share of the KitchenAid product, but without impinging upon any aspect of the property appertaining to the trade mark. *(h)* So it comes within the scope of the principle that:
>
>> "No economic operator can claim a right to property in a market share ... a market share constitutes only a momentary economic position exposed to the risks of changing circumstances." [The quotation is from *Swedish Match v Secretary of State for Health* Case C-210/03, which was not concerned with trade marks.]
>
> *(3) (j)* The trade mark represented by the bodywork of the Artisan is, as I have said, distinctive with relatively little scope for deviation from the paradigm form. *(k)* I do not think that the bodywork of the kMix is relevantly similar to a degree which impinges upon the distinctiveness of the trade mark so as to satisfy the 'specific condition' for liability. *(m)* I think it would be excessive, in the realm of product shapes, to apply the concepts of 'free riding', 'blurring', 'tarnishment' or 'dilution' more generally so as to hold that the bodywork of the kMix was too close to the bodywork of the Artisan for the purposes of Article 9(1)(c). *(n)* I am not persuaded otherwise by the evidence indicating that consumers may or will be drawn into choosing the kMix by reason of its resemblance to the Artisan. *(o)* Resemblance can have that effect without being objectionable from a trade

mark point of view. *(p)* The claim for infringement under Article 9(1)(c) is not made out on the evidence and materials before me."

53. Mr Mellor submitted that paragraph 80 contains a misdirection of law, at (m), in that the judge appears to apply a different standard or test in relation to matters of infringement because the mark is a shape from that which he would apply in the case of another kind of mark, such as a word. He also submitted that the paragraph contains two findings of fact in his favour: one at (g) to the effect that the link between the mark and the sign is likely to erode the Whirlpool's market share, and the other, to similar effect, at (n), as to the evidence of the effect of the similarity of shape and mark on the economic behaviour of relevant consumers. Some attention was also given during argument to the passage at (j), which repeats a phrase used at paragraph 68: "with relatively little scope for deviation from the paradigm form".

54. The judge expressed his conclusions on factual issues but by and large did not make specific findings as to the effect of the evidence which he heard and read. One finding that he did make was as to the absence of any serious risk of confusion between the CTM mark and the kMix shape in the mind of the relevant average consumer, even at an initial stage, in the sense that a consumer might think that the kMix was similar in shape to the KitchenAid Artisan, and therefore think that it was made by the same undertaking as made the KitchenAid Artisan. That is clear from paragraphs 71 and 75. That was the basis of his rejection of the claim under article 9(1)(b).

55. Mr Purvis Q.C., for Kenwood, argued that when the judge was considering the question of similarity, and the link, at paragraph 71, he used the word "people" (in the phrase "enough similarity for each to remind people of the other") in a sense which is not limited to relevant average consumers, and that this was a flaw in his analysis. I do not accept that argument, and not only because it is unlikely, given Mr Hobbs' great experience of trade mark law and practice, that he would have made an elementary mistake of that kind. Paragraph 71 follows directly on from three paragraphs in which the judge considered in terms the argument as to what kind of consumer is relevant for this purpose, and concluded that it is the average design conscious consumer, willing to spend a significant sum on an appliance, partly because of its design qualities. It would be bizarre if he had slipped, for a single sentence, into applying what he had just held to be the wrong test. Moreover, as a matter of language, in paragraph 70 he spoke in terms of the qualities of the hypothetical average consumer, and spoke in that context of "real people", clearly meaning real examples of the class of person which he had just identified. He then went on in paragraph 71 to speak of "people", in the sentence under consideration, and in the next sentence of "the relevant average consumer". In turn, in paragraph 80, at the sentence which I have labelled (a), he referred back to paragraph 71 in terms, and collated both the sentence under consideration and the next following sentence, but using "them" in the latter context. That seems to me to make it plain, if it were not already, that "people" in the first of the sentences from paragraph 71, means the same people as the relevant average consumer mentioned in the next sentence. There are some phrases in the judgment where I do not find it altogether easy to determine the judge's meaning, but this is not one of them.

56. In sentence (g) of paragraph 80(2), the judge said that "it" is apt to erode KitchenAid's market share. Mr Mellor argued, as a matter of strict language, that the word "it" must

refer back to what has last previously been spoken of, namely the reminder, which is the basis of the judge's finding of link. It is partly on that footing that he argued that the judge made a finding of fact that relevant average consumers would buy a kMix, rather than a KitchenAid Artisan, because of being reminded of the KitchenAid Artisan by the appearance of the kMix. If that is what the judge meant by this sentence, it seems to me that it would contrast oddly with the rest of his judgment, at any rate as regards passages where he expressed an opinion as to the effect of the similarity.

57. Mr Mellor sought to fortify this submission by what he said about the sentence which I have marked as (n) in paragraph 80(3). He submitted that this sentence is a finding that consumers will be drawn into choosing to buy the kMix by reason of its resemblance to the KitchenAid Artisan. He also pointed to the judge's comment in the next sentence, (o), as supporting this reading. If sentence (n) were intended as such a finding, it would be a very odd and oblique way to make and express it. It seems to me that the only proper way to read that sentence is that it is not a finding of fact at all. It is a reference to the fact that there was some evidence which could support a contention that the similarity between the two machines might influence a consumer into buying the kMix. The sentence cannot be read as an endorsement of that proposition, for at least three reasons. One is that the judge used the words "may or will", so he clearly did not accept the evidence as showing that any consumer "will" be so influenced. Secondly, the word "indicating" is far from the sort of expression one would naturally use or expect to see used to convey an actual finding of fact as to the effect of the evidence referred to. Thirdly, the opening words of the sentence, "I am not persuaded otherwise by" the evidence, put the whole sentence into a negative context. The judge's use of that phrase suggests to me that he may have had the evidence of the demonstrators in mind, of which he said at paragraph 75 that he was "not persuaded" by it of any likelihood of even initial confusion. The sentence in paragraph 80 at (n) might be expressed in other words, for example as follows: "There was evidence which indicated that consumers might or would be drawn into choosing the kMix by reason of its resemblance to the KitchenAid Artisan. Despite that evidence, in my judgment the bodywork of the kMix is not relevantly similar to that to the KitchenAid Artisan to a degree which impinges on the distinctiveness of the trade mark so as to satisfy the specific condition of liability." In my judgment that is what the judge intended to convey by that sentence, (n); as such, it cannot be read as an acceptance of the evidence or a finding that consumers would be influenced in the way suggested. His sentence (o) is not inconsistent with that reading. It says no more than that, even if there were such an effect, it would not necessarily give rise to an infringement of any kind.

58. Mr Purvis invited us to examine what the evidence was to which the judge was referring in sentence (n). He submitted that there was nothing that could have provided a sound basis for such a finding, even if the judge's language should have been read as amounting to a finding to that effect. Mr Mellor on the other hand pointed to several passages in the evidence which he said did support the finding which he contended the judge had made.

**The survey witnesses**

59. The survey witnesses who were said to be relevant for this purpose, or more generally as to the effect of the link, as found, on the economic behaviour of a relevant average

consumer, on either side, were Roger Adams, Anne Banks, Mirja Bauer, Laura Dubois, Jane Grey, Ella Sara Hershman, Joanne Langston, Victoria Leffman, Anne Mansey, Patricia Morrison, Ruth Pitcher and Pamela Stoker. I omit Bethany Hughes from this list as her evidence seems to have been strongly affected by her regarding KitchenAid as a generic description, rather than as a brand name.

60. Particular attention was given to the few of these who did not already own or use a KitchenAid, and who were interested in acquiring a mixer. One was Laura Dubois. She provided a witness statement and was not required for cross-examination. She said a number of things in her witness statement which appear to conflict. Thus, describing her reaction on seeing the flashcard (the fourth) she said this:

> "As soon as I saw the [flashcard] I thought it was a KitchenAid stand mixer. It looked retro, like a 1950s style. It looked like a KitchenAid mixer, particularly its shape and colour. The red of the mixer on the photo on the card caught my eye. Before answering the questionnaire I had seen an all red stand mixer, which I think was a KitchenAid, in John Lewis or Selfridges. I remember the retro shape. I particularly associate KitchenAid with red. When I saw the card it called to mind that I was thinking of getting a similar one – a Kenwood "K" something. I like its design. The design of the mixer in the photo felt like something I had seen before and really liked."

61. Thus, she associated what she saw (in fact a picture of the kMix) both with a KitchenAid Artisan and with a Kenwood which she was thinking of getting. Then she said this:

> "They [the kMix] looked like a cheap version, a copy, of the original KitchenAids. A nasty copy of the original. The Kenwoods are trying to be trendy with different colours. KitchenAids are in fashion, so it seems to me that Kenwood has decided 'Let's do something that looks like it but not exactly the same, and keep Kenwood so people know it's us'."

62. Thus she was not confused as to the trade origin of either product, and she clearly preferred the KitchenAid Artisan.

63. Joanne Langston was another in this group, identified through the telephone survey. She was not cross-examined. She was shown the fourth flashcard and said she thought it looked exactly like the one that Nigella Lawson had used, though she did not know the brand of that item. She had also seen on the John Lewis website a mixer which she thought was a Kenwood, and she said was exactly like the one on the flashcard (except for being in a different colour). When she saw the debranded KitchenAid Artisan she did not know what brand it was. When she saw the kMix models she recognised them as Kenwood products, though she thought they were the same shape as that which Nigella Lawson used, and did not begin to query that until she saw the branded KitchenAid Artisans. She said the two products looked similar, but she preferred the Kenwood for its shape, which would attract her to it.

64. The third in this group to whom particular attention was given in submissions was Ruth Pitcher. She was part of the general survey, having been approached outside Page's kitchen shop in Shaftesbury Avenue. She did not own a stand mixer and coveted a KitchenAid Artisan, though it was not clear that she was likely to be

acquiring one in the near future. She thought that the image on the flashcard was of a KitchenAid Artisan. Her witness statement recorded no reaction to the debranded KitchenAid Artisan, but said that she recognised the kMixes as being Kenwood products and the branded KitchenAid Artisans as what they were. She had a clear preference for the KitchenAid Artisan. She said this:

> "I'm afraid that the Kenwoods look like a cheap imitation of the KitchenAid. KitchenAid is probably about £350 but the Kenwoods are probably about £150 each. Seeing them together I could tell that the Kenwood was not of the same quality as the KitchenAid. The fact that the kMix looks like the KitchenAid mixer would mean that I would take a closer look at the kMix if I were shopping for a kitchen stand mixer. Its lines, style and colour would attract me to it. But once I got hold of it I would be put off by its quality. The KitchenAid mixer has a reputation for being robust, indestructible, heavy and durable."

65. All three of these witnesses reveal the phenomenon of imperfect recollection which is undoubtedly significant in this field. None of them, as it seems to me, provides evidence that an average consumer's economic behaviour would be influenced adversely to the KitchenAid Artisan by any perceived similarity between the shapes of the two products. Laura Dubois and Ruth Pitcher clearly preferred the KitchenAid Artisan and would not be put off that preference in favour of the kMix. Joanne Langston preferred the Kenwood product because of its shape, which she preferred to that of the KitchenAid Artisan, that is to say, she would be influenced in her choice by the differences between the two shapes, not by the similarities.

66. Two others of the witnesses relied on in this context were not KitchenAid Artisan owners: Roger Adams and Ella Sara Hershman, though Roger Adams had used a KitchenAid Artisan borrowed from a friend. He was not an example of a relevant average consumer because he said he would not be influenced by the appearance of a product. He would look for durability and reputation, which he said he knew KitchenAid Artisans to have.

67. Ella Sara Hershman was approached through the telephone survey. The judge referred to her evidence at paragraph 53. She was interested in buying, and would like to buy a KitchenAid Artisan. Unlike the others that I have mentioned, she was cross-examined. As with a number of witnesses, she thought the mixer shown on the flashcard was a KitchenAid Artisan, part of her reason for that being that she did not associate Kenwood with a stylish well-designed product. Asked about whether and if so how the appearance of the mixers would influence her decision as to which to buy, she said:

> "If I were to buy a stand mixer, if I were looking for that style, I would certainly look at the Kenwood and the KitchenAid and compare both, given the similarities. I know KitchenAids are very good. If they were the same price, I would go for the KitchenAid mixer."

68. In cross-examination, as to why she would like to buy a KitchenAid Artisan, she said that she thought them to be "very stylish and very nice". Her evidence in cross-examination as to why she had said what she did in her witness statement was quite unclear, and suggested that she did not recall the occasion well. One thing she did say

was that one of the factors in her thinking the two products to be similar was the bowl of the KitchenAid Artisan, something which does not form part of the CTM or, therefore, of Whirlpool's case under article 9(1)(c).

69. Among those witnesses who already owned or used a KitchenAid Artisan, Jane Grey included a sentence in her witness statement on which the Claimants place some reliance: "If I were looking to buy a stand mixer and saw the kMix I would take a look at it because of its shape and style." But this needs to be seen in the context of the next two sentences: "But if it didn't have the KitchenAid name on it then I would not buy it. I'm a convert to KitchenAid."

70. Victoria Leffman, also a KitchenAid Artisan owner, said something similar:

> "The fact that the shape of the Kenwood is similar to the KitchenAid would cause me to take a look at it - to click on it on a website or go over and have a look at it in a shop. But before buying it I would look carefully at it, and when I'd examined it I would realise that it wasn't as good as a KitchenAid stand mixer. I'd still go for a KitchenAid stand mixer. It might affect others' choice in terms of style but I would be more interested in what they all do."

71. Mr Mellor might have been able to get more from the evidence of Mirja Bauer, who has a KitchenAid Artisan at home, as does her mother, but who thought better of Kenwoods than do some KitchenAid Artisan owners. In her witness statement, as to whether and how she would be affected in a decision to buy by the appearance of the mixers, she said:

> "For the style, I would still go with the KitchenAid because I like the 1950s style and it is timeless. It would fit into a modern kitchen. I like the Kenwoods here because they are split into two colours and I like that. I would have confidence buying the Kenwoods because of their brand name. The Kenwoods look very similar to the KitchenAids. I would be more likely to purchase the kMix because they look similar to the KitchenAid stand mixer. I associate KitchenAid with quality, so would be more likely to buy the kMix or be willing to buy it because it looks like the KitchenAid stand mixer. KitchenAid has a good reputation."

72. Then in cross-examination, she said she liked the KitchenAid Artisan:

> "I love how it works and it is great quality so I would probably buy that. The other one I like because it is more modern so it could kind of go into a contemporary flat, maybe for younger people. If I did not have one, I would probably have to make a decision between the two.
>
> Q. It would depend on the style of your kitchen?
>
> A. Yes, exactly."

73. She explained her statement in the penultimate sentence of the paragraph quoted in paragraph [71] above as referring to a stage in the process when she thought the kMix was a prototype of a new version of the KitchenAid Artisan. She also said that during the process of looking at the appliances in the solicitors' offices she did not

really think about them from a branding point of view, instead she was thinking about the design point of view.

74. Paula Stoker, asked about any effect on a possible purchasing decision, said:

> "If I were looking to purchase another kitchen stand mixer, I would go for the one I prefer the look of, the KitchenAid mixer. I'd also go for the KitchenAid name. But the fact that the kMix resembles the KitchenAid may mean that I would at least take a look at it if I saw it in a shop or on a website."

75. In her answers to the questionnaire, in response to the question "Does the shape tell you anything about the product", she said, among other comments, "It seems the obvious shape for a mixer".

76. Patricia Morrison, another long-standing and convinced KitchenAid Artisan user, said:

> "I would stick with my KitchenAid. I prefer the design of it to the Kenwoods. The Kenwoods are more straightforward, less complicated but curves always give something more interest. The Kenwoods don't have as many curves. I may be diverted over to the kMix, to take a look at it, because its shape is reminiscent of the KitchenAid. I'd take a look at both if I was buying another mixer."

77. Anne Mansey, who is a chef, has owned a KitchenAid Artisan for three years and has used them a lot, said something rather similar:

> "Because I know how reliable the KitchenAids are I would go for a KitchenAid. To me it is a known quantity and I know they are reliable. I asked for a KitchenAid for Christmas. The similarity between the kMix and the KitchenAid would get me to go and take a look at the kMix if I saw it in a shop, out of curiosity. I would go and have a look at it to see who was doing this."

78. She was asked about that in cross-examination:

> "Q. Presumably any sort of attractive looking new mixer would have a similar effect on you?
>
> A. Not necessarily. Some might do, but I think with one like that [i.e. the kMix], I would, out of curiosity, go and have a look at it, yes?
>
> Q. And do you like the look of it?
>
> A. I know which I prefer. I am sorry.
>
> Q. I am not trying to sell you one!
>
> A. I just know the old faithful."

79. Her witness statement suggested, and her cross-examination confirmed, that one important element in her feeling that the two products were similar was the bowl.

80. The last of the witnesses relevant for this purpose is Anne Banks. The judge referred to her evidence at paragraph 54. In her witness statement, her evidence about the possible effect on her in the hypothetical event of her wanting to acquire a new mixer, was this:

> "The fact that the kMix looks like the KitchenAid mixer would make me more likely to buy it. It looks good. I quite liked it. It would probably have a positive effect on me. I would have looked at the kMix. I always thought Kenwoods were old-fashioned, which is strange when you consider the KitchenAid mixer looks like they come from the 1930s. My impression of Kenwood mixers is that they are big chunky heavy and old-fashioned, and usually in white – but the kMix looks good."

81. In cross-examination on this point there was the following exchange:

> "A. Obviously I wanted a KitchenAid. So if I was going shopping by myself I possibly would be swayed by this design because –
>
> Q. Because you like it.
>
> A. Yes, it looks nice. It looks like the KitchenAid in my opinion.
>
> Q. If it looks like the KitchenAid, then what is the advantage? You may as well buy the KitchenAid. Presumably you buy it because you preferred it.
>
> A. I didn't buy it.
>
> Q. If you were going to buy it at all, it would be because you preferred the look of it.
>
> A. I think that looks do have something to do with it. It looks similar."

**The judge's findings on the evidence**

82. I have gone into that aspect of the evidence in more detail than would normally be appropriate on appeal, because of the reliance placed on some of these witnesses' evidence on each side, particularly in relation to the judge's sentence at paragraph 80(3)(n). It seems to me that the evidence of these witnesses is an important part of the evidence to which the judge referred in that sentence, though as mentioned above (paragraph [57]) he may also have been thinking of the demonstrators' evidence. He had other evidence as well, including Kenwood's expert, but that would be at best very peripheral on this point.

83. Having reviewed the evidence of these witnesses, it seems to me that while it was, of course, for the judge to decide what weight to place on any of it, it would have been difficult to conclude that it did make out a case of any strength in favour of saying that the economic behaviour of a relevant average consumer would be influenced in any significant way in favour of Kenwood by the person being reminded of the KitchenAid Artisan by the shape of the kMix. Each of the three witnesses most relevant, namely those who did not own or use a KitchenAid Artisan and who were or might be in the market to acquire a stand mixer, had decided views of her own in

favour of one brand or the other, and such similarities as there were between the two shapes would not influence any of them in a decision which to purchase.

84. The fact that some witnesses said that, if (hypothetically) they were in the market for a new mixer and saw the kMix in a shop or on a website, they would take a closer look at it, because of its resemblance to the KitchenAid Artisan, seems to me an altogether inadequate foundation for a conclusion that a relevant average consumer who was thinking of buying would be influenced by the resemblance in making a buying decision. I have already quoted (at paragraph [44] above) what the judge said at paragraph 71 about the process by which an average consumer would come to a decision what product to buy. That seems to me a very strong indication against Mr Mellor's submission on this point. It must be borne in mind that this is a relatively sophisticated market, involving discriminating consumers and significant expenditure. So far as concerns stand mixers appealing to design conscious consumers willing to spend £300 or more, only one product had been available, and the kMix was a brand new entrant to the market. On the one hand, the hypothetical (or paradigm) reasonably well-informed and reasonably observant and circumspect consumer would be expected to be aware of this new product in the relevant market, which might not be the case if the new product was one of ten or twenty, rather than only the second of two. On the other hand, since the new product is in certain respects inevitably similar to the other, just because it performs the functions of a stand mixer, a degree of similarity of appearance between the two is almost unavoidable.

85. In the light of what I said at paragraph [57] above, and of my comments on the witnesses who appear to be those whom the judge would have had in mind, I do not accept Mr Mellor's submission that in the sentence at paragraph 80(3)(n) the judge made a finding that relevant average consumers would be influenced in their economic behaviour in favour of Kenwood by reason of the resemblance of the kMix to the CTM. I consider that, in that sentence, he referred to there being some evidence to that effect, but he did not accept that it justified such a conclusion.

86. Going back to the judge's sentence (g) in paragraph 80(2), and the question to what did the judge refer by the opening word "It", it seems to me that to read this (as is strictly correct, as a matter of syntax) on the footing that the opening word "It" refers to the link or reminder is not consistent with what the judge said elsewhere about the effect of the similarity, nor with the reading of the sentence at paragraph 80(3)(n) which I have explained above. It seems to me that "It", in sentence 80(2)(g), means the kMix itself, as the new entrant to the market of which the KitchenAid Artisan previously had sole possession.

87. The judge's phrase about "deviation from the paradigm form" could be of importance in that it has a bearing on the nature of his conclusion as to distinctiveness. I confess to being a little puzzled by this phrase. Both Counsel suggested that the reference to the "paradigm form" was to the form of the KitchenAid Artisan itself. For myself I would have read this as referring more naturally to the essential form of a stand mixer: what was referred to before us as the C-form, with a substantial base which not only holds the appliance steady but also allows the mixing bowl to be fitted in securely, then an upright section, and thirdly the upper horizontal section or head on which the individual mixing tools are fitted for use in the bowl. The judge included images of a wide variety of stand mixers at paragraph 26 (originally provided by the

Kenwood expert in her report), showing a number of variations on what might well be called a paradigm form. However, if the reference is to that, I cannot easily explain the use of the phrase "relatively little scope for deviation" from that form. The different mixers illustrated a considerable range of variations from the paradigm form, of which the KitchenAid Artisan is one. In any event, it is not easy to see why the judge should have spoken of "scope for" variation, rather than of actual variation, if the paradigm form was that of, as it were, the essence of a stand mixer, given that he was speaking of the particular variant represented by the KitchenAid Artisan. So Counsel may be right that the judge's paradigm form is the "paradigm KitchenAid Artisan". In that case, the reference to "relatively little scope for deviation", in the context of distinctiveness and of "a degree of specific individuality" in the appearance of the KitchenAid Artisan (see paragraph 68), seems to me to refer to there being only a relatively narrow range of variation from this particular form within which the distinctive quality would or could persist or be maintained. To go back to the judge's sentence in paragraph 68 in which he first used this phrase (quoted at paragraph [40] above), the main point of the sentence is clear, as can be seen by deleting the phrase under consideration: "there is in my judgment a degree of specific individuality in the finished appearance of the KitchenAid Artisan mixer which is sufficient ... to render it thereby distinguishable from mixers of a different trade origin in the minds of design conscious consumers". The phrase about deviation from the paradigm form seems to be a qualification or limitation of the general proposition.

88. Whatever may be the precise meaning that the judge sought to convey, I read it as intended to show that the distinctiveness of the finished appearance is sufficient to act as a sign of trade origin in some circumstances, for example (as he said at the beginning of paragraph 71) as compared with another mixer of identical appearance, but that a relatively small amount of variation from the appearance of the KitchenAid Artisan would be sufficient to differentiate another mixer from the KitchenAid Artisan in the minds of relevant average consumers. In that sense, "relatively little scope for deviation" refers to the limited range of the possible variants from the actual appearance of the KitchenAid Artisan which would be thought by relevant average consumers to indicate that the rival mixer was of the same trade origin as the KitchenAid Artisan.

**European trade mark cases**

89. Before I analyse the judge's findings and conclusions further, I must refer to some of the cases relied on before us, particularly among the evolving series of cases referred to the ECJ on relevant trade mark issues. The law in this respect has been a moving target: the judge had the benefit of Advocate General Sharpston's opinion on one case, on which the ECJ has given judgment since the date of the judge's judgment, but we have the benefit of an opinion of Advocate General Mengozzi in another case, on another reference by this court and, delivered after the argument on the appeal, the ECJ's judgment in that case. The point is one which is entirely new to English law, and I have found it desirable to quote rather extensively from some of the decisions.

90. The judge quoted from the judgment of the ECJ in *Adidas v Marca Mode II*, Case C-102/07 at his paragraph 77. I will repeat his citation and add one paragraph, next after those which he quoted, on which Mr Mellor based part of his arguments on the appeal. (I omit the supporting case references, here and in later quotations.)

"40. Article 5(2) of the Directive establishes, for the benefit of trade marks with a reputation, a form of protection whose implementation does not require the existence of a likelihood of confusion. Article 5(2) applies to situations in which the specific condition of the protection consists of a use of the sign in question without due cause which takes unfair advantage of, or is detrimental to, the distinctive character or the repute or the trade mark.

41. The infringements referred to in Article 5(2) of the Directive, where they occur, are the consequence of a certain degree of similarity between the mark and the sign, by virtue of which the relevant section of the public makes a connection between the sign and the mark, that is to say, establishes a link between them even though it does not confuse them. It is not therefore necessary that the degree of similarity between the mark with a reputation and the sign used by the third party is such that there exists a likelihood of confusion between them on the part of the relevant section of the public. It is sufficient for the degree of similarity between the mark with a reputation and the sign to have the effect that the relevant section of the public establishes a link between the sign and the mark.

42. The existence of such a link must be appreciated globally, taking into account all the relevant factors relevant to the circumstances of the case.

43. It is clear that the requirement of availability is extraneous both to the assessment of the degree of similarity between the mark with a reputation and the sign used by the third party and to the link which may be made by the relevant public between that mark and the sign. It cannot therefore constitute a relevant factor for determining whether the use of the sign takes unfair advantage of, or is detrimental to, the distinctive character or the repute of the trade mark."

91. Mr Mellor submitted that what the judge said in his paragraph 78 conflicted with what the ECJ said in paragraph 43, and that issues relevant to validity have no bearing on whether a trade mark, presumed to be valid, has been infringed.

92. The judge had also, and referred to, the Advocate General's Opinion in *Intel Corporation v CPM UK Ltd* Case C-252/07. The ECJ's judgment in that case was delivered on 27 November 2008. That was a case under the Directive rather than the CTMR, but on articles 4(4)(a) and 5(2) of the Directive which are equivalent to article 9(1)(c) of the CTMR. It concerned a very well known mark, used for particular goods, and the use of a later registered mark, which was said to be similar, in relation to completely different services. The judgment contains some passages which assist on the points in the present case, even though we are concerned with similar goods, not with dissimilar goods or services. At paragraphs 26 to 32 the Court in part restated and in part elaborated on points already made in *Adidas v Marca Mode II*:

"26. Article 4(4)(a) of the Directive establishes, for the benefit of trade marks with a reputation, a wider form of protection than that provided for in Article 4(1). The specific condition of that protection consists of a use of the later mark without due cause which takes or would take unfair

advantage of, or is or would be detrimental to, the distinctive character or the repute of the earlier mark.

27. The types of injury against which Article 4(4)(a) of the Directive ensures such protection for the benefit of trade marks with a reputation are, first, detriment to the distinctive character of the earlier mark, secondly, detriment to the repute of that mark and, thirdly, unfair advantage taken of the distinctive character or the repute of that mark.

28. Just one of those three types of injury suffices for that provision to apply.

29. As regards, in particular, detriment to the distinctive character of the earlier mark, also referred to as 'dilution', 'whittling away' or 'blurring', such detriment is caused when that mark's ability to identify the goods or services for which it is registered and used as coming from the proprietor of that mark is weakened, since use of the later mark leads to dispersion of the identity and hold upon the public mind of the earlier mark. That is notably the case when the earlier mark, which used to arouse immediate association with the goods and services for which it is registered, is no longer capable of doing so.

30. The types of injury referred to in Article 4(4)(a) of the Directive, where they occur, are the consequence of a certain degree of similarity between the earlier and later marks, by virtue of which the relevant section of the public makes a connection between those two marks, that is to say, establishes a link between them even though it does not confuse them.

31. In the absence of such a link in the mind of the public, the use of the later mark is not likely to take unfair advantage of, or be detrimental to, the distinctive character or the repute of the earlier mark.

32. However, the existence of such a link is not sufficient, in itself, to establish that there is one of the types of injury referred to in Article 4(4)(a) of the Directive, which constitute, as was stated in paragraph 26 of this judgment, the specific condition of the protection of trade marks with a reputation laid down by that provision."

93. The Court reiterated the familiar identification of the relevant public at paragraph 34, and went on to make a point which, in itself, does not arise in the present case but shows something of the Court's thinking about the different ways of satisfying the specific condition under article 9(1)(c), in paragraphs 35 and 36:

"35. Accordingly, the existence of injury consisting of detriment to the distinctive character or the repute of the earlier mark must be assessed by reference to average consumers of the goods and services for which that mark is registered, who are reasonably well informed and reasonably observant and circumspect.

36. Secondly, as regards injury consisting of unfair advantage taken of the distinctive character or the repute of the earlier mark, in so far as what is

prohibited is the drawing of benefit from that mark by the proprietor of the later mark, the existence of such injury must be assessed by reference to average consumers of the goods or services for which the later mark is registered, who are reasonably well informed and reasonably observant and circumspect."

94. The particular point there discussed does not arise here because the same body of consumers is relevant to both products. "Drawing of benefit" from the mark is perhaps no more than a different way of saying "taking advantage". It does not reveal anything about the circumstances in which the advantage is taken unfairly.

95. As regards proof, the Court observed that the proprietor of the mark must prove the fact of unfair advantage, or detriment, or the serious risk of either occurring in the future, whereas if issue is taken as to "due cause", it is for the later user to show that there is due cause for the use of the mark. In the present case Kenwood did not assert that any use made was with due cause, so that point does not arise.

96. The questions referred sought guidance as to the criteria for the establishment of the necessary link. On that point the Court said this:

"41. The existence of such a link must be assessed globally, taking into account all factors relevant to the circumstances of the case.

42. Those factors include:

the degree of similarity between the conflicting marks;

the nature of the goods or services for which the conflicting marks were registered, including the degree of closeness or dissimilarity between those goods or services, and the relevant section of the public;

the strength of the earlier mark's reputation;

the degree of the earlier mark's distinctive character, whether inherent or acquired through use;

the existence of the likelihood of confusion on the part of the public.

43. In that respect, the following points must be made.

44. As regards the degree of similarity between the conflicting marks, the more similar they are, the more likely it is that the later mark will bring the earlier mark with a reputation to the mind of the relevant public. That is particularly the case where those marks are identical.

45. However, the fact that the conflicting marks are identical, and even more so if they are merely similar, is not sufficient for it to be concluded that there is a link between those marks.

46. It is possible that the conflicting marks are registered for goods or services in respect of which the relevant sections of the public do not overlap.

47. The reputation of a trade mark must be assessed in relation to the relevant section of the public as regards the goods or services for which that mark was registered. That may be either the public at large or a more specialised public.

48. It is therefore conceivable that the relevant section of the public as regards the goods or services for which the earlier mark was registered is completely distinct from the relevant section of the public as regards the goods or services for which the later mark was registered and that the earlier mark, although it has a reputation, is not known to the public targeted by the later mark. In such a case, the public targeted by each of the two marks may never be confronted with the other mark, so that it will not establish any link between those marks.

49. Furthermore, even if the relevant section of the public as regards the goods or services for which the conflicting marks are registered is the same or overlaps to some extent, those goods or services may be so dissimilar that the later mark is unlikely to bring the earlier mark to the mind of the relevant public.

50. Accordingly, the nature of the goods or services for which the conflicting marks are registered must be taken into consideration for the purposes of assessing whether there is a link between those marks.

51. It must also be pointed out that certain marks may have acquired such a reputation that it goes beyond the relevant public as regards the goods or services for which those marks were registered.

52. In such a case, it is possible that the relevant section of the public as regards the goods or services for which the later mark is registered will make a connection between the conflicting marks, even though that public is wholly distinct from the relevant section of the public as regards goods or services for which the earlier mark was registered.

53. For the purposes of assessing where there is a link between the conflicting marks, it may therefore be necessary to take into account the strength of the earlier mark's reputation in order to determine whether that reputation extends beyond the public targeted by that mark.

54. Likewise, the stronger the distinctive character of the earlier mark, whether inherent or acquired through the use which has been made of it, the more likely it is that, confronted with a later identical or similar mark, the relevant public will call that earlier mark to mind.

55. Accordingly, for the purposes of assessing whether there is a link between the conflicting marks, the degree of the earlier mark's distinctive character must be taken into consideration.

56. In that regard, in so far as the ability of a trade mark to identify the goods or services for which it is registered and used as coming from the proprietor of that mark and, therefore, its distinctive character are all the stronger if that mark is unique – that is to say, as regards a word mark such as INTEL, if the word of which it consists has not been used by anyone for any goods or services other than by the proprietor of the mark for the goods and services it markets – it must be ascertained whether the earlier mark is unique or essentially unique.

57. Finally, a link between the conflicting marks is necessarily established when there is a likelihood of confusion, that is to say, when the relevant public believes or might believe that the goods or services marketed under the earlier mark and those marketed under the later mark come from the same undertaking or from economically-linked undertakings.

58. However, as is apparent from paragraphs 27 to 31 of the judgment in *Adidas-Salomon and Adidas Benelux*, implementation of the protection introduced by Article 4(4)(a) of the Directive does not require the existence of a likelihood of confusion.

59. The national court asks, in particular, whether the circumstances set out in points (a) to (d) of Question 1 referred for a preliminary ruling are sufficient to establish a link between the conflicting marks.

60. As regards the circumstance referred to in point (d) of that question, the fact that, for the average consumer, who is reasonably well informed and reasonably observant and circumspect, the later mark would call the earlier mark to mind is tantamount to the existence of such a link."

97. The passage at paragraphs 46 to 52 is not of much relevance to the present case, where the mark and the sign are used in relation to similar goods aimed at the same public. However, paragraph 60 shows that the judge was right as a matter of law in his approach to whether the necessary link was established, at paragraph 80(1). He was right to take the approach of a global assessment (see paragraph 79) and to take account (as he mentions in that paragraph) of the degree of strength of the distinctive character of the mark, and of the degree of similarity between the mark and the sign: see paragraphs 42 and 56 of the judgment in *Intel*.

98. The Court went on, in addressing the remaining questions referred, to give guidance as to finding injury to the earlier mark or unfair advantage taken of it, at paragraphs 66 to 79:

"66. First, as was pointed out in paragraph 30 of this judgment, the types of injury referred to in Article 4(4)(a) of the Directive, where they occur, are the consequence of a certain degree of similarity between the earlier and later marks, by virtue of which the relevant section of the public makes a connection between those two marks, that is to say, establishes a link between them even though it does not confuse them.

67. The more immediately and strongly the earlier mark is brought to mind by the later mark, the greater the likelihood that the current or future use

of the later mark is taking unfair advantage of, or is detrimental to, the distinctive character or the repute of the earlier mark.

68. It follows that, like the existence of a link between the conflicting marks, the existence of one of the types of injury referred to in Article 4(4)(a) of the Directive, or a serious likelihood that such an injury will occur in the future, must be assessed globally, taking into account all factors relevant to the circumstances of the case, which include the criteria listed in paragraph 42 of this judgment.

69. As regards the strength of the reputation and the degree of distinctive character of the earlier mark, the Court has already held that the stronger the earlier mark's distinctive character and reputation the easier it will be to accept that detriment has been caused to it.

70. Secondly, the circumstances listed in points (a) to (d) of Question 1 are not sufficient to establish the existence of unfair advantage and/or detriment within the meaning of Article 4(4)(a) of the Directive.

71. So far as concerns, in particular, the fact referred to in point (d) of that question, as follows from paragraph 32 of this judgment, the existence of a link between the conflicting marks does not dispense the proprietor of the earlier trade mark from having to prove actual and present injury to its mark, for the purposes of Article 4(4)(a) of the Directive, or a serious likelihood that such an injury will occur in the future.

72. Lastly, as regards, more particularly, detriment to the distinctive character of the earlier mark, the answer to the second part of the third question must be that, first, it is not necessary for the earlier mark to be unique in order to establish such injury or a serious likelihood that it will occur in the future.

73. A trade mark with a reputation necessarily has distinctive character, at the very least acquired through use. Therefore, even if an earlier mark with a reputation is not unique, the use of a later identical or similar mark may be such as to weaken the distinctive character of that earlier mark.

74. However, the more 'unique' the earlier mark appears, the greater the likelihood that the use of a later identical or similar mark will be detrimental to its distinctive character.

75. Secondly, a first use of an identical or similar mark may suffice, in some circumstances, to cause actual and present detriment to the distinctive character of the earlier mark or to give rise to a serious likelihood that such detriment will occur in the future.

76. Thirdly, as was stated in paragraph 29 of this judgment, detriment to the distinctive character of the earlier mark is caused when that mark's ability to identify the goods or services for which it is registered and used as coming from the proprietor of that mark is weakened, since use of the

later mark leads to dispersion of the identity and hold upon the public mind of the earlier mark.

77. It follows that proof that the use of the later mark is or would be detrimental to the distinctive character of the earlier mark requires evidence of a change in the economic behaviour of the average consumer of the goods or services for which the earlier mark was registered consequent on the use of the later mark, or a serious likelihood that such a change will occur in the future.

78. It is immaterial, however, for the purposes of assessing whether the use of the later mark is or would be detrimental to the distinctive character of the earlier mark, whether or not the proprietor of the later mark draws real commercial benefit from the distinctive character of the earlier mark.

79. The answer to point (ii) of Question 1 and to Question 3 must therefore be that Article 4(4)(a) of the Directive is to be interpreted as meaning that whether a use of the later mark takes or would take unfair advantage of, or is or would be detrimental to, the distinctive character or the repute of the earlier mark, must be assessed globally, taking into account all factors relevant to the circumstances of the case."

99. Thus, paragraph 67 confirms the importance of taking into account the strength (or otherwise) of the distinctiveness of the mark, and paragraphs 68 and 79 show that the fact or likelihood of detriment or of unfair advantage must be considered on the basis of a global assessment, taking into account the factors mentioned in paragraph 42 as well as any other relevant matters. Detriment to the distinctive character of the mark requires proof of a change in the economic behaviour of the average consumer consequent on the use of the sign, or a serious likelihood of such a change (paragraph 77), irrespective of any real commercial benefit to the undertaking using the sign being drawn from the distinctiveness of the mark (paragraph 78). The latter factor, by contrast, would be relevant to the issue of unfair advantage.

100. The Court said little in its judgment in *Intel* about unfair advantage. Advocate General Sharpston had covered this subject at paragraphs 62 to 67 of her opinion in the case, before dealing with "blurring", that is to say detriment to the distinctive character of the mark, and then tarnishing, or detriment to the repute of the mark. Although not binding, this is worth citing, to show what the judge had before him, and for the guidance it gives on the point:

"Free-riding

62. The concept of 'unfair advantage' focuses on benefit to the later mark rather than harm to the earlier mark. What must be established is some sort of boost given to the later mark by its link with the earlier mark. If, despite its reputation, the connotations of the earlier mark have a dampening or even merely neutral effect on the performance of the later mark, unfair advantage seems less likely. In the hypothesis, for example, of a select range of expensive hand-made jewellery sold under the trade mark 'Coca-Cola' or a similar mark, it does not seem inevitable that the

marketing of the jewellery would benefit unfairly (or at all) from the Coca-Cola Company's trade mark.

63. In that light, the facts set out in question 1 seem too flimsy on their own to support a finding of free-riding.

64. It is, of course, necessary as a precondition for such a finding that the earlier mark should have a reputation and that the later mark should bring the earlier mark to mind for the average consumer. There is (at least since *Davidoff II*) no necessity for the goods or services covered by the two marks to meet any particular standard of similarity or dissimilarity. Nor can it be concluded, simply from the fact that the earlier mark is unique, that the later mark takes unfair advantage of it.

65. That said, it seems clear that, as the reputation and distinctiveness of the earlier mark, and the similarity between the goods or services covered by the two marks, increase, so will the likelihood that the later mark will derive advantage from any link established between the two in the mind of the public.

66. But more is needed. If the later mark is to derive unfair advantage, the associations of the earlier mark must be such as to enhance the performance of the later mark in the use that is made of it. A relevant factor to consider, therefore, will be the relationship between the prestigious connotations of the earlier mark and the context in which the later mark is used. Any advantage may well be greater if the earlier mark is unique, but there is nothing in the legislation to suggest that protection against free-riding can vary according to the extent of the unfair advantage derived.

67. If the later mark has already been registered and used (as in the main proceedings), or if it is a sign whose use it is sought to prevent under Article 5(2), it may well be possible to provide consumer survey evidence indicating whether there has been any boosting or enhancing effect on the later mark as a result of the existence of the earlier mark. If, under Article 4(4)(a), it is a question of preventing the registration of a mark that has not yet been used, such evidence may be less easy to obtain, and inferences may have to be drawn from all the circumstances of the case as to the likely effect."

101. The subject of unfair advantage has been considered in two cases cited to us, one before the First Board of Appeal of the Office for the Harmonisation of the Internal Market, *Mango Sport System SRL v Diknah SL* Case R 308/2003-1, and the other in the Court of Appeal, and in due course in the ECJ, *L'Oréal v Bellure*: [2007] EWCA Civ 968, and Case C-487/07.

102. In *Mango*, the issue was as between a mark registered for clothing for men women and children, and a claim to register the same mark for protective helmets for work sport and leisure purposes, the owner of the former mark opposing the application to register the latter. The Board of Appeal, addressing issues under article 8(5) of CTMR which are substantially equivalent to those under article 9(1)(c), referred to

propositions familiar from cases to which I have already referred, and addressed the general principles relevant to unfair advantage at paragraphs 19 to 22:

> "19. As to unfair advantage, which is in issue here since that was the condition for the rejection of the mark applied for, that is taken when another undertaking exploits the distinctive character or repute of the earlier mark to the benefit of its own marketing efforts. In that situation that undertaking effectively uses the renowned mark as a vehicle for generating consumer interest in its own products. The advantage for the third party arises in the substantial saving on investment in promotion and publicity for its own goods, since it is able to "free ride" on that already undertaken by the earlier reputed mark. It is unfair since the reward for the costs of promoting, maintaining and enhancing a particular trade mark should belong to the owner of the earlier trade mark in question.
>
> 20. In that regard, it should be observed that the stronger the earlier mark's distinctive character and reputation the easier it will be to accept that unfair advantage has been taken or detriment has been caused.
>
> 21. Furthermore, the closer the similarity between the marks the greater is the risk that unfair advantage will be taken. An identity or a very high degree of similarity is a factor of particular importance in establishing if an unfair advantage will be taken.
>
> 22. The greater the proximity between the goods and the circumstances in which they are marketed, the greater the risk that the public in question will make a link between the mark and the sign in question. The existence of the similarity of the goods may be taken into account to the extent that the greater the similarity between the goods in question, the greater the risk that unfair advantage will be taken of the earlier mark."

103. Applying those principles to the facts, the Board of Appeal held that the success of the opposition in the office had been correct. Paragraph 35 summarises the most relevant factors:

> "35. Given the identity of the marks, the complementary nature of the goods, and the fact that the word MANGO is highly distinctive in relation to the goods concerned, and the extensive nature of the reputation throughout Spain, unfair advantage within the meaning of Article 8(5) cannot be excluded. It is highly likely based on those considerations that the applicant will benefit from and free ride on the opponent's successful marketing efforts. In that sense it will derive an unfair advantage in Spain from the link the relevant public will make to the earlier mark which already enjoys substantial reputation there."

104. In *L'Oréal v Bellure*, the competing products were similar, namely perfumes, but they were at opposite ends of the market. L'Oréal sold fine fragrance brands: premium price brands, with selective distribution, expensive packaging and presentation, heavily advertised and strongly promoted. The Defendants sold smell-alike, or replica fragrance brands. These are imitations, but not counterfeits, of fine fragrance brands, and they trade on their image, being sold at retail prices well below those of the

premium priced brands. L'Oréal complained of two things: the use of the names of the L'Oréal brands in comparison tables issued by the Defendants, and the packaging and names used for five items in the Defendants' ranges. The issue of comparative reference is not relevant to the present case.

105. As regards the issue of packaging, which is more relevant to the present case, Jacob LJ considered unfair advantage in a passage of which I will quote paragraphs 87 to 92:

> "87. This is the real legal point under Art 5(2). There can be little doubt that the link between the defendants' packaging and the registered marks, if established, confers an advantage on the defendants. They are able to charge more (true, nothing like the price of a fine fragrance) for the Creation Lamis range than for a range whose packaging owes nothing to that of the "original," for instance the Stitch packaging. No doubt part of the higher price is attributable to the better quality of the packaging as such, but part of the higher price must be attributable to the "wink." The Judge so held at [151] (iii).

> 88. So is the advantage taken "unfair"? That depends on what is meant by "unfair advantage". The Judge applied the test used by the First Board of Appeal of OHIM in Case R 308/2003-1 *Mango Sport v Diknak* [2005] ETMR 5 at [19]. [He then set out this paragraph, which I have quoted at paragraph [102] above].

> 89. The test was propounded in very different circumstances from the present case. The marks were the same, and highly distinctive ("strong") for the goods of each side (clothing vs protective helmets). As a factual matter one can perhaps understand how there might even be confusion of consumers or at least a question in their minds as to whether there was some sort of connection between Mango helmets and Mango clothing. Here we have different marks and signs. And no question of even a speculation about a connection.

> 90. In essence the *Mango* test is "free riding" and no more. It does not matter whether the consumer is confused. Nor does it matter that the essential function of the trade mark is not impaired. Nor does it matter that there is no tarnishing or blurring of the trade mark or its reputation. It does not matter that the trade mark owner's sales are not impaired. It does not even matter that the trade mark owner is not deprived of any of the reward for promotion, maintenance or enhancement of his trade mark.

> 91. I am not convinced that this is necessarily correct. It amounts to saying "If there is an advantage, it must also be unfair". It gives no meaning whatever to the important word "unfair". If it is indeed virtually meaningless, that needs to be established at ECJ level. So I would ask a question about "unfair advantage" based on the above assumed facts. The question I would ask is:

> > 5. Where a trader uses a sign which is similar to a registered trade mark which has a reputation, and that

sign is not confusingly similar to the trade mark, in such a way that:

(a) the essential function of the registered trade mark of providing a guarantee of origin is not impaired or put at risk;

(b) there is no tarnishing or blurring of the registered trade mark or its reputation or any risk of either of these;

(c) the trade mark owner's sales are not impaired; and

(d) the trade mark owner is not deprived of any of the reward for promotion, maintenance or enhancement of his trade mark;

(e) but the trader gets a commercial advantage from the use of his sign by reason of its similarity to the registered mark

does that use amount to the taking of "an unfair advantage" of the reputation of the registered mark within the meaning of Art.5(2) of the Trade Mark Directive?

92. Mr Carr [Counsel for L'Oréal] submits that in many other EU countries those circumstances are regarded as unfair competition. He is probably right about some EU countries, though my general understanding (I could not give chapter and verse) is that in some countries there has been a "rowing back" on what amounts to "unfair competition". But even if such circumstances amount to unfair competition in some countries, it is surely clear that the concept of "unfair advantage" is an autonomous EU concept. It needs to be clarified, and I hope, a fairly bright-line rule established so that traders know what they can and cannot do."

106. This court referred questions to the ECJ on both comparative use of the mark and unfair advantage. By the time the appeal was argued the Advocate General's opinion had been given, and we heard submissions about it. Since then the Court's judgment has been delivered. We received written submissions from both sides about that.

107. The facts of *L'Oréal v Bellure* are very far away from those of the present case. Sub-paragraph (e) of question (5) assumed that the third party does obtain a commercial advantage from the use of a sign similar to the mark, which was an established fact in that case, but is not made out in the present case. But for the fact that this judgment would not, at the earliest, have been delivered until shortly before the announced date for that of the ECJ, we would not have waited to see what was said in that judgment. However, we do now have the benefit of that, and can see what was said about unfair advantage. In these circumstances I need not spend time on the opinion of the Advocate General, since the points which might be important are all made in the judgment of the Court. The Court introduced another paraphrase for unfair

advantage, namely the user of the sign "riding on the coat-tails of the mark"; this does not seem to mean anything different from free-riding.

108. The Court's answer to referred question (5) was as follows (the second sentence is the more important for present purposes):

> "Article 5(2) of [the Trade Marks Directive] must be interpreted as meaning that the taking of unfair advantage of the distinctive character or the repute of a mark, within the meaning of that provision, does not require that there be a likelihood of confusion or a likelihood of detriment to the distinctive character or the repute of the mark or, more generally, to its proprietor. The advantage arising from the use by a third party of a sign similar to a mark with a reputation is an advantage taken unfairly by that third party of the distinctive character or the repute of that mark where that party seeks by that use to ride on the coat-tails of the mark with a reputation in order to benefit from the power of attraction, the reputation and the prestige of that mark and to exploit, without paying any financial compensation, the marketing effort expended by the proprietor of the mark in order to create and maintain the mark's image."

109. In the course of its judgment, the Court came to unfair advantage at paragraph 41:

> "As regards the concept of 'taking unfair advantage of the distinctive character or the repute of the trade mark', also referred to as 'parasitism' or 'free-riding', that concept relates not to the detriment caused to the mark but to the advantage taken by the third party as a result of the use of the identical or similar sign. It covers, in particular, cases where, by reason of a transfer of the image of the mark or of the characteristics which it projects to the goods identified by the identical or similar sign, there is clear exploitation on the coat-tails of the mark with a reputation."

110. Unfair advantage can be found even if there is no element of confusion nor any detriment "either to the distinctive character or to the repute of the mark or, more generally, to its proprietor" (paragraph 43). Thus, unfair advantage can arise where the Defendant has obtained a benefit without the Claimant having suffered any loss. At paragraph 44 the Court reiterated points made in *Intel*, including the need for a global assessment, and the relevance of the strength of the mark and of the link:

> "It is also clear from the case-law that, the more immediately and strongly the mark is brought to mind by the sign, the greater the likelihood that the current or future use of the sign is taking, or will take, unfair advantage of the distinctive character or the repute of the mark or is, or will be, detrimental to them."

111. The crucial passage in the judgment on unfair advantage, leading up to the conclusion at paragraph 50 which is in the terms set out in the Court's ruling, quoted at paragraph [108] above, is paragraphs 47 to 49, as follows:

> "47. In that regard, the referring court has held that there is a link between certain packaging used by Malaika and Starion, on the one hand, and certain marks relating to packaging and bottles belonging to L'Oréal and

others, on the other. In addition, it is apparent from the order for reference that that link confers a commercial advantage on the defendants in the main proceedings. It is also apparent from the order for reference that the similarity between those marks and the products marketed by Malaika and Starion was created intentionally in order to create an association in the mind of the public between fine fragrances and their imitations, with the aim of facilitating the marketing of those imitations.

48. In the general assessment which the referring court will have to undertake in order to determine whether, in those circumstances, it can be held that unfair advantage is being taken of the distinctive character or the repute of the mark, that court will, in particular, have to take account of the fact that the use of packaging and bottles similar to those of the fragrances that are being imitated is intended to take advantage, for promotional purposes, of the distinctive character and the repute of the marks under which those fragrances are marketed.

49. In that regard, where a third party attempts, through the use of a sign similar to a mark with a reputation, to ride on the coat-tails of that mark in order to benefit from its power of attraction, its reputation and its prestige, and to exploit, without paying any financial compensation and without being required to make efforts of his own in that regard, the marketing effort expended by the proprietor of that mark in order to create and maintain the image of that mark, the advantage resulting from such use must be considered to be an advantage that has been unfairly taken of the distinctive character or the repute of that mark."

112. Thus, the issue raised by Jacob LJ at paragraph 91 of his judgment in *L'Oréal v Bellure*, which led him to pose the fifth of the referred questions, has been answered, in essence, to the effect that an advantage obtained by the third party from the use of a similar sign, which is neither confusing nor otherwise damaging, is unfair if the advantage is obtained intentionally in order to benefit from the power of attraction, the reputation and the prestige of the mark and to exploit the marketing effort expended by the proprietor of the mark without making any such efforts of his own, and without compensation for any loss caused to the proprietor, or for the benefit gained by the third party.

113. Mr Mellor submitted that the element of intention would be relevant if it were proved, but that it is not necessary in order to show unfair advantage. He made a legitimate point that the Court's comment at the end of paragraph 41 of the judgment appears to be illustrative rather than definitive. He contended that the effect of the Court's decision, stripped of inessentials, is that, in a case where the third party, using a sign which is sufficiently similar to a mark with a reputation for a link to be established, obtains any commercial boost or other advantage from the link, then that advantage is of itself unfair, without proof of any additional factor. That reading would deprive the word "unfair" of any added meaning in the article.

114. I cannot accept Mr Mellor's submission, for at least two reasons. First, bearing in mind the terms in which Jacob LJ explained why he posed question (5), in paragraph 91 of his judgment in *L'Oréal v Bellure*, inviting the Court to say, if they thought it, that the word "unfair" is virtually meaningless (see paragraph [105] above), I find it difficult to

suppose that the Court would not have risen to his invitation (or challenge) and said so in terms, if they did mean to hold that any advantage was an unfair advantage.

115. Secondly, considering the terms in which they did answer question (5), if they had meant to convey that "unfair" adds nothing, so that any advantage is an unfair advantage, they need not, and in my judgment would not, have said what they did. The second sentence of paragraph 50 of the judgment is far more specific and detailed than would have been necessary if that was their meaning.

116. I will discuss this judgment further when I come later to consider Whirlpool's claim on the basis of unfair advantage.

**Discussion**

117. Mr Mellor, for Whirlpool, contended that the judge made two errors of law, which I have already mentioned, and that but for those, on the findings he made, he would have decided in favour of Whirlpool. Mr Purvis denied that the judge made either of the suggested errors, and also that he made findings such as Mr Mellor sought to rely on and said, in any event, that the facts do not justify a finding in Whirlpool's favour. In turn he argued, if necessary, that the judge should not have found a link sufficient to bring article 9(1)(c) into play.

**Was the judge's reference to article 7(1)(e) a misdirection?**

118. Article 7(1)(e) of the CTMR prohibits the registration as a CTM of a sign or signs which consist exclusively of, in particular, the shape of goods which results from the nature of the goods themselves and the shape of goods which is necessary to obtain a technical result. The policy behind that provision is clear enough: a manufacturer cannot monopolise the market for a particular kind of product by registering a trade mark consisting of the shape of the product where that is the shape which the product has to have because of its very nature, or in order to work. This is an absolute ban on registration, which cannot even be overcome by acquired distinctiveness. The article did not apply to the registration of Whirlpool's CTM because it does not consist exclusively of a shape: it includes the word KitchenAid.

119. The judge did not make the elementary mistake of applying article 7(1)(e) to the present case. What he said in paragraph 78 was that the policy underlying that article was relevant to the assessment of whether there is a sufficient similarity between the mark and the sign, both being shapes, for article 9(1)(c) to be satisfied. Given that the ECJ has taught us that an assessment of similarity must be carried out on a global basis, by reference among other things to the degree of similarity between the mark and the sign (see *Intel* paragraphs 42 and 68), it seems to me that the nature of mark and sign and the nature of the similarity must also be relevant. It is therefore not a misdirection in itself to observe that the mark and the sign respectively consist, for this purpose (i.e. ignoring the word marks visible on each product), of the shape of the product itself, and that while the KitchenAid Artisan has a shape which has to some extent become distinctive, it does not involve any fanciful or capricious element as a distinguishing feature.

120. Apart from having sounded a warning note, it is not clear what function or effect the judge's observations in paragraph 78 had on his actual decision. Mr Mellor submitted,

first, that it must be assumed to have had some effect, since otherwise there would have been no point in making the observation, and secondly that it could be seen that the judge had been influenced, because of his reference to "the realm of product shapes" in paragraph 80(3) in sentence (m). As to the first of those points, the judge said a number of things which are not strictly necessary to his decision, for example in his comments about the registration of the CTM, at paragraphs 21 and 22. As for the second point, this is related to the second error which Mr Mellor said the judge had made, to which I will therefore turn.

**Did the judge apply a different test for infringement in respect of product shapes?**

121. The sentence (m) in paragraph 80(3) shows, Mr Mellor argued, that the judge applied the tests relevant to infringement under article 9(1)(c) in a more narrow or restricted manner than he would otherwise have done because the subject of the mark and of the allegedly infringing sign was, in substance, a product shape. If he did so, that would have been an error of law.

122. It can be said that the judge did not express fully his analysis or reasoning in paragraph 80. He started from the point that the two shapes have enough in common for the one to remind relevant average consumers of the other, while not causing even initial, let alone lasting, confusion as to trade origin. He accepted that this is sufficient in law to amount to the necessary link. He then asked whether the link caused detriment or led to unfair advantage being taken of the mark's distinctive character or repute, and said that it did not (sentence (e): "I cannot see that it is.") At (g) (read as I have explained it above, at paragraph [86]) he said that the arrival on the market of the kMix did erode the market share of the KitchenAid Artisan, but that this did not impinge on any aspect of the property appertaining to the CTM, by which he must have intended to refer to the distinctive character and the reputation of the mark, since those are what give the mark its value as an economic asset. Later, at sentence (k), he said in terms that the similarity between the bodywork of the kMix and that represented by the mark is not sufficient to impinge on (or, in other words, to affect in any way) the distinctiveness of the mark. In sentence (m) he went on to refer not only to the concepts labelled "blurring" and "dilution", which are colloquial ways of referring to detriment to the distinctive character of a mark, but also to "tarnishing", which refers to detriment to the repute of the mark, such as by association with another product which would be incongruous or damaging, as in the Claeryn/Klarein case, a decision of the Benelux Court of Justice. (That case concerned the identically pronounced marks "Claeryn" for a Dutch gin and "Klarein" for a liquid detergent. Since it was found that the similarity between the two marks might cause consumers to think of detergent when drinking "Claeryn" gin, the "Klarein" mark was held to infringe the "Claeryn" mark.) He also referred to "free-riding", which as we have seen is used as shorthand for taking unfair advantage of the mark. He had already said that none of these was made out, in his sentence (e).

123. Mr Mellor submitted that the judge's sentence (m) is to be read as if, set out more fully, it said: "In the realm of product shapes it would be wrong to apply the concepts ... as generally as they would be applied as regards another kind of mark; because they are to be applied less generally than they otherwise would be, the similarity

between the bodywork of the two appliances is not such as to satisfy any aspect of the specific condition under article 9(1)(c)."

124. I do not accept Mr Mellor's analysis of the judge's words. It seems to me that "more generally" means, in effect, "so generally as to find that the similarity does satisfy the specific condition under article 9(1)(c)". He meant that the relevant concepts cannot properly be applied so generally as to find that the shape of the kMix is so close to that of the CTM as to offend against the article. In my judgment the judge did not go wrong in law because he did not apply a different test for shapes from that which he would have applied in relation to a different kind of mark. Mr Mellor's argument obtains such force as it might have from the inclusion in the sentence of the phrase "in the realm of product shapes". However, it does not seem to me that this can legitimately be read as setting up an implied contrast with what would have been the position "in the realm of" some other type of trade mark or sign. It does no more than refer to the fact that the kind of mark or sign with which the case is concerned is that of product shapes. The phrase may not be strictly necessary to the sentence, but I do not accept that it reveals or amounts to a misdirection in law.

125. Let me suppose, however, in the alternative, that the judge did apply a different test because the mark and the sign are both product shapes, being influenced by what he had said at paragraph 78. He should not have done so, but what is the consequence if he did? On the findings of fact he made, would he have come to a different conclusion if he had applied the correct test, namely the same as if it had been, for example, a word mark? He had accepted Mr Mellor's case as to there being a sufficient link between Whirlpool's mark and Kenwood's sign. Mr Mellor sought to show that the link led, or was likely to lead, to a change in the economic behaviour of the relevant average consumer (see paragraph 77 of the judgment in *Intel*). It seems to me that, on the basis of the judge's review of the evidence, which I have already considered at some length, my conclusion being expressed at paragraph [85] above, the judge would not, in any event, have held that Mr Mellor's contention was made out. On that evidence, and on his conclusion as to its effect, I see no reason to suppose that he would have come to a different result on any of the several different ways of putting the claim under article 9(1)(c). Accordingly, even if I am wrong and the judge did misdirect himself as to the test to be applied when considering a mark and a sign each consisting of product shapes, the facts as found by the judge on the basis of the evidence do not lead to a different conclusion.

**Detriment to the distinctive character of the CTM**

126. I return to the sentence at paragraph 80(2)(g). The proposition that something is apt to erode Whirlpool's market share without impinging on the rights associated with its trade mark is not in itself a difficult proposition. Especially where one product has had a particular sector of the market to itself, the introduction of another by a rival undertaking is itself likely to affect the market share of the first, which had been a monopoly. That can happen by fair and lawful competition, without anything being done which might infringe the trade mark rights of the first undertaking. In sentence (f) the judge had just said that the marketing of the kMix did not touch or otherwise affect the distinctive character or the repute of the KitchenAid Artisan mark. Mr Mellor's submission is that in the very next sentence he said something which amounted to a contradiction of the previous sentence. That seems to me unlikely.

127. I find further support for this in what the judge had said previously. A liking for the design of the KitchenAid Artisan is a major factor in the appeal of the product (paragraph 32). Comments on the kMix from survey respondents looking at the flashcards were given primarily on the aesthetic and functional aspects of the appliance without regarding its shape or appearance as an indication of trade origin (paragraph 51). I have already quoted what he said at paragraph 68 about distinctiveness, and at paragraph 71 about similarity and the link. In paragraph 71 he mentioned in particular that consumers in this market would be alive to the potential for variations in appearance to be indicative of differences in trade origin, and said that no-one actually contemplating the purchase of either appliance would be under any misapprehension as to their true trade origin. The judge there clearly discounted any reliance on the reported customer at Fenwicks in Brent Cross as having been at any real risk of having bought a kMix while thinking it was a KitchenAid Artisan. At paragraph 75 he rejected the possibility of initial confusion, and held that relevant average consumers would be aware, looking at each product, that it was different from the other of which it reminded them, and would not be under the misapprehension that each was of the same trade origin. That disposed of the claim based on article 9(1)(b). It seems to me that it also disposed of any claim under article 9(1)(c) based on detriment to the distinctiveness of the mark, because the judge has held that the CTM shape remains as distinctive as it was before. He said so in terms in paragraph 80(2) at sentence (f).

128. Whirlpool did not put forward a case based on damage to the repute of the CTM, the other possible "detriment" case under article 9(1)(c).

**Unfair advantage of the distinctiveness or repute of the CTM**

129. On the footing that the relevant average consumer is aware of the difference of appearance between the two products, and does not confuse the one with the other, in terms of trade origin or otherwise, what is the case as to Kenwood taking unfair advantage of the reputation or the distinctive character of the CTM?

130. Mr Mellor submitted that the similarity between the shape of the kMix and that of the CTM, giving rise to the link which the judge held to exist, had an economic impact on Whirlpool's trade. He also argued that Kenwood gained a competitive advantage by reason of the similarity, and that this by itself demonstrated that Kenwood secured an unfair advantage from the distinctive character and the repute of the CTM. Relying on the reference in paragraph 36 of the ECJ's judgment in *Intel*, he submitted that the evidence of the expert witness for Kenwood, Mrs Watson, showed that Kenwood drew a relevant benefit from the similarity and the association in the minds of relevant average consumers. With the benefit of the opinion of Advocate General Mengozzi in *L'Oréal v Bellure*, in addition to that of Advocate General Sharpston in *Intel*, and now the judgment of the Court in *L'Oréal v Bellure* he contended that the similarity and the association gave a boost to Kenwood's sales of the kMix, and that the shape of the kMix has a particular attraction to consumers due to its association with the positive qualities of the well-known shape of the KitchenAid, in such a way as to induce the consumer to buy the kMix product because of the similarity of its shape to the CTM. In part these submissions are based on a reading of paragraph 80 which I do not accept, for reasons already given. I need not go into that aspect of the evidence again.

131. I do need to make some reference to Mrs Watson's evidence, because of the reliance placed on it by Mr Mellor in the context of unfair advantage. The judge mentioned a number of points from her evidence at paragraph 67. One, relied on by Whirlpool, is that having a similar "look appeal" potentially attracts customers who would not have looked at the Kenwood Chef. In the context of the particular series of questions and answers, I do not regard that as referring to anything other than that both products are designed to a high standard, and both thereby attract a type of customer who would not be attracted by a less stylish product such as the Kenwood Chef. The same goes for her comment that there is a competitive advantage in being an iconic brand when selling to consumers. That proposition is obvious in itself, and does not take the case any further on its own. Mrs Watson thought that there might be initial confusion between the two products, which would be dispelled on closer examination, but of course the judge held that there would not even be initial confusion, so this aspect of Mrs Watson's evidence (not within the ambit of her expertise) is of no help to Whirlpool. Mr Mellor also pointed to a passage in her evidence in which she accepted that, if a customer were to be looking at a kMix because of its similarity to the KitchenAid Artisan, that would be a competitive advantage. Mrs Watson was answering Mr Mellor's question on the basis of an assumed hypothesis, and was not asserting or accepting that a customer would look at a kMix because of its similarity to the KitchenAid Artisan. It seems to me that that answer proves nothing. To the extent that the evidence of the survey witnesses touched on this point, I have reviewed it earlier, and I conclude, for reasons there given (paragraph [85]), that it does not make out any case of any similarity or reminder having an effect on the economic behaviour of relevant average consumers.

132. In his written submissions made in the light of the ECJ's decision in *L'Oréal v Bellure*, Mr Mellor made further points. First, he put forward a criticism of the judge's comment in sentence (o) in paragraph 80, that resemblance can have the effect of drawing consumers towards choosing the kMix without being objectionable from a trade mark point of view. Since, however, my conclusion is that the judge did not find that consumers would be so drawn (see paragraph [85] above), I need not spend time on that new point.

133. His next line of attack was to draw an analogy with the evidence of intention which was present, and plain, in that case, to which the Court clearly attached considerable importance, on the one hand, and the evidence as to Kenwood's intentions in the present case on the other hand. The second sentence of paragraph 47 and paragraphs 48 and 49 of the Court's judgment all mention as significant the third party's intentions: the intentional creation of an association in the mind of the public between its product and that of the trade mark holder; the intention to take advantage for promotional purposes of the distinctive character and the repute of the marks; the attempt through the use of a sign similar to the mark in order to benefit from the mark's power of attraction, its reputation and its prestige. A somewhat similar point is made in paragraph 41 (though there without express reference to subjective intention) with the reference to "a transfer of the image of the mark or of the characteristics which it projects to the goods identified by the identical or similar sign".

134. The material in the present case which is said to bring it within that reasoning is that summarised by the judge at paragraph 7 of his judgment, to which I have referred at

paragraph [14] above.

135. It seems to me that this case is a very long way away from *L'Oréal v Bellure*. As I have mentioned at paragraph [14] above, Whirlpool did not make any relevant allegation of intention in their pleaded case. Kenwood could not have planned its entry into this sector of the market, of which KitchenAid had until then had a monopoly, without being very well aware at all times of the KitchenAid Artisan. That in itself is not sinister (as the judge said), nor does it amount to anything like what the alleged infringers did in *L'Oréal v Bellure*. Kenwood, after all, had its own established goodwill in small domestic appliances, and kitchen items especially, on which it sought to build and rely, although not in the particular niche of the market to which the KitchenAid Artisan appealed. It did not need to ride on KitchenAid's coat-tails, so as to save itself from making promotional efforts in relation to its new product. It wished and aimed to use and to develop its own established goodwill and reputation by way of the promotion of its new product. As Mr Purvis submitted, Kenwood would not have wanted to be thought to have produced a "me too" design. Nor can I regard the colour similarity as sufficient to bring the case within the approach explained by the Court in its recent decision, especially as the CTM is not colour-specific, and in the absence of any pleaded allegation on this point.

136. I do not consider that Kenwood's design involves anything like a transfer of the image of the KitchenAid mark, or of the characteristics which it projects, to the goods identified by Kenwood's sign (see *L'Oréal v Bellure* paragraph 41). Of course, as a newcomer in a specialist market of which KitchenAid had a monopoly, and being (necessarily) in the basic C-shape of a stand mixer, the kMix would remind relevant average consumers, who are design-aware, of the KitchenAid Artisan. That, however, is a very different phenomenon, in very different commercial circumstances, from the situation considered in *L'Oréal v Bellure*. I find the Court's judgment instructive, but it does not seem to me to lead to the conclusion in favour of Whirlpool for which Mr Mellor contends. On the contrary, having rejected his radical submission that the word "unfair" could just as well have been left out of the article, it seems to me that the decision points away from, rather than towards, liability under the article on the facts of the present case. It is not sufficient to show (even if Whirlpool could) that Kenwood has obtained an advantage. There must be an added factor of some kind for that advantage to be categorised as unfair. It may be that, in a case in which advantage can be proved, the unfairness of that advantage can be demonstrated by something other than intention, which was what was shown in *L'Oréal v Bellure.* No additional factor has been identified in this case other than intention.

137. The question of unfair advantage has to be considered in the round, using a global assessment as indicated in *Intel* in paragraph 79 of the Court's judgment. As Advocate General Sharpston said at paragraph 65 of her Opinion in *Intel*, unfair advantage is the more likely to be found if the mark is more distinctive and if the goods or services are more similar. The Board of Appeal in *Mango* also said that unfair advantage is the more likely where there is greater similarity of goods as well as where the mark is more distinctive, but that was a case where the mark was identical, and strongly distinctive, and the goods were not the same but they were in an associated or overlapping field. The Court in *L'Oréal v Bellure* also referred to the importance of the strength of the reputation of the mark, and the strength of the reminder, reiterating what had been said in *Intel*. Here, although the relevant goods are very similar (even

identical if one is considering the category stand mixers), the mark is distinctive, but not strongly so, nor is the reminder strong. That is therefore another pointer away from unfair advantage. At paragraph 66 of her Opinion in *Intel* Advocate General Sharpston referred to the question whether the association of the earlier mark would enhance the performance of the later sign in the use made of it. That is another way of putting the proposition that the alleged infringer must draw some advantage from the use of a similar mark or sign. In *L'Oréal v Bellure* the third party's advantage had been established; here it is very much in issue.

138. It seems to me that, on the evidence and on the judge's findings as regards that evidence, Whirlpool is unable to show that Kenwood has in fact drawn, or is likely to draw, any commercial advantage from the perceived similarity. None of Mrs Watson, the survey witnesses, or the demonstrators enables Whirlpool to show clearly that Kenwood had obtained any such advantage, or were likely to do so. Relevant average consumers would be aware both of the KitchenAid Artisan and of the new entrant to the market. The two are similar in certain respects, but above all because both are stand mixers designed to a high standard of style, so as to be attractive products on the kitchen work surface, rather than functional items to be hidden away when not in use. Accordingly, looking at the question of unfair advantage generally, it seems to me that the judge was right to reject the case made on that footing for two reasons: there was no advantage to Kenwood, and if, to the contrary, there were, it was not an unfair advantage.

139. It follows that the alternative case under article 9(1)(c) based on unfair advantage is not made out, any more than is the case based on detriment to the distinctive character of the CTM.

**Disposition**

140. For those reasons it seems to me that Whirlpool's appeal fails.

141. In those circumstances I need not consider the issues arising on the Respondent's Notice.

142. We had some submissions as to whether a reference to the ECJ might be necessary in this case, but it seems to me that the case depends on the findings of fact and on the correct understanding of what the judge said, not on any debatable or doubtful proposition of trade mark law under the CTMR.

143. For those reasons and in those circumstances, I would dismiss the appeal.

**Lord Justice Wilson**

144. I agree.

**Lord Justice Rix**

145. I also agree.

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                         MARSHALL DIVISION

 3

    WHIRLPOOL CORP, and WHIRLPOOL    )(   CIVIL ACTION NO.
 4  PROPERTIES, INC.,                )(   2:22-cv-00027-JRG-RSP
                                     )(
 5            PLAINTIFF(S),          )(
                                     )(   MARSHALL, TEXAS
 6       versus                      )(   APRIL 19, 2022
                                     )(
 7  SHENZHEN SANLIDA ELECTRICAL      )(   PRELIMINARY INJUNCTION
    TECHNOLOGY, CO., LTD and         )(       HEARING
 8  SHENZHEN AVOGA TECHNOLOGY CO.    )(
    LTD.,                            )(
 9                                   )(
              DEFENDANT(S).          )(
10        _____

11

12                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JUDGE ROY S. PAYNE
13                 UNITED STATES MAGISTRATE JUDGE

14

15

16  SUSAN A. ZIELIE, FCRR, RMR
    FEDERAL OFFICIAL STENOGRAPHIC COURT REPORTER
17  Official Stenographic Court Reporter
    United States District Court
18  Eastern District of Texas
    Tyler Division
19  211 West Ferguson Street
    Tyler, Texas 75701
20  903-590-1065
    susan_zielie@txed.uscourts.gov
21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3         FOR PLAINTIFFS - WHIRLPOOL:
           TOM GORHAM,  ESQ.
 4         MARK LORELLI, ESQ.
           CHELSEA PASCUALI, ESQ.
 5

 6         FOR DEFENDANTS - SHENZHEN:

 7         TIANYU JU, ESQ.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
          1              MARSHALL, TEXAS; TUESDAY, APRIL 19, 2022

          2                          9:00 A.M.

          3              THE COURT:  For the record, we're here for the

          4     preliminary junction hearing in Whirlpool Corporation, et al.,

08:09AM   5     versus Shenzhen Sanlida Electrical Technology Company, et al,

          6     which is Case Number 2:22-27 on our docket.

          7              Would counsel state their appearances for the record.

          8              MR. GORHAM:  Good morning, Your Honor.  Tom Gorham on

          9     behalf of plaintiff Whirlpool.  With me here today from the

08:10AM  10     Brooks and Kushman Law Firm is Mark Lorelli, also Chelsea

         11     Pascuali.  From Whirlpool, we have Doug Serales and Nate Davis.

         12              We're ready to proceed, Your Honor.

         13              THE COURT:  All right.  Thank you, Mr. Gorham.

         14              MS. JU:  Good morning, Your Honor.  This is Tianyu Ju

08:10AM  15     appearing on behalf of defendants.

         16              THE COURT:  And is it Ms. Ju?

         17              MS. JU:  Yes, that's correct, Your Honor.

         18              THE COURT:  And I don't note that you have appeared in

         19     any manner in this case; have you?

08:10AM  20              MS. JU:  I just turned in my appearance to the clerk.

         21              THE COURT:  Have you filed that?

         22              MS. JU:  No, Your Honor.

         23              THE COURT:  All right.  It does not accomplish anything

         24     if you haven't filed it.

08:11AM  25              I have the document that you handed to the courtroom
```

1    deputy.  That's a document that bears the caption from the

2    Western District of Texas, Waco Division.

3              MS. JU:  That must be a mistake.  Sorry, Your Honor.

4              THE COURT:  So what is your relationship to the case?

08:11AM  5              MS. JU:  I'm the counsel retained by the defendant to

6    appear for the purpose of today's hearing.

7              THE COURT:  All right.  Is there any reason you have not

8    already filed an appearance?

9              MS. JU:  I just arrived in this district yesterday, so I

08:11AM 10   haven't got a chance to efile it.

11             THE COURT:  You do understand these things are normally

12   filed through CM-ECF?

13             MS. JU:  Yes, Your Honor.

14             THE COURT:  Which is available throughout the country.

08:11AM 15             MS. JU:  Yes, Your Honor.

16             I spent almost all day yesterday with airplane because I

17   flew here from Los Angeles.

18             But I can ask my colleague, who has access to computer,

19   to file, to efile the appearance for me, if it works.

08:12AM 20             THE COURT:  Are you admitted to practice in this

21   district?

22             MS. JU:  Yes, Your Honor.

23             THE COURT:  And you have some evidence of that?

24             I guess we can determine that.

08:12AM 25             I'm going to take a short break, and I'll give you an

```
 1   opportunity, Ms. Ju, to actually file your notice of

 2   appearance.

 3          MS. JU:  Sure.  Of course, Your Honor.

 4          THE COURT:  But I cannot have you participate in this

 5   hearing unless you have formally enrolled in this case on

 6   behalf of the defendants.

 7          MS. JU:  I think I will need only five minutes to file

 8   my appearance, Your Honor.

 9          THE COURT:  All right.  Well, I'm going to give you an

10   opportunity to do that, and we will resume shortly.

11          MS. JU:  Thank you, Your Honor.

12          [PROCEEDINGS IN RECESS]

13          THE COURT:  Good morning again.  Please be seated.

14          I'll note for the record that Ms. Ju has now filed a

15   notice of appearance in the matter on behalf of both

16   defendants.

17          And, with that, I will turn it over first to counsel for

18   plaintiff.

19          MR. SERALES:  Thank you, Your Honor.  Mark Lorelli on

20   behalf of Whirlpool, plaintiffs.

21          It's a little difficult to know how to proceed.

22   Certainly, we filed our papers, presented evidence in the form

23   of numerous declarations.  We have Mr. Serales here to testify,

24   if needed.  But as the Court noted in its order when we asked

25   for this hearing, is that the purpose of a hearing is to see if
```

1    there's any disputes as to the facts or disputes as to whether

2    the Court should grant this preliminary injunction.

3          We had provided notice of our motion in late January and

4    early February to both defendants.  We asked for a preliminary

08:36AM 5    injunction hearing, at which point the Court ordered us to

6    provide notice of this hearing, which we did, on March 23rd, a

7    month ago.

8          As we've come here today, we don't know if there's any

9    facts in dispute.  We don't know whether there is any

08:36AM 10   opposition to our preliminary injunction papers.

11         One of the things that we've noticed in the marketplace

12   is that the distribution of the accused products is dwindling,

13   and its price is dropping dramatically.  That may indicate to

14   some that the defendants know that they shouldn't have been

08:36AM 15   selling this product in the United States.

16         But, at this injunction, I will ask the Court what its

17   preference is.  We can certainly go through and do a

18   presentation of everything that we've already presented.  I

19   don't know that that's the most efficient way to do it, given

08:37AM 20   the posture that we sit here today, Your Honor.

21         THE COURT:  Well, we do have the benefit of having

22   counsel for the defendants.  So, Mr. Lorelli, what I will do is

23   turn it over for the time being to defense counsel, find out

24   what issues there are, and then get you back up.

08:37AM 25         MR. LORELLI:  Thank you, Your Honor.

 1          THE COURT:  Thank you, Mr. Lorelli.

 2          MS. JU:  Good morning, Your Honor.  I'm sorry for what

 3     happened earlier today.

 4          Without moving any 12(b) defenses, I'm representing

08:37AM  5     defendants in this case to oppose the preliminary injunction

 6     filed by plaintiff.

 7          First of all, we would like to mention that there is no

 8     dispute that the service of process have not been effectuated

 9     on those defendants.  Without serving those defendants of

08:38AM 10     process, this Court does not have personal jurisdiction over

11     this defendant, which renders that this Court should not render

12     any judgment or orders against these defendants.

13          THE COURT:  As you know, Ms. Ju, the rules on

14     preliminary injunctions require notice.  They don't actually

08:38AM 15     require service.

16          Do you dispute that your clients have received notice of

17     this proceeding?

18          MS. JU:  I do not dispute that, Your Honor.

19          What I'm talking about is the Fifth Circuit has

08:38AM 20     recognized that it is well-settled law that without service of

21     process the Court does not have personal jurisdiction to render

22     a judgment against a defendant.

23          In this case, since the defendants have not been served

24     service of process yet, so this Court should not grant

08:39AM 25     plaintiff's motion for preliminary injunction.

1        THE COURT:  Before a judgment can be rendered, you're

2   right, there will have to be proof of service.  But a

3   preliminary injunction is a preliminary matter, and it requires

4   notice, not actual proof of service of process.  So I note your

08:39AM 5   point on that.

6        Beyond the issue of service of process, what are the

7   other points in the plaintiff's presentation that your clients

8   dispute?

9        MS. JU:  There are two points that defendants dispute.

08:39AM 10       First of all is plaintiff's motion must be denied

11  because the alleged infringement was based on the trademarks

12  that should not have been granted -- should not have been

13  issued due to the functionality of the feature and

14  configuration.  Contrary to plaintiff's allegation in its

08:40AM 15  motion, plaintiff conceded the functionality of the mixer

16  because plaintiff is assignee of two utility patents that are

17  having, admittedly, the same appearance of the trademark.

18       In addition, there is a utility patent filed in 1937 for

19  a food handler, also bears the similar, and, admittedly, same

08:40AM 20  appearance of plaintiff's trademark.

21       In addition, the Fifth Circuit applies the test

22  concerning functionality is whether characterizing a feature or

23  configuration as protected would hinder competition upon

24  other's rights to compete.

08:40AM 25       THE COURT:  What case is that that you're citing from

1    the Fifth Circuit?

2          MS. JU:  It is *Sicilia DI R Biebow and Co versus Cox*.

3    The citation is 732 F.2d 417, 420 (5th Cir. 1984).

4          THE COURT:  And what is the -- can you spell the first

08:41AM  5    name of that case cite?

6          MS. JU:  Sure.  It's S-I-C-I-L-I-A, and then D-D-I, and

7    a capital R, and B-I-E-B-O-W and Co.

8          THE COURT:  All right.

9          And you are saying that -- that case stands for what

08:41AM 10    proposition?

11          MS. JU:  That case shows that the Fifth Circuit adopted

12    a test of functionality and entered this test.  The admittedly

13    inquiry concerning functionality is whether it characterizes a

14    feature or configuration as protected will hinder competition

08:42AM 15    upon the rights of others to compete effectively in the sale of

16    goods.

17          Here, the feature and configuration of plaintiff's

18    product will certainly hinder competition and allow plaintiff

19    to achieve a monopoly in the mixer market.

08:42AM 20          The second argument defendants would like to make is

21    there is no likelihood of confusion.  In plaintiff's motion,

22    plaintiff also referred to defendants by their brand name.  As

23    shown also in page 3 of the complaint, defendant's product

24    incorporated we their on brand name.

08:42AM 25          Moreover, as the case plaintiff lost in the UK, the case

1    in -- the judge in UK stated that the consumer would not

2    confuse the product between plaintiff and others since the

3    plaintiff's product were offered for sale for a couple hundred

4    dollars.  In UK, it should be 300 pounds.  So, for consumer

08:43AM 5    would like to buy a mixer in that price range, they would

6    access reasonable evaluation.  Due to the difference in prices,

7    the consumers would less likely to encounter any confusion.

8         THE COURT:  You're saying that was from a proceeding in

9    the UK?

08:43AM 10        MS. JU:  Yes.

11        THE COURT:  And how would that relate to US trademark

12   law?

13        MS. JU:  Plaintiff in that case also sued another

14   manufacturer of the similar mixer.

08:44AM 15        I would just want to present this argument to this

16   Court, and I know that because in UK they apply the different

17   trademark law than the US trademark law.  However, there is a

18   parallel, for example, in the US trademark law.  It should be

19   1025, which is a parallel to the UK statute that solidified

08:44AM 20   that case.

21        THE COURT:  All right.  And so the point of that case,

22   as far as you're representing, is that a consumer would not

23   confuse the two products because of the difference in price?

24        MS. JU:  Yes.

08:44AM 25        And the UK court actually contacted the service of

1    multiple consumers.  And there are a lot of service contacted

2    by the defendants and the plaintiffs in this case, in the UK

3    case, and so that's the reason I would like to bring this

4    argument in front of this Court.

08:45AM  5              THE COURT:  All right.

6              Are you aware of any cases in the US that have held that

7    a difference in price can be a defense to the likelihood of

8    confusion?

9              MS. JU:  I haven't conducted my research.  But, Your

08:45AM 10   Honor, I believe this would be one of the elements that could

11   attribute to the argument about likelihood of confusion.

12   Because, when evaluating whether there is likelihood of

13   confusion, we look to whether there's confusion among the

14   consumers, the average consumers of the relevant use is to be

08:45AM 15   taken as reasonably well informed and reasonably observant.  So

16   when the consumer who would purchase a couple hundred dollars

17   mixer, those consumers should be the consumer we need to take

18   into consideration regarding whether there is likelihood of

19   confusion.

08:46AM 20             THE COURT:  All right.

21             MS. JU:  In addition, when the consumers look at the

22   design, the price and functionality and the quality of the

23   mixer before making a decision to purchase, an ordinary

24   consumer would not simply be confused and believe that the

08:46AM 25   defendant's mixers are the same as the plaintiff's mixer.

1    THE COURT:  Are there other facts that you can point to

2  that you think count against likelihood of confusion other than

3  the difference in price?

4    MS. JU:  And, as shown in plaintiff's complaint on page

08:46AM  5  3, defendants' products incorporated with their own brand.

6    And plaintiff also in its motion for preliminary

7  injunction refers to the defendants by using their brand name.

8    THE COURT:  Okay.  So you're relying then on the fact

9  that there's a difference in price and that your client's goods

08:47AM 10  have a different brand name on them?

11    MS. JU:  Yes, Your Honor.

12    THE COURT:  Okay.

13    MS. JU:  And I would like to highlight my first argument

14  regarding functionality.  It's defendant's position that the

08:47AM 15  alleged infringement is meritless because the trademarks should

16  be cancelled due to the functionality of the feature and the

17  configuration.

18    THE COURT:  All right.  And do you have any other cases

19  you want to cite on that point, besides the *Sicilia* case?

08:48AM 20    MS. JU:  Actually, I would like to cite one case for the

21  service of the process issue.  I would like to cite a Fifth

22  Circuit case in 1957, the *Royal Lace Paperworks versus*

23  *Pest-Guard Plus*.

24    THE COURT:  Spell the first word of that name.

08:48AM 25    MS. JU:  Sure.  It's R-O-Y-A-L, space, L-A-C-E, space,

```
 1    paper, P-A-P-E-R, space, W-O-R-K-S.

 2          THE COURT:  And what is the cite?

 3          MS. JU:  It's 240 F2.d, 8214.

 4          THE COURT:  And that's Fifth Circuit 1957?

 5          MS. JU:  Yes.  That's correct, Your Honor.

 6          THE COURT:  Okay.

 7          MS. JU:  And I also would like to cite another case.

 8    There is one case in the Northern District of Texas, has

 9    delayed ruling on the request for preliminary injunction until

10    the service of process on defendants have been effectuated,

11    which shows that the Court understood the preliminary

12    injunction could not be granted or denied without having

13    affected services.  The case is Katerra, K-A-T-E-R-R-A, Inc.,

14    versus P-A-R-A-G-O-N Construction Co., LLC.  And the civil

15    action number is 21-cv-914, and the citation is 2021 US

16    District Lexis 77365, Northern District of Texas.  This ruling

17    was published in 2021, April.  On April 22nd.

18          Like in this case, the plaintiff has not effectuated

19    service process on defendants.  So, thus, defendant

20    respectfully requests this Court to delay in making a decision

21    on plaintiff's motion for preliminary injunction.

22          THE COURT:  I'm not sure what that court was concerned

23    about.  It may be that they used service as interchangeable

24    with notice.

25          But the law is very clear that preliminary injunctions
```

1   can be obtained before service of process is effectuated.

2          Anyway, go ahead.  I interrupted you.  What else?

3          MS. JU:  In addition, because we are very recently just

4   been retained by defendant, we haven't got a chance to review

08:51AM  5   the full docket of this case, so it would be -- it would cause

6   substantial injustice to the defendant if defendant would not

7   be able to allow a chance to brief this motion.  So the

8   defendant would like the Court allow an opportunity for

9   defendants to briefing this motion.

08:51AM 10          THE COURT:  Why have you not sought additional time

11   before this morning if you need additional time?

12          MS. JU:  We were actually just being retained, and I

13   just got into this district yesterday, and during nighttime, so

14   I haven't been able to get any -- get information regarding all

08:52AM 15   aspect of this case yet.

16          THE COURT:  Has your client given you any explanation

17   for why they did not contact you until last night?

18          MS. JU:  It's really because our client's in China, and

19   Chinese people just have so limited ability to find a US

08:52AM 20   attorney who has permission to this district and can speak both

21   Mandrin and English.

22          THE COURT:  All right.  Anything else, Ms. Ju, before I

23   ask Mr. Lorelli for his response?

24          MS. JU:  Nothing further, Your Honor.  Thank you.

08:53AM 25          THE COURT:  All right.  Thank you.

1           MR. LORELLI:  May I, Your Honor?

2           THE COURT:  Yes, sir.

3           MR. LORELLI:  I think the -- I don't know what else need

4     to be said about the service of process.  Certainly, this is an

08:53AM  5     issue that is very important to Whirlpool.  That's why they

6     came to this Court with a preliminary injunction.  That's why

7     we moved quickly to get notice to these Chinese defendants,

8     through various means.  And then, also, exactly a month ago,

9     provided them with notice of this Court's order to present any

08:53AM 10     evidence that they had in opposition to the preliminary

11     injunction today.

12           Certainly, these are new arguments that we've heard for

13     the first time today, but I'm fully able to address each and

14     every one of them because they don't matter in what I believe

08:54AM 15     is the right decision in this case.

16           The first one is that our trademarks should not have

17     been granted.  Your Honor, our trademarks are very old.  They

18     are incontestable.  They provide presumptive evidence of

19     non-functionality.  And not only do they provide that

08:54AM 20     presumptive evidence of non-functionality and are incontestable

21     on other grounds but we also presented evidence that our

22     designs are not functional.

23           I, of course, did not hear the numbers of the utility

24     patents that were allegedly filed, but I guarantee you none of

08:54AM 25     them address the look or the appearance of the stand mixer.

1    When we talk about utility patents, we talk about the planetary

2    gears, we talk about how things operate.  We don't talk about

3    how something looks.  When you understand that we are asking

4    for an injunction on the appearance of the stand mixer, it is

08:55AM   5    very clear that it is non-functional.

6         In fact, the defendants say they rely on a case that

7    says that our rights hinder competition.  The defendants sell a

8    number of stand mixers.  We presented the Court with evidence

9    of other stand mixers in the marketplace, as well as one from

08:55AM  10    the defendants, that don't use our trade address, our

11    registered trademark for the stand mixer.  That is conclusive

12    evidence that our trademark is non-functional, when they can

13    compete with other designs in the marketplace; and they do.  So

14    that's the first point:  Our design does not hinder

08:55AM  15    competition.

16         The second point was they put their brand name on the

17    product -- oh, I'm sorry.  Before I leave that first point on

18    the functionality, I just wanted to note to the Court that the

19    functional standard as well as evidence of other designs are

08:56AM  20    set forth on pages 10, 11 and 12 of our motion.  But it's not

21    the first time that somebody has considered the functionality

22    of our -- I'm sorry -- the non-functionality of our stand mixer

23    design; the trademark office did that.

24         The second point that was raised is they put their brand

08:56AM  25    name on the product.  That, of course, was addressed by us as

1    well on pages 14 to 15 of our opening papers.  And as this

2    Court is aware the similarity of the designs are judged by

3    what's called the subjective eyeball test.  It's when I look at

4    something and I look at something else.  It's not whether I

08:56AM 5    study it and whether I can tell there's differences.  Most

6    people, when they would see a design of a stand mixer, they

7    might not see the brand name.  They would have to study it.

8    But the test is a subjective eyeball test where you look at one

9    and then you look at the other.  Whether somebody even looks at

08:57AM 10   the brand name is not common.  But, here -- this is the point

11   that we make in our brief -- is that, because they are the

12   similar products and they are so confusingly similar in design,

13   consumers may look at the name and think it's a related product

14   or a line extension.  For example, KitchenAid has the Artisan,

08:57AM 15   the Classic, the Mini stand mixers.  Make the Cooklee is the

16   next one.  These are things that the case law has indicated --

17   and that is case law from the Fifth Circuit -- that a

18   purchaser, even though they see a different brand name, might

19   think that it is still an infringement.  And, in fact, it may

08:58AM 20   aggravate, not lessen, the infringement because they see a

21   different name, simply a line extension or something along

22   those lines.

23       THE COURT:  I saw in your brief that you cited a couple

24   of district court cases from the Southern and Northern

08:58AM 25   Districts of Texas on that point.  Do you have a Fifth Circuit

1   case that you think speaks to the fact that just having a

2   different brand name does not rebut the likelihood of

3   confusion?

4           MR. LORELLI:  Yes, Your Honor.  It's on the bottom of

08:58AM 5   page 14 to the top of page 15.  It's the Board of Supervisors

6   For Louisiana State University Agricultural and Mechanical

7   College, 550 F.3d 482, is the Fifth Circuit case that we cite

8   to.

9           THE COURT:  All right.  Thank you.

08:59AM 10          MR. LORELLI:  And, of course, we cite to other district

11   courts, Fifth Circuit cases, about the subjective eyeball test,

12   and we look at similarities of the designs, Your Honor.  We

13   don't look at little differences that might be identified by a

14   defendant.  It's whether, when you look at the design

08:59AM 15   subjectively, do they look similar, and that's he the test that

16   we're looking at here.

17           With regards to the high price argument, I'd like to

18   address that.  And we also address that in our brief on pages

19   18 through 20.  While it is true that a general proposition

08:59AM 20   that people that spend more money might spend more care, it's

21   but one factor or one digit in the likelihood of confusion

22   analysis.  $200 is not $100,000 for an automobile, or a lot of

23   money for a piece of heavy equipment.  $200 is not the level of

24   price that makes the determination in this digit for confusion.

09:00AM 25           And the cases that we cite are very clear that when the

```
 1   products -- when the parties sell the same products, prices --
 2   the case what we cite from the Fifth Circuit:  A high price tag
 3   alone does not negate other indica of likelihood of confusion,
 4   especially if the goods and the marks are similar.  And that's
 5   Extreme Lashes, 576 F.3d 221, Fifth Circuit 2009.  Price does
 6   not enter the calculus.  What does is all of the digits of
 7   confusion that we went through in our brief, Your Honor.
 8        And not every one of them needs to go our way.  It's on
 9   balance whether there is a significant likelihood of confusion.
10   And, on balance, the most important factors are always the
11   similarity of the marks, the similarity of the goods, the
12   similarity of the retail channels.  And you didn't hear any
13   dispute with regards to those.  In fact, other circuits -- not
14   the Fifth Circuit -- find when those three go in your favor
15   it's an automatic likelihood of confusion.  But we don't cite
16   that law, obviously.  And we don't cite law from other
17   countries as well.
18        But I wanted to raise one interesting point on the price
19   argument, because I heard that opposing counsel said before a
20   purchase is made people figure it out.  Well, that's an
21   argument.  I don't know that it's true.  But it's not the law.
22   In the Fifth Circuit, initial interest confusion is confusion.
23   Which means if I'm looking at a product online and I see a
24   stand mixer that looks similar to a KitchenAid, and I decide to
25   spend more time looking at that, it sparks my initial interest
```

09:00AM (line 5)
09:00AM (line 10)
09:01AM (line 15)
09:01AM (line 20)
09:01AM (line 25)

1    because it looks alike, and that is actionable confusion.  And

2    we cite the *Board of Regents versus the University of Houston*

3    case.  That was a case where the plaintiff and the defendant

4    were rival colleges.  And the argument was:  Well, before you

09:02AM  5    register to take classes, you're going to figure out that it's

6    a different college.  But that's the law.  Initial interest

7    confusion.  They got these people interested in a different

8    college because of the similarities of a trademark from another

9    college, and that was wrong.  That was actionable by the Fifth

09:02AM 10    Circuit.  And other courts talk about it, bringing patrons into

11    the door.

12         THE COURT:  What is the cite on the Houston case?

13         MR. LORELLI:  That is -- I'm sorry, I've got a pinpoint

14    cite here, Your Honor.  I've got a pinpoint cite as 214

09:02AM 15    F.Supp.3d 598.  I will locate the full cite for you, but it is

16    in our brief.

17         THE COURT:  That's sufficient.  Thank you.

18         MR. LORELLI:  And there's the Luxeada Group case, which

19    is about sunglasses -- which, I know Luxeada sunglasses can

09:03AM 20    cost well more than 20 -- and they talk about the

21    bait-and-switch.  Right?  You get them interested, and then,

22    you know, when it's a different brand at the end of the day

23    it's still actionable confusion.

24         And that's where I think I wanted to end today, because

09:03AM 25    that's why we're here.  We're here for the riding on the

|       |    |                                                                                  |
|-------|----|----------------------------------------------------------------------------------|
|       | 1  | coattails.  We're here because our design, our trademark, is so                  |
|       | 2  | famous and popular.  We presented all of the evidence about it                   |
|       | 3  | being iconic, about it being a market leader, about how people                   |
|       | 4  | aspire to own such a design.  And the value of that design to                    |
| 09:04AM | 5  | our reputation is immense.  And what people like defendants                    |
|       | 6  | hope to do is ride off of our coattails.  Then want to enjoy                     |
|       | 7  | the bait-and-switch.  They want to get people interested in                      |
|       | 8  | their -- what we've presented in our papers -- is a sub quality                  |
|       | 9  | produced, they want to get them interested at a lower price                      |
| 09:04AM | 10 | point, and then they want to make the sale.  And not only does                |
|       | 11 | that sale hurt us by a loss of a sale but it prevents us from                    |
|       | 12 | having our own reputation in the marketplace anymore, and this                   |
|       | 13 | is a reputation that was built over 80 years.                                    |
|       | 14 | These two particular products that we have identified                            |
| 09:04AM | 15 | and we seek a preliminary injunction for are causing great harm               |
|       | 16 | to us in the marketplace.  That's why we've acted.  That's why                   |
|       | 17 | we are here.  And that's why we've requested a preliminary                       |
|       | 18 | injunction.                                                                      |
|       | 19 | THE COURT:  Mr. Lorelli, before you sit down, do you                             |
| 09:05AM | 20 | have any response on what was cited as the UK case?                           |
|       | 21 | MR. LORELLI:  I don't know anything about the UK case.                           |
|       | 22 | I don't.                                                                         |
|       | 23 | THE COURT:  Okay.                                                                |
|       | 24 | MR. LORELLI:  I actually whispered:  What UK case?  I                            |
|       | 25 | don't know.                                                                      |

1          I do know that trademark law is not same when you go to

2     other areas of the world.  I also know that it's not the same

3     depending on what circuit you're in.

4          But I do know, in the Fifth Circuit, initial interest

09:05AM 5     confusion, wholesale confusion, and the balance of the digits

6     are strongly in our favor and certainly worthy of a preliminary

7     injunction in this case.

8          THE COURT:  All right.  Thank you, Mr. Lorelli.

9          MR. LORELLI:  Thank you.

09:05AM 10         THE COURT:  Ms. Ju, do you have other comments you want

11    to offer?

12         MS. JU:  Yes.  If I may, Your Honor.

13         THE COURT:  Yes.

14         MS. JU:  Your Honor, in terms of the functionality

09:05AM 15    aspect, I would like to refer to the utility patents.  If I may

16    read of the number of the utility patent.

17         The utility patent filed in November 2, 1937 is with the

18    number 2,185,155.  And there are also two utility patents, one

19    is US 2009 0,109,792 and then the other one is US 2016

09:06AM 20    0,324,367.

21         As ruled by the Supreme Court, a product feature is

22    functional and cannot serve as a trademark if it is essential

23    or use or purpose of the article or if it affects the cost or

24    quality of an article.  *TrafFix Devices, Inc., versus Marketing*

09:07AM 25    *Displays, Inc.*

```
 1          THE COURT:  Give me that citation again.

 2          MS. JU:  It's P-R-A-F-F-I-X space D-E-V-I-C-E-S, Inc.

 3   The citation is 532 US 23 and 32 (2001).

 4          THE COURT:  And you think that that case stands for the

09:07AM  5   proposition that, if a design is essential to the function,

 6   that it is not entitled to protection, trademark protection?

 7          MS. JU:  Yes.  That's correct, Your Honor.

 8          THE COURT:  What evidence is there that this design is

 9   essential to the function?

09:07AM 10          MS. JU:  I'm going to refer to the utility patents that

11   I just read to the Court.

12          So, in terms of the utility patents that are filed in

13   1937 with a US patent number 2,185,155, in the two utility

14   patents in 2019 and 2016, in the 2009 was the published number

09:08AM 15   US 2009 0,109,792 and the other one is US 2016 0,324,367.

16          I actually have the patent feature and the look, the

17   appearance of those two patents with me.  I may deliver them to

18   the Court?

19          THE COURT:  All right.  If you would show them first to

09:09AM 20   counsel for plaintiff, and then you can pass them up to the

21   clerk.

22          [PAUSE IN PROCEEDINGS]

23          MS. JU:  By taking a look at those utility patents, the

24   feature incorporated by the products should be functional and

09:10AM 25   should not be served as trademark.
```

1          THE COURT:  And that's something that you believe is

2     established in the *Sicilia* case in the *Royal Lace* case that

3     you've cited?

4          MS. JU:  In the *Sicilia* case, I would say -- the *Sicilia*

09:10AM 5     case mainly focuses on whether the feature or configuration as

6     protected will hinder competition.

7          But in terms of whether the functionality featuring --

8     characterizing a feature or configuration, I do believe, based

9     on the utility patent, the product feature is functional, as in

09:10AM 10    this case.

11         THE COURT:  All right.

12         I'd note that the 2009 patent that you have offered is

13    one of Whirlpool's patent.

14         MS. JU:  Yes.  The 2009 and the 2016 utility patents,

09:11AM 15    the assignee is the plaintiff in this case.

16         THE COURT:  All right.  And so what you're relying on in

17    your argument is that the figures show a device which is

18    similar to what they have trademarked?

19         MS. JU:  Yes.  That is correct, Your Honor.

09:11AM 20         And the plaintiff in this case actually conceded the

21    aspect of functionality by being the assignee of those two

22    utility patents.

23         THE COURT:  All right.  I will consider that argument.

24         Do you have other objections to the showing that the

09:12AM 25    plaintiffs have made in support of their motion for preliminary

```
 1    injunction?

 2          MS. JU:  Yes, Your Honor.  I do have two quick remarks

 3    on this one.

 4          From when I take a look at the defendant's product and

 5    the plaintiff's product, it's actually the defendant's product

 6    and the plaintiff's product incorporates kind of different

 7    design.

 8          The defendants incorporates with a dial switch bottom on

 9    the mixers, while plaintiff's do not have such design.

10          And the face of plaintiff's product is also heavier in

11    the sense that it is thicker compared to plaintiff's.

12          THE COURT:  What is the first difference that you

13    mentioned?

14          MS. JU:  Defendant's products incorporate a dial switch

15    bottom on the mixer while plaintiff's does not have such

16    design.

17          THE COURT:  And I'm just not understanding the -- what

18    is the bottom that you're saying?

19          MS. JU:  It's a dial switch.  There is a switch on the

20    defendant's product.

21          THE COURT:  All right.  And the word that you're using

22    to describe that switch, could you spell it?

23          MS. JU:  It's dial, D-I-A-L switch.  Switch is

24    S-W-I-T-C-H.

25          THE COURT:  Oh, dial.  I see.
```

09:12AM (line 5)
09:12AM (line 10)
09:12AM (line 15)
09:13AM (line 20)
09:13AM (line 25)

1    MS. JU:  I'm sorry, Your Honor.

2    And then, also, the appearance of defendant's products

3    are already much different compared to plaintiff's.

4    Furthermore, the last thing that I want to mention is

09:13AM  5    the purchasers and the retailers are not identical.  For

6    example, ordinary consumer can purchase plaintiff's mixer at

7    retail stores, such as Bed and Bath Beyond, BestBuy,

8    Burlington, and other stores, while defendant's product are

9    only available for purchase on Amazon and Wayfair, those the

09:14AM  10    online platforms.  Different types of consumers are able to

11    view plaintiff's product in person have a variety of the mixers

12    to choose from.  The fact that plaintiffs decide not to mention

13    this fact tends to prove that the purchase and retailers are

14    different.

09:14AM  15    The marketing effort are also different since plaintiff

16    also implies marketing strategies at giant retailers, such as

17    BestBuy, Bed and Bath Beyond, Walmart, Target, and other

18    retailers, while defendant only sell those product on Amazon

19    and Wayfair.

09:14AM  20    And the fact that plaintiff may also sell on Amazon and

21    Wayfair does not automatically mean that the marketing effort

22    are the same.  More importantly, Amazon and Wayfair are the

23    marketplace for sellers to sell their product to consumers is

24    normal for different sellers to sell similar product in this

09:15AM  25    marketplace.

1      That's why defendants -- it's defendant's position that

2   consumers are less likely and highly unlikely going to be

3   confused about defendant's and plaintiff's products.

4      THE COURT:  All right.

09:15AM  5      MS. JU:  Nothing further, Your Honor.

6      THE COURT:  All right.  Thank you, Ms. Ju.

7      Mr. Lorelli, anything?

8      MR. LORELLI:  If I may, very briefly, Your Honor?

9      THE COURT:  Yes.

09:15AM 10      MR. LORELLI:  With regards to the functionality argument

11   and the argument with regards to these patents, as Your Honor

12   noted, the 2009 and 2016 patents are Whirlpool patents.

13   Clearly, the patents are describing something new -- or, I'm

14   sorry -- are claiming something new, non-obvious, et cetera.

09:15AM 15   The stand mixer design had been around for 70 years at that

16   point.  Clearly, we were not claiming the design that we're

17   trying to enforce today.  And I think Your Honor got to that

18   with one of the questions, what is it about these patents that

19   has any relation to the overall shape and design.  And the

09:16AM 20   answer is that they don't have anything.

21      I looked at the older patent.  It's all about the

22   planetary gear inside the chamber.  Right?  Inside the head.

23   We're not stopping them from making a mixer with a head.  What

24   we're trying to stop them from doing is making a mixer that is

09:16AM 25   shaped like our mixer, that has the bullet-shaped head, that

1    has the rounded edges, that has the sloped neck, that has the

2    rounded base.  These are things that are not anywhere described

3    as a utility issue in any of these patents.

4         One other point is there was some notion of a dial

09:17AM 5    difference.  And, again, we are focused on the overall

6    appearance and the similarity and the subjective eyeball test.

7    Is a dial different than a switch?  Sure.  But does that change

8    the overall appearance of the stand mixer as we're enforcing,

9    which has become known to us -- or known as us in the

09:17AM 10   marketplace?

11        And then the last point, Your Honor, is, I think, very

12   telling.  Counsel's here saying that the marketing channels are

13   different, the retailers are different because KitchenAid sells

14   much broader.  KitchenAid sells at Bed, Bath and Beyond,

09:17AM 15   KitchenAid sells in brick-and-mortar stores, KitchenAid has a

16   distribution network that is much wider.  KitchenAid does a lot

17   of advertising.  KitchenAid spends a lot of money to promote

18   their design, their image, and the quality of their products.

19   The defendants do not.  The defendants sell in the easiest

09:18AM 20   channel that they can sell, Amazon -- which is the same --

21   Whirlpool also sells on Amazon -- but they do it to benefit

22   from all of the money, all of the time, all of the effort that

23   KitchenAid puts out there in all the other distribution

24   channels.

09:18AM 25        I think the argument is actually an indication of what

1    they're trying to do in the marketplace, and that is to ride on

2    our coattails and basically reap where they have not sewn.

3    Thank you, Your Honor.

4              THE COURT:  Mr. Lorelli, let me say that I know you have

09:18AM 5    submitted a proposed order with your motion for preliminary

6    injunction.  Is there anything that you think you need to alter

7    about your proposed order in view of the presentation that the

8    defendants have made?

9              MR. LORELLI:  I do not, Your Honor.

09:18AM 10             THE COURT:  All right.  Good enough.  Thank you,

11   Mr. Lorelli.

12             MR. LORELLI:  Thank you.

13             THE COURT:  I will look at the authorities that the

14   defendants have cited, and consider their arguments, and get a

09:19AM 15   ruling out promptly.

16             Is there anything else that either side wants to put on

17   the record now?

18             MR. LORELLI:  Nothing for the plaintiffs, Your Honor.

19   Thank you.

09:19AM 20             THE COURT:  Ms. Ju, anything else for the defendants?

21             MS. JU:  Your Honor, I would like to -- may I?

22             THE COURT:  Yes.

23             MS. JU:  I would like to draw the Court attention to

24   plaintiff's motion on page 12.  Plaintiff also cited a Fifth

09:19AM 25   Circuit case, AM Rice, R-I-C-E, Inc.  The citation is 518 F.3D,

1   321, 329 (5th Circuit 2008).  So, in terms of assessment of

2   likelihood of confusion, it should be an indicia of confusion,

3   and the court must consider these eight elements together.  So

4   defendant just want to draw the Court attention on this part.

09:20AM  5        THE COURT:  All right.  You're citing the *American Rice*

6   case that is on page 12 of their brief, with the eight-factor

7   test?

8        MS. JU:  Yes.  That's correct, Your Honor.

9        THE COURT:  All right.  I will consider that as well.

09:20AM 10        MS. JU:  Thank you, Your Honor.

11        THE COURT:  Good enough.

12        Thank you for your presentations; and, like I said, I'll

13   try to get something out promptly.  Thank you.  We're

14   adjourned.

09:20AM 15        [PROCEEDINGS IN RECESS]

16

17           OFFICIAL COURT REPORTER'S CERTIFICATE

18

19        I (we) certify that the foregoing is a correct

20   transcript of proceedings in the above-entitled matter.

21

22

23                              */S/ Susan A. Zielie, RMR, FCRR*

24                              Susan A. Zielie, RMR, FCRR
                                April 25, 2022

25

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION and WHIRLPOOL PROPERTIES, INC., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 2:22-CV-00027-JRG-RSP |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO., LTD. and SHENZHEN AVOGA TECHNOLOGY CO. LTD., | § § § § § | |
| *Defendants*. | § | |

<u>**PRELIMINARY INJUNCTION ORDER**</u>

Plaintiffs previously filed a motion for preliminary injunction.  Dkt. No. 6.  Magistrate Judge Payne entered a Report and Recommendation (Dkt. No. 18), recommending granting Plaintiffs' motion for preliminary injunction. Defendants filed Objections ( Dkt. No. 20) with  Plaintiff filing a Response (Dkt. No. 22).

After conducting a *de novo* review of the briefing on the motion for preliminary injunction, the Report and Recommendation, Defendants' Objections and Plaintiffs' Response, the Court agrees with the reasoning provided within the Report and Recommendation and concludes that the Objections fail to show that the Report and Recommendation was erroneous.  Consequently, the Court **OVERRULES** Defendants' Objections, **ADOPTS** the Report and Recommendation, **GRANTS** the motion for preliminary injunction, and **ORDERS** the following:

1.     That Defendants, their affiliates, subsidiaries, related companies, all those acting in concert or participation with them, and anyone that received actual notice of this order, be immediately and preliminarily enjoined and restrained from:

(a)     importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting, displaying or otherwise using the Infringing Mixers including any mixer that is similar to the Infringing Mixers;

(b)     importing, manufacturing, producing, distributing, circulating, selling, offering for sale, advertising, promoting, using or displaying any service or product using any simulation, reproduction, counterfeit, copy, or colorable imitation of the Plaintiffs' Trademark;

(c)     otherwise competing unfairly with Plaintiffs in any manner, including, without limitation, unlawfully adopting or using any design or image that imitates, copies, or is otherwise likely to cause confusion with Plaintiff's Trademark;

(d)     committing any acts or making any statements calculated, or the reasonably foreseeable consequence of which would be, to infringe or likely to dilute Plaintiff's Trademark, or to confuse, mislead, or deceive consumers as to the affiliation, connection, or association of Defendants with Whirlpool or as to the origin, sponsorship, or approval of Defendants' goods or commercial activities by Plaintiffs; and

(e)     conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a), (b), (c) and (d) above.

2.      That, Defendants, their affiliates, subsidiaries, related companies, and all those acting in concert or participation, and anyone that received actual notice of this order, be ordered to:

(a)     remove from all websites any depiction of references to Defendants'
        Infringing Mixers;

(b)     recall and destroy and provide proof to the Court of recall and destruction
        (or recall and deliver to the Court for destruction) all Infringing Mixers and
        any packaging that includes images or other materials pertaining to the
        Infringing Mixers; and

(c)     destroy and provide proof of destruction to the Court (or deliver to the Court
        for destruction) any and all advertising or promotional or other materials
        pertaining to the Infringing Mixers and all products bearing the design of
        the Infringing Mixers, regardless of the medium on which such advertising,
        promotional, or other materials are contained.

**So ORDERED and SIGNED this 14th day of June, 2022.**


_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WHIRLPOOL CORP. and<br>WHIRLPOOL PROPERTIES, INC., | |
| Plaintiffs, | Case No. 2:22-cv-00027-JRG-RSP |
| v. | |
| SHENZHEN SANLIDA ELECTRICAL<br>TECHNOLOGY CO. LTD., and | JURY DEMAND |
| SHENZHEN AVOGA TECHNOLOGY CO.<br>LTD., | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO STAY PRELIMINARY INJUNCTION
PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................................. 1

II.   FACTS AND PROCEDURAL HISTORY ......................................................... 2

III.  THE LEGAL STANDARD FOR A STAY PENDING AN APPEAL DECISION ........... 3

IV.   ARGUMENT ......................................................................................................... 3

      A.   Defendants Have Not Made a Strong Showing That They Are Likely to
           Succeed on the Merits ................................................................................ 3

           1.   Defendants' argument that a preliminary injunction requires
                perfected service of process is not strong .................................... 3

           2.   Defendants' argument that the Court erred by not requiring a bond is
                not strong .................................................................................... 5

           3.   Defendants' invalidity argument is not strong ............................. 6

           4.   Defendants' argument against a likelihood of confusion is not strong ....... 8

      B.   The Irreparable Harm to Whirlpool Without Immediate Relief Far
           Outweighs Any Incidental Harm to Defendants .................................... 11

      C.   Defendants Have Not Shown That a Stay Will Promote the Public Interest ........ 15

V.    CONCLUSION .................................................................................................. 15

i

# TABLE OF AUTHORITIES

## Cases

*Alamo Area Mut. House Assn. v. Lazenby*,
    2017 U.S. Dist. LEXIS 216835 (W.D. Texas 2017) .......................................................... 4

*Am. Rice, Inc. v. Producers Rice Mill, Inc*.,
    518 F.3d 321 (5th Cir. 2008) ........................................................................................ 10

*Cent. Freight Lines Inc. v. APA Transp. Corp*.,
    332 F. 3d 367 (5th Cir. 2003) ........................................................................................ 5

*Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc*.,
    659 F.2d 695 (5th Cir. 1981) ........................................................................................ 10

*Clearline Tech. Ltd. v. Cooper B-Line Inc.*,
    948 F. Supp. 2d 691 (S.D. Tex. 2013) ......................................................................... 10

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
    569 F. 2d 300 (5th Cir. 1978) ........................................................................................ 4

*E. & J. Gallo Winery v. Spider Webs, Ltd.*,
    286 F.3d 270 (5th Cir. 2002) ........................................................................................ 10

*Enterprise Int'l, Inc., v. Corporation Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ...................................................................................... 4, 5

*epicRealm Licensing, LLC v. Autoflex Leasing, Inc*.,
    492 F. Supp. 2d 608 (E.D. Tex. 2007) ........................................................................ 5, 8

*Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*,
    434 F. Supp. 3d 473 (E.D. Tex. 2020) ..................................................................... 12, 15

*Gonza LLC v. Mission Competition Fitness Equip. LLC*,
    W-21-CV-007712021 U.S. Dist. LEXIS 229632, * (W.D. Tex. Dec. 1, 2021) ................. 9

*Gordon v. City of Houston*,
    79 F. Supp. 3d 676  (S.D. Tex. 2015) ............................................................................ 6

*H.H. Robertson, Co., v. United Steel Deck, Inc*.,
    820 F.2d 384 (Fed. Cir. 1987) ........................................................................................ 3

*H-D Michigan, LLC. v. Hellenic Duty Free Shops S.A*.,
    694 F.3d 827 (7th Cir. 2012) ........................................................................................ 4

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ............................................................................................................ 3

*Hutchinson v. Essence Commc'ns, Inc.,*
    769 F. Supp. 541 (S.D.N.Y. 1991) .................................................................................. 10

*Hybritech Inc. v. Abbott Laboratories,*
    849 F.2d 1446 (Fed. Cir. 1988) ......................................................................................... 3

*Kaepa, Inc. v. Achilles Corp.,*
    76 F.3d 624 (5th Cir. 1996) ................................................................................................ 6

*Lakedreams v. Taylor,*
    932 F. 2d 1103 (5th Cir. 1991) ........................................................................................ 12

*Mobius Med. Sys. LP v. Sun Nuclear Corp,*
    2013 U.S. Dist LEXIS 175026, *44 (S.D. Tex. 2013) ....................................................... 6

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................................ 3

*ODonnell v. Harris Cnty,*
    260 F. Supp. 3d 810 (S.D. Tex. 2017) ....................................................................... 5, 6, 9

*Oreck Corp. v. U.S. Floor Sys.,*
    803 F.2d 166 (5th Cir. 1986) ........................................................................................... 10

*Quantum Fitness Corp. v. Quantum Lifestyle Ctrs. L.L.C.,*
    83 F. Supp. 2d 810 (S.D. Tex. 1999) ......................................................................... 10, 15

*Rosenzweig v. Azurix Corp.,*
    332 F. 3d 854 (5th Cir. 2003) ........................................................................................ 5, 6

*Scott Fetzer Co. v. House of Vacuums Inc.,*
    381 F.3d 477 (5th Cir. 2004) ........................................................................................... 10

*Scrum All., Inc. v. Scrum, Inc.,*
    4:20-cv-00227, 2020 U.S. LEXIS 125002, *8 (E.D. Tex. July 16, 2020) ........................... 5

*Smith and Nephew, Inc. v. Arthex, Inc.,*
    No. 2:07-cv-335-TJW-CE, 2010 WL 2522428 (E.D. Tex. June 18, 2019) ....................... 14

*TGI Friday's, Inc v. Great Northwest Rests., Inc.,*
    652 F. Supp. 2d 763 (N.D. Tex. 2009) ................................................................. 10, 11, 15

*Tinnus Enters., LLC v. Telebrands Corp.,*
    2016 U.S. Dist. LEXIS 197476 (E.D. Tex. 2016) ........................................................ 3, 14

*United States v. Armstrong*,
   951 F.2d 626 (5th Cir. 1992)......................................................................... 5, 8

*United States v. Transocean Deepwater Drilling, Inc.*,
   537 Fed. Appx. 358 (5th Cir. 2013) ..................................................................3

*Wilde v. Huntington Ingalls, Inc.*,
   616 Fed. Appx. 710 (5th Cir. 2015) ..................................................................3

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
   576 F.3d 221 (5th Cir. 2009)..............................................................................9

**Statutes**

15 U.S.C. § 1115(a)..................................................................................................7
15 U.S.C. § 1116(a)................................................................................................11

**Other Authorities**

Trademark Modernization Act of 2020..................................................................11

**Rules**

Fed. R. Civ. P. 65(a)........................................................................................4, 5, 6

# I.    INTRODUCTION

Whirlpool is a leading global manufacturer of home appliances, including the iconic KitchenAid stand mixer.  For over 80 years, Whirlpool invested heavily in marketing and promotion to develop tremendous brand recognition and goodwill in the shape of its most popular and well-known stand mixer.   Decades ago, Whirlpool was even awarded an incontestable trademark registration that protects its signature shape.  Defendants, who operate primarily through online channels in the United States, recently introduced stand mixers that mimic Whirlpool's iconic shape. To generate sales, Defendants intentionally seek to trade on the goodwill Whirlpool built in the KitchenAid stand mixer over its 80-year history.  Trademark law is designed to prevent this precise copycat situation that fosters confusion, mistake and deception with the leader in the marketplace.

After attempting to stop Defendants' infringement via violation reporting on Amazon, Whirlpool brought this action in January of 2022.  Defendant's receipt of the Complaint, as well as Whirlpool's Motion for a Preliminary Injunction, was confirmed no later than February 9, 2022.  (DN 9 at PageID#681.)  Even though Defendants had notice of these proceedings, Defendant refused to respond until the Court held a hearing in April.  While Defendants ignored Whirlpool and the delayed consideration of Whirlpool's Preliminary Injunction Motion, Defendants began a process of selling-off the Infringing Mixers in the United States at substantial price reductions, at times more than a 47% reduction!  (DN 9 at 679; DN 9-1 at 688-690.)

The Court issued a Preliminary Injunction in June of 2022. (DN 23.)  Now that Defendants are prohibited from dumping their inventory, they seek a stay of the Preliminary Injunction to do just that.  Permitting the Defendants to sell-off its copy-cat and inferior inventory at rock bottom prices will further, substantially, and irreparably harm Whirlpool.  There is no justifiable basis for a stay of the existing Preliminary Injunction to permit these foreign Defendants from causing more harm in the United States market.  Defendants' motion should be DENIED.

1

## II.   FACTS AND PROCEDURAL HISTORY

On January 31, 2022, Plaintiff Whirlpool filed a Complaint (DN 1) and Motion for Preliminary Injunction (DN 6) against the Defendants. Whirlpool provided notice of the filings to the Defendants by email, hand delivery, and text messages to Defendants' and their legal representatives. (DN9.) On February 9, 2022, a Defendant even opened the Complaint and Motion for Preliminary Injunction from Whirlpool's electronic communications. (*Id*. at PageID#681.) Defendants chose not to respond.

On March 14, 2022, Whirlpool advised the Court that Defendants received notice of these proceedings and that Defendants were actively attempting to sell-off their inventory of Infringing Mixers at depressed prices.  (DN 9 at 679.)  Defendants have never disputed attempting to sell-off its inventory after it received notice of these proceedings.  On March 16, 2022, the Court set a hearing date and ordered Whirlpool to again "notify Defendants of this Order via email, hand delivery and text no later than March 29, 2022."  (DN 10.)  Whirlpool complied, but Defendants, again, did not respond.  (DN 11.)

Defendants appeared at the April hearing and admitted they received notice of the proceedings.  (DN20-4 at 4:16-18).  At the hearing, Defendants "did not dispute the evidence presented by Whirlpool." (DN 18 at 834.) Judge Payne recorded that he was "unpersuaded by any of Defendants' arguments" and issued a Report and Recommendation to grant Plaintiff's Motion for Preliminary Injunction, *id*., to which Defendants objected. (DN 20). Judge Payne explained: "The entry of a preliminary injunction as outlined above against Defendant is necessary to prevent Whirlpool from continuing to be irreparably harmed by Defendants' unauthorized use of Plaintiffs' Trademark." (DN18 at 837.)  Even after receiving Judge Payne's Report and Recommendation, Defendants continued to sell-off their inventory of Infringing Mixers at depressed pricing. Subsequently, the Court accepted Judge Payne's Report and Recommendation, overruled

Defendants' objections, and entered the Preliminary Injunction Order. (DN 23). This motion for stay followed.  (DN 26.)

### III.    THE LEGAL STANDARD FOR A STAY PENDING AN APPEAL DECISION

A stay of an injunction "is not a matter or right, even if irreparable injury might otherwise result to the appellant." *Wilde v. Huntington Ingalls, Inc.*, 616 Fed. Appx. 710, 712 (5th Cir. 2015) citing *Nken v. Holder*, 556 U.S. 418 (2009).  A stay is an "intrusion into the ordinary processes of administration and judicial review." *United States v. Transocean Deepwater Drilling, Inc*., 537 Fed. Appx. 358, 365 (5th Cir. 2013) citing *Nken*, 556 U.S. at 427.  Whether to enter a stay is left to the Court's discretion. *Id.*

Courts consider several factors in determining whether to issue a stay pending appeal, including (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Tinnus Enters., LLC v. Telebrands Corp*. 2016 U.S. Dist. LEXIS 197476 (E.D. Tex. 2016) citing *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987). A "flexible approach" is required, and individual factors are not dispositive. *Id.*, citing *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed. Cir. 1988) and *H.H. Robertson, Co., v. United Steel Deck, Inc*., 820 F.2d 384, 390 (Fed. Cir. 1987).

### IV.    ARGUMENT

### A.    Defendants Have Not Made a Strong Showing That They Are Likely to Succeed on the Merits

#### 1.    Defendants' argument that a preliminary injunction requires perfected service of process is not strong

Defendants argued to the Court that "a preliminary injunction is invalid without perfected service of process on Defendants."  (DN 20 at PageID#842; DN 18 at 834.)  But, it is well established that the issuance of a preliminary injunction requires only notice, not service of process. Fed. R.

Civ. P. 65(a). Indeed, the Fifth Circuit has stated in no uncertain terms that "Rule 65(a) does not require service of process." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F. 2d 300 (5th Cir. 1978). And "[w]hile Rule 65 does not specify what exactly constitutes notice, Courts have ruled that notice under Rule 65 does not require service of process and that it is in the trial court's discretion to determine the sufficiency of the written or oral notice to the adverse party." *Alamo Area Mut. House Assn. v. Lazenby,* 2017 U.S. Dist. LEXIS 216835 (W.D. Texas 2017).[1]

Defendants' perfected service argument has even been referred to by the Seventh Circuit as "preposterous." *H-D Michigan, LLC. v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 842 (7th Cir. 2012) (explaining Defendants' argument is "refuted by the plain language of Rule 65.")  Since formal service of process through the Hague Convention can take many months or even years, Defendants' argument would have the "effect of immunizing most foreign defendants from needed emergency injunctive relief." *Id.*  "There is a reason Rule 65 allows emergency injunctive relief before service of process, and this case provides a good example." *Id.*

Understanding that it has no justification for this argument, Defendants now state: "Defendants had also argued that jurisdiction over the Defendants have not been established during the hearing." (DN 26 at 1002.) Defendants provide no citation to the record because it does not exist. When objecting to Judge Payne's Report and Recommendation, Defendants argued: "without serving those defendants of process, this Court does not have personal jurisdiction over this defendant." (DN 20-4 at 7.)

---

[1] Defendants have again changed citations for this specious argument. Defendants now cite *Enterprise Int'l, Inc., v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985), but this decision involved a challenge to personal jurisdiction over "the official state-operated oil company of the republic of Ecuador." *Id.* at 467.  The district court improperly postponed a decision regarding "personal jurisdiction over C.E.P.E. under the foreign Sovereign Immunities Act." *Id.* at 471.  Here, the District Court fully addressed Defendants' only challenge based on perfected service of process.

Defendants' newly presented argument that there is no personal jurisdiction fails for two reasons. ***First***, Defendants do not dispute that they sell their Infringing Mixers (the subject of this lawsuit) in the United States, including in Texas and in this District, via online retailers such as Amazon and Wayfair.[2] "When a nonresident defendant has purposefully directed its activities at the forum state and the litigation result from alleged injuries that arise out of or relate to those activities, the defendant's contacts are sufficient to support the exercise of specific jurisdiction over that defendant." *Cent. Freight Lines Inc. v. APA Transp. Corp*., 332 F. 3d 367, 381 (5th Cir. 2003). ***Second***, as with a motion for reconsideration, a motion to stay cannot "raise arguments which could, or should, have been made before the judgment issued." *ODonnell v. Harris Cnty,* 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) citing *Rosenzweig v. Azurix Corp*., 332 F. 3d 854, 863-64 (5th Cir. 2003); *see also epicRealm Licensing, LLC v. Autoflex Leasing, Inc*., 492 F. Supp. 2d 608, 613 (E.D. Tex. 2007) citing *United States v. Armstrong*, 951 F.2d 626, 630 (5th Cir. 1992).

Defendants have made no showing, let alone a *strong* showing, that the Court should disregard Fifth Circuit precedent, Rule 65, and immunize these foreign defendants from preliminary relief while they delay service and actively sell-off their Infringing Mixer inventory.

### 2.    Defendants' argument that the Court erred by not requiring a bond is not strong

Until now, Defendants never requested bond or so much as raised the issue with the Court. As noted above, a motion to stay an order for preliminary injunction should not be used to "raise

---

[2] The Report and Recommendation relies upon and references the Complaint (DN 18 at 835) which states: "The Court has personal jurisdiction over Defendants based on their sale of goods that infringe on Whirlpool's trademarks and trade dress in the Eastern District of Texas, causing injury to Whirlpool in this state and district." (DN 1 at ¶23; *see also*, Ex. A, Collins Decl.) Moreover, all that is required is that "there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *Scrum All., Inc. v. Scrum, Inc*., 4:20-cv-00227, 2020 U.S. LEXIS 125002, *8 (E.D. Tex. July 16, 2020)(citing *Enterprise Int'l, Inc*., 762 F.2d at 471. The Court also likely will have jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2) over these foreign Defendants. (DN 1 at ¶24.)

arguments which could, and should, have been made before the judgment issues." *ODonnell* at 815, citing *Rosenzweig* at 863-64. Arguments raised for the first time on a motion to stay are waived. *Id.* Therefore, the issue of bond is not proper before the Fifth Circuit on Appeal and Defendants cannot succeed on the merits on the issue.

Even so, the cases cited by Defendants are inapposite. Neither compels entry of a bond. Rather, the Fifth Circuit is clear that bond "is a matter for the discretion of the trial court" and a district court "may elect to require no security at all" notwithstanding the language in Rule 65(c). *Kaepa, Inc. v. Achilles Corp*., 76 F.3d 624, 628 (5th Cir. 1996) (finding that "the district court did not violate Rule 65(c) by failing to compel Kaepa to post a bond."). And notably, *Gordon,* the case relied upon by Defendants, expressly cites the *Kaepa* holding in finding that because the defendant did not respond on bond, the bond requirement was waived. *Gordon v. City of Houston*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015). In the other case cited by Defendants, the court ordered the plaintiff to post a bond as it has the discretion to do, but none of the cases ever held that bond was mandatory. *Mobius Med. Sys. LP v. Sun Nuclear Corp*, 2013 U.S. Dist LEXIS 175026, *44 (S.D. Tex. 2013).

Remarkably, Defendants argue that the Court erred in declining to require a bond here, where the Defendants have not come forward with any evidence regarding the extent of its infringement from which the amount of a bond could even be evaluated. Defendants provide no evidence regarding what amount of bond (even if somehow a bond was needed) that should be required and for what reason. Simply, Defendants cannot succeed on the merits with this issue and certainly do not have a *strong* showing of success.

### 3. Defendants' invalidity argument is not strong

Defendants' invalidity arguments continue to morph. Defendants now state: "This Court clearly erred in finding that Plaintiffs have registered incontestable Trademark rights simply because the design stand for over 80 years and is still a market leader today."  (DN 26 at 1005.)  This

misrepresents the Court's findings.  As recounted at the Hearing (DN20-4 at 932-33) and presented

in Whirlpool's briefs (DN6 at 64-66), Whirlpool asserts a registered and incontestable trademark,

U.S. Registration No. 1,711,158 (DN 6-6).   As correctly stated, the registration is *prima facie*

evidence of non-functionality of the exterior shape of the KitchenAid Stand Mixer.  15 U.S.C. §

1115(a); DN6 at 64.  In addition, as shown below, Whirlpool submitted evidence of other stand

mixer designs—including mixer designs from the Defendants—that do not utilize Plaintiff's

trademark further demonstrating non-functionality.  (DN 6-5 at 178; *see also*, DNs 6-9, 6-10, and

6-11.)



Contrary to Defendants' accusations regarding the Court's errors, the Court evaluated

Defendants' position—***consisting solely of attorney argument***—and concluded that Whirlpool

would prevail on the merits which includes a *prima face* showing of non-functionality. 15 U.S.C.

§ 1115(a). To this day, Defendants' have not presented any evidence regarding functionality actually

directed to the trademarked KitchenAid Stand Mixer design.

Defendants previously argued that the KitchenAid Stand Mixer design was functional and

cited to a Whirlpool patent from 1937. (DN 20 at 843-44.) That patent concerned internal gearing

mechanisms, assembly, and construction of joints. (DN 20-1.) Whirlpool's trademark, however,

concerns the exterior shape of the mixer and features such as a "sleek design, rounded edges,

signatures bullet-shaped head, protruding attachment hub and rounded base" which perform no

function and have no utilization advantage—and Defendants do not contend otherwise.  The 1937

patent is thus irrelevant to the trademarked shape and cannot rebut the statutorily presumed non-functionality.

Now, Defendants assert "Plaintiffs' marks consist of three parts . . . like any stand food mixer" and these unidentified three parts are "the reason the device works." (DN 26 at 1005.) Contrary to Defendants' attorney assertions, the '158 Registration does not consist of "three parts" and is not directed to "any stand food mixer." (DN 6-6.)  Instead, it consists of the overall shape of the KitchenAid Stand Mixer design as included in the Registration Certificate and shown below. (*Id*.)   As such, Defendants' argument misses the mark and cannot rebut the statutorily presumed non-functionality provided by the '158 Registration.



In sum, Defendants' new-found attorney argument can be disregarded as: (1) non-sensical and contrary to the '158 Registration shown above, and (2) waived because it was not raised prior to Judge Payne's Report and Recommendation.  *epicRealm, LLC. v. Autoflex Leasing, Inc*., 942 F. Supp. 2d 608, 613 (E.D. Tex. 2007) citing *United States v. Armstrong*, 951 F. 2d 626, 630 (5th Cir. 1992)*; see also*, DN 22 at 983-985.

### 4.      Defendants' argument against a likelihood of confusion is not strong

Defendants now contend that "in finding Plaintiff's marks were strong, the Court erred in concluding that evidence of length of use of the mark at issue represents unrebutted evidence that third-party use by twelve competitors does not diminish the association of the mark with Plaintiffs

in the public's mind." (DN 26 at 1006.) It is unclear what the Defendants are referencing or attempting to argue.  No citations are provided. But what is known is that Defendants never previously raised this issue, therefore, it will not be considered by the Fifth Circuit and cannot support a likelihood of success on the merits. *ODonnell* at 815.

Defendants further argue that "the Court erred by not considering Defendants' evidence that the parties' related licenses cost thousands of dollars." (DN 26 at 1006). It is unclear what "related licenses" Defendants are referencing.  No citations are provided. Defendants never raised any issue at the hearing regarding licenses or any product that costs "thousands of dollars," nor do any of the products at issue cost "thousands of dollars." In fact, the Court specifically asked Defendants' counsel if there were any cases in the United States that have held that a difference in price can be a defense to the likelihood of confusion. (DN 20-4 at 11:6-8). Counsel did not provide a response because the Fifth Circuit recognizes that "a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar."  *Xtreme Lashes, LLC v. Xtended Beauty, Inc*., 576 F.3d 221, 231 (5th Cir. 2009) (citations omitted).  Indeed, where "consumers are faced with seemingly identical products at starkly different price points, [Plaintiff's] fear of price erosion is not a future or speculative harm, but an immediate and irreparable one." *Gonza LLC v. Mission Competition Fitness Equip. LLC*, W-21-CV-007712021 U.S. Dist. LEXIS 229632, * (W.D. Tex. Dec. 1, 2021).

Defendants now cite *Oreck Corp. v. U.S. Floor Sys*., 803 F.2d 166 (5th Cir. 1986), but this decision clearly does not help them.  In *Oreck*, the market was "persons [who] are buying for professional and institutional purposes at a cost in the thousands of dollars, they are virtually certain to be informed deliberate buyers."  *Id*. at 173.  Here, both parties sell to consumers.  In *Oreck*, there were "substantial dissimilarities" between the products, different "channels of trade," and there was evidence of defendant innocently adopted "XL" as a model designation to differentiate it as its larger

model.  *Id.*  These *Oreck* facts are not applicable here.  Rather, Defendants' copying of a known market leader <u>*alone*</u> justifies a finding of a likelihood of confusion.  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004); *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 332 (5th Cir. 2008) (*quoting Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703-04 (5th Cir. 1981); s*ee also, Hutchinson v. Essence Commc'ns, Inc.*, 769 F. Supp. 541, 566 (S.D.N.Y. 1991) ("The junior user's awareness of the senior user's mark 'can give rise to an inference of bad faith.'") (citation omitted); *E. & J. Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002) (in a similar context, "when the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame, a presumption of bad faith arises from the choice of the same name because it is inferable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark.")  Any likelihood of confusion of the Defendants in the face of these facts is not strong.

Defendants' argument regarding likelihood of success seemingly concludes with this statement: "Where Plaintiffs have failed to meet its heavy burden of establishing irreparable harm and likelihood of success, the Court's entry of a preliminary injunction was erroneous.  (DN 26 at 1007.)  Defendants present no argument that Whirlpool failed to establish irreparable harm.  The Court found otherwise: "The entry of a preliminary injunction as outlined above against Defendant is necessary to prevent Whirlpool from continuing to be irreparably harmed by Defendants' unauthorized use of Plaintiffs' Trademark."  (DN 18 at 837.)   Indeed, under the Lanham Act, a proprietor's loss of control over its own reputation and goodwill is deemed an irreparable injury for which preliminary relief is appropriate. *See*, *e.g.*, *Quantum Fitness Corp.*, 83 F. Supp. 2d at 831; *TGI Friday's, Inc v. Great Northwest Rests., Inc.*, 652 F. Supp. 2d 763, 772 (N.D. Tex. 2009). This is particularly true where, as here, the parties directly compete. *See Clearline Tech. Ltd. v. Cooper B-Line Inc.*, 948 F. Supp. 2d 691, 715 (S.D. Tex. 2013) ("Where the infringement involves direct

competitors, a finding of irreparable harm may well be appropriate").  In fact, there is a statutory rebuttable presumption of irreparable harm codified in the Trademark Modernization Act of 2020, 15 U.S.C. § 1116(a) (effective as of December 2021), a Congressional acknowledgement that the loss of control over reputation and goodwill is difficult to quantify. Defendants' unarticulated and previously unmentioned argument regarding irreparable harm is not strong.

## B.   The Irreparable Harm to Whirlpool Without Immediate Relief Far Outweighs Any Incidental Harm to Defendants

Previously, Defendants did not contest the substantial irreparable harm to Whirlpool. (*See* DN 18 at 834; DN 20 at 842-44.)  Whirlpool has invested 80 years and millions of dollars promoting its registered trademarks through the KitchenAid stand mixer. (DN 6-1 at 80-88.) Continued sales of Defendants' Infringing Mixers will cause Whirlpool to lose this well-earned reputation given the similarities that may cause consumers to, at a minimum, presume an affiliation between Whirlpool and the Defendants.  This harm is amplified where Defendants manufacture products overseas that are well below the standards of quality consumers have come to expect from Whirlpool's KitchenAid stand mixers. (DN 6 at 15; DN 6-4.)  For this reason, "courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *TGI Friday's, Inc. v. Great Northwest Rest., Inc.* 652 F. Supp. 2d 763 (N.D. Tex. 2009); *see also*, 15 U.S.C. § 1116(a).

In their Motion for a Stay, Defendants unfortunately resort to misstatements.  First, without any support, Defendants' state: "As the record reflects, Defendants' mixers have coexisted for with Plaintiff's business model without issue, confusion, or any claimed harm for many years."  (DN at 1010.)  There is no support for this statement.  Whirlpool only learned of Defendants' copy-cat products on amazon.com months ago. (DN 6-5 at 176-177.) And as soon as Whirlpool became aware of these products, Whirlpool reported them to Amazon.com as infringing Whirlpool's trademark.

(*Id.*)  On January 12, 2022,[3] after certain listings were removed, Whirlpool communicated directly with the Defendants as instructed by Amazon to try to obtain full compliance. (DN 6-5 at 177; DN 6-16; DN 6-17.)  The Defendants refused to respond. (DN 6-5 at 177.)  There is no record of coexistence for many years.  Indeed, Defendants have failed to present any sales information to the Court to highlight the extent of the infringement, let alone the alleged coexistence.

Second, Defendants falsely contend that "the Court's preliminary injunction prohibits Defendants from selling their products" and they are not "able to market their brand and reduced demand."  (DN 26 at 1007.) That is simply not true.  Both Defendants sell a model 1522 mixer which are copycats of the famous KitchenAid stand mixer design. Defendants sell numerous other stand mixers and use their brands on their other products not at issue here.  (DN 6-5 at 177-178.) Indeed, an amazon.com search for Sanlida, Cooklee, or Phisinic will return dozens of stand mixer models from the Defendants such as those shown below.



The Preliminary Injunction concerns the Infringing Mixers—<u>not</u> the brand and <u>not</u> Defendants' other stand mixers such as those shown above.  When only considering the enjoined Infringing Mixers, the Fifth Circuit holds harm to defendants from "an activity which has been shown likely to be infringing" merits "little equitable consideration."  *Fletcher's Original State Fair Corny Dogs,*

---

[3] The declaration (DN 6-5 at 177) that references Exhibits J and K but incorrectly records 2021 when these attached communications are dated January 12, 2022.

*LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473 (E.D. Tex. 2020), citing *Lakedreams v. Taylor*, 932 F. 2d 1103, 1109 n.12 (5th Cir. 1991).

Third, Defendants state that "Defendants have had to contact all of its customers, including its manufactures, and product owners, and requested they remove all reference to the Defendant brand from their website, social media pages, and marketing materials." (DN 26 at 1008.)  This is also not true.  Defendants have not contacted stand mixer purchasers.  (Ex. A, Collins Decl.)  Defendants have not even removed images of the model 1522 from their own websites, let alone informed others.  The following appears at Phisinic's Amazon store front as of June 30, 2022, which includes a lengthy video highlighting the Infringing Mixers.



Similarly, the SanLida/Cooklee store on Amazon as of June 30, 2022 still includes large images of Infringing Mixers.



13

Defendants cite to decisions, but none support a stay here.  Defendants cite *Smith and Nephew, Inc. v. Arthex, Inc.*, No. 2:07-cv-335-TJW-CE, 2010 WL 2522428 (E.D. Tex. June 18, 2019), where the Court stayed a permanent injunction in a *patent case* but only upon very stringent and detailed conditions, including payments of twice of the judgment rate into an escrow account.  And notably, *Smith and Nephew* did not involve the irreparable harm that results from trademark theft.  Defendants also cite *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:16-cv-0022 RWS-JDL, 2016 U.S. Dist. LEXIS 180833 (E.D. Tex. Nov. 21, 2016) where the Court issued a preliminary injunction in a *patent case* and also ordered non-defendant retailers to remove the infringing product from their inventory.[4] No stay was granted in the *Tinnus* decision cited by the Defendants.

At bottom, Defendants apparently misconstrue an ambiguity in the Order regarding destruction.  The Order required a recall and to provide proof to the Court of the recall.  The Order also mentions "destruction" but that does not require that the destruction be *immediate*.  The Order requires that infringing product be recalled and removed from the stream of commerce immediately.  While that can be ensured by destroying product and materials, but it also may be done by holding product and materials for subsequent destruction at the appropriate juncture.  To the extent that the Order was ambiguous or misconstrued, paragraph 2(b) and 2(c) should be amended to read: "recall (and hold for subsequent destruction if directed by the Court) and provide proof to the Court of the recall of all Infringing Mixers . . ." related packaging, as well as advertising and promotional materials bearing the design of the Infringing Mixers.  (DN 23.)

Any hardship is minimal and Defendants' own fault since it results "directly from Defendants' decision to build their business around confusingly similar marks" and thus "merits

---

[4] The patent owner asserted that the sell-off of currently stocked items would result in price erosion. *Id*. at *8.  As the Court is aware, Plaintiffs presented evidence that prior to the Preliminary Injunction, the Defendants were attempting to sell-off inventory at substantial discounts as much as 47%.  (DN 9 at 679.)

little consideration." *Fletcher's*, 434 F. Supp. 3d at 497.   It is Whirlpool that will suffer significant harm if a stay is granted.  Defendants cannot complain that their Infringing Mixers, copied from the iconic KitchenAid Stand Mixers, are removed from the marketplace.

**C.    Defendants Have Not Shown That a Stay Will Promote the Public Interest**

There is no question that the interest of the public is better served by the protection of Plaintiffs' registered trademark. Even where a preliminary injunction will have the effect of forcing a business to close (which is not the case here) and effect the local economy (again, not the case here), the public interest in protecting trademarks is the broader public interest that the court must consider. *TGI Friday's* at 773. "The public interest promotes the protection of valuable trademarks and service marks in a capital-based economy that rewards success through competition." *Id.* Moreover, "the public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Id*, citing *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs.* L.L.C., 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999).

## V.    CONCLUSION

For the foregoing reasons, Whirlpool respectfully requests that this Court deny Defendants' Motion to Stay Preliminary Injunction Pending Appeal.

Respectfully submitted,

Dated:  July 1, 2022                           */s/ Melissa R. Smith*
                                               Melissa Richards Smith
                                               **GILLAM & SMITH, LLP**
                                               303 South Washington Avenue
                                               Marshall, Texas 75670
                                               Telephone: (903) 934-8450
                                               Facsimile: (903) 934-9257
                                               melissa@gillamsmithlaw.com

15

Marc Lorelli (Michigan Bar No. P63156)
LEAD ATTORNEY
Chanille Carswell (Michigan Bar No. P53754)
**BROOKS KUSHMAN P.C.**
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone: (248) 358-4400
Facsimile: (248) 358-3351
Email: mlorelli@brookskushman.com
       ccarswell@brookskushman.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who are deemed to have consented to electronic service are

being served this 1st day of July, 2022 with a copy of this document via the Court's CM/ECF system

per local Rule CV-5(a)(3).

*/s/ Melissa R. Smith*_____

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **WHIRLPOOL CORP. and**<br>**WHIRLPOOL PROPERTIES, INC.**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**SHENZHEN SANLIDA ELECTRICAL**<br>**TECHNOLOGY CO., LTD., and**<br>**SHENZHEN AVOGA TECHNOLOGY**<br>**CO. LTD.**<br><br>       **Defendants.** | **Case No. 2:22-cv-00027-JRG-RSP**<br><br><br>**JURY DEMAND** |

**DECLARATION OF MICHAEL J. COLLINS IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION**
**PENDING APPEAL PURSUANT TO FED.R.CIV.P. 62(C)**

I, Michael J. Collins, state as follows:

I am a Private Investigator at Collins Investigations. I have personal knowledge of the facts set forth in this declaration. If called upon to testify under oath, I could and would testify competently to the facts stated herein.

1.    I purchased the "Cooklee Stand Mixer, 800w 8.5-Qt. Kitchen Mixer With Dishwasher-Safe Dough Hooks, Flat Beaters, Wisk & Pouring Shield, Sm-1522nm, Black" from Amazon.com.  The product was shipped to me at 1500 Royal Oak Drive, Tyler, Texas, 75703.

2.    A representative photograph of the COOKLEE Stand Mixer that I purchased is below:



3.      I also purchased the "PHISINIC Stand Mixer, 6.5QT 800W Kitchen Electric Mixer, 6+1 Speed Tilt-Head Household Stand Mixer, Electric Food Mixer with Dough Hook/Wire Whip/Beater, for Butter, Cream, Meringue, Cookie (Red)" from Amazon.com. This product was also shipped to me at 1500 Royal Oak Drive, Tyler, Texas, 75703.

4.      A representative photograph of the PHISINIC Stand Mixer that I purchased is below:



5.      I have never received any additional correspondence directly from the sellers or anyone on their behalf regarding the products after receiving these products. I have never been notified of an injunction, court order, recall, or received any similar information from the sellers or on their behalf regarding these stand mixers.

I make this Declaration on personal knowledge and declare under penalty of perjury that

the foregoing is true and correct.

Executed June 30, 2022, in
Tyler, Texas

/s/ Michael J. Collins
Michael J. Collins

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION and | § | |
| WHIRLPOOL PROPERTIES, INC., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:22-CV-00027-JRG-RSP |
| SHENZHEN SANLIDA ELECTRICAL | § | |
| TECHNOLOGY CO., LTD. and SHENZHEN | § | |
| AVOGA TECHNOLOGY CO., LTD., | § | |
| | § | |
| *Defendants*. | § | |

## <u>ORDER</u>

As required by Rule 4(l) of the Federal Rules of Civil Procedure, plaintiffs Whirlpool Corporation and Whirlpool Properties, Inc. are hereby **ORDERED** to file within 30 days evidence of service of process upon defendants Shenzhen Sanlida Electrical Technology Co., Ltd. and Shenzhen Avoga Technology Co., Ltd.

**SIGNED this 22nd day of August, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

# RELEVANT ORDERS AND PLEADINGS

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRPOOL CORPORATION AND WHIRPOOL PROPERTIES, INC., | § § § | CASE No: 2:22-CV-00027-JRG-RSP |
| *Plaintiffs*, | § § | Honorable Judge: Rodney Gilstrap |
| v. | § § | |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO., LTD. and SHENZHEN AVOGA TECHNOLOGY CO. LTD., | § § § § § | |
| *Defendants*. | § | |

**DEFENDANTS' EMERGENCY MOTION TO STAY
PRELIMINARY INJUNCTION PENDING APPEAL
PURSUANT TO FED.R.CIV.P. 62(C)**

**\*Emergency Motion With Request for Accelerated Briefing Schedule\***

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 5

II.   LEGAL STANDARD........................................................................................... 6

III.  ARGUMENT ....................................................................................................... 7

    A.    Defendants are Likely to Succeed on the Merits on Appeal............................. 7

        *i.*    The Court Err in Finding That a Preliminary Injunction Is Valid Without Perfected Service of Process on Defendants. ....................................................................... 8

        ii.    The Court Erred in Ordering Preliminary Injunction Without Requiring Plaintiff to Post Bond. .......................................................................................................... 10

        iii.    The Court Erred in Finding that Plaintiff's trademark is valid. ......................... 11

        iv.    The Court Erred in Finding Likelihood of Confusion and Irreparable Harm to Support Entry of a Preliminary Injunction........................................................ 12

    B.    Defendants Will Suffer Serious Irreparable Harm......................................... 13

    C.    A Stay of Injunction Will Not Substantially Injure Plaintiffs......................... 16

    D.    The Public Interests Favor Staying the Injunction......................................... 16

IV.  CONCLUSION.................................................................................................... 17

# TABLE OF AUTHORITIES

Cases

*Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984) ................................... 7

*Arch-Con Corp. v. Archcon Architecture*, Ltd., No. 5-18-CV-00821-OLG, 2019 WL 422662, at *9 (W.D. Tex. Feb. 1, 2019) ........................................................................ 13

*Arnold v. Garlock*, 278 F. 3d 426, 438-39 (5th Cir. 2001) ...................................................... 6

*AtwoodTurnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) ...................................................................................................................................... 15

*Cf. Hargrove v. Underwriters at Llyod's, London*, 937 F. Supp. 595, 607 (S.D. Tex. 1996) .. 9

*Cf. In re Revel AC, Inc.*, 802 F.3d 558, 566 (3d Cir. 2015). ..................................................... 16

*Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082–85 (5th Cir. 1982) ............................................................................................................ 12

*Enterprise Int'l, Inc.* 762 F.2d at 470 ...................................................................................... 8

*Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) .................................................................................................................................. 7

*Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002) ........... 11

*Eppendorf Netheler Hinz GmbH,* 289 F.3d 351, 355 .............................................................. 11

*Florida Med. Ass'n v. H. E. W.*, 601 F.2d 199, 202 (5th Cir. 1979) ......................................... 7

*Gordon v. City of Houston, Tex.,* 79 F. Supp. 3d 676, 695 (S.D. Tex 2015) ........................... 10

*In re First S. Sav. Ass'n,* 820 F.2d 700, 704 (5th Cir. 1987) .................................................... 6

*Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3D 602, 609 (5th Cir. 2008) ............................ 8

*Mobius Med. Sys., LP v. Sun Nuclear Corp.* No. 413-CV-3182, 2013 U.S. Dist. LEXIS 175026 (S.D. Tex. Dec. 10, 2013) ......................................................................................... 10

*Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) ............................... 12

*Prudential Mortgage Capital Co., L.L.C. v. Faidi*, 444 Fed. Appx. 732, 736 (5th Cir. 2011). 6

*rev'd on other grounds*, 453 F. App'x 977, 987 (Fed. Cir. 2011) ......................................... 13

*Sally Beauty Co. v. Beautyco, Inc.*, *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) ................................................................................. 12

*Sangha v. Navig8 ShipManagement Private Ltd.,* 882 F.3d 96, 102 (5th Cir. 2018) ............... 9

*Smith and Nephew, Inc., v. Arthrex, Inc*., No. 2:07–cv–335–TJW–CE, 2010 WL 2522428 (E.D. Tex. June 18, 2018) ................................................................................................. 13

*Tinnus Enters., LLC v. Telebrands Corp.,* No.6:16-CV-0033 RWS-JDL, 2016 WL 9131960, at *2 (E.D. Tex. Nov. 21, 2016).............................................................................................. 13

*Traffix Devices, Inc. v. Marketing Displays, Inc.,* 523 U.S. 23, 28 (2001)............................ 11

*United States. v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972) ................................................ 8

*Wilson v. Benlin*, 20 F.3d 644, 648 (5th Cir. 1994) ................................................................. 8

Rules

Fed. R. App. P. 8(a) ................................................................................................................ 6

Fed. R. Civ. P. 65(c) ............................................................................................................. 10

Federal Rules of Civil Procedure 62 (c) ............................................................................... 5

Without waiving any Rule 12(b) defenses, Defendants Shenzhen Sanlida Electrical Technology Co. Ltd. and Shenzhen Avoga Technology Co. Ltd. (collectively "Defendants") respectfully move for a stay of this Court's preliminary injunction order (Dkt. No. 23) pending appeal to the United States Court of Appeals for the Fifth Circuit (Dkt. No. 24), pursuant to Federal Rules of Civil Procedure 62 (c). This motion is accompanied by Defendants' Request for an Accelerated Briefing Scheduling.

## I.   INTRODUCTION

On April 19, 2022, the Magistrate Judge held a motion for preliminary injunction hearing. (Dkt. No. 15). On the same day, Magistrate Judge issued Report and Recommendations for recommending this Court to grant Plaintiff's motion for preliminary injunction. (Dkt. No. 18). Defendants filed an objection to Report and Recommendation on May 03, 2022. (Dkt. No. 20).

Plaintiffs Whirlpool Corporation and Whirlpool Properties, Inc. ("Plaintiffs") filed a response to Defendants' objection to Report and Recommendation on May 09, 2022. (Dkt. No 22). On June 14, 2022, this Court entered an order granting Preliminary Injunction for Plaintiffs. (Dkt. No. 23). The Order indicated that the Court agrees with the reasoning provided within the Report and Recommendations and concludes that the Objections fails to show that the Report and Recommendation was erroneous. *See* Prelim. Inj. Order, p.1, at ¶2 (Dkt. 23). The Order ordered Defendants to recall and destroy all the alleged infringing products and any packaging that includes images or other materials pertaining to the alleged Infringing Mixers", which is not tailored to the harm that occasions it and will cause imminent and irreparable harm to Defendants. *Id* at §2 (b) (Dkt. 23). Defendants filed with this Court a Notice of Appeal of the Preliminary Injunction order to the United States Court of Appeals for the Fifth Circuit on June 14, 2022. Defendants now move this Court to stay the Preliminary Injunction Order pending their appeal.

<u>**Request for Accelerated Briefing Schedule**</u>

Because of the time-sensitive nature of this motion, Defendants respectfully request an accelerated briefing schedule which requires Plaintiffs to file any response in opposition to this motion and to the proposed Order no later than June 28, 2022, and Defendants be required to reply no later than July 1, 2022. To avoid any further delay, Defendants respectfully requests that there be no surreply.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62 (c). As a procedural matter, a party seeking a stay pursuant to Rule 62(c) must first move in the district court. Fed. R. App. P. 8(a).

"The decision to grant or deny a motion to stay pending appeal lies in the sound discretion of the court whose order is being appealed." *Prudential Mortgage Capital Co., L.L.C. v. Faidi*, 444 Fed. Appx. 732, 736 (5th Cir. 2011) (citing *Arnold v. Garlock*, 278 F. 3d 426, 438-39 (5th Cir. 2001)). "In exercising that discretion, however, a court is to be guided by the four factor test ordinarily used to evaluate motions for preliminary injunction." *Id.* at 737 (citing *Arnold*, 278 F.3d at 438-39). These factors are: (1) the movant's likelihood of success on the merits, (2) the irreparable harm to the movant if the stay is not granted, (3) the substantial harm to the other parties if the stay is granted, and (4) the public interests implicated in granting or denying the stay. *Id.* (citing *Arnold*, 278 F. 3d at 438-39). Although the movant must meet each part of the test, "the appellant 'need not always show a "probability" of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show

that the balance of the equities weighs heavily in favor of granting the stay.'" *Arnold*, 278 F.3d at 349 (quoting *In re First S. Sav. Ass'n,* 820 F.2d 700, 704 (5th Cir. 1987)).

### III. ARGUMENT

#### A.    Defendants are Likely to Succeed on the Merits on Appeal

To obtain a preliminary injunction, Plaintiff had the burden of proving four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest. *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984). While a district court's decision to grant or deny a preliminary injunction lies within its discretion, "this discretion… is not unbridled, and a preliminary injunction 'must be the product of reasoned application of four factors held to be necessary prerequisites.'" *Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Florida Med. Ass'n v. H. E. W.,* 601 F.2d 199, 202 (5th Cir. 1979)).

The Court considered Defendants' argument regarding personal jurisdictional yet erred in finding that the personal jurisdiction argument was established even though there was no service of process. *See* Report and Recommendation, p. 2, at ¶¶3-5. (Dkt. No.18). The Court also erred in finding that Plaintiffs established all four relevant injunction factors, despite ample legal and factual support that confusion is unlikely and lack of evidence of any irreparable harm. *Id*. As set forth below, there is a substantial case on the merits of Defendant's personal jurisdiction and service of process challenge. Defendants are also likely to prevail on their appeal of the findings underlying the preliminary injunction.

*i.*        **The Court Err in Finding That a Preliminary Injunction Is Valid Without Perfected Service of Process on Defendants.**

Defendants are likely to succeed in challenging the Court's finding that preliminary injunction is valid without perfected service of process on Defendants. It is undisputed that Plaintiffs did not effectuate service of process on Defendants prior to the preliminary injunction hearing. *See* Defs.' Objection, p. 2, at ¶8. So, this Court lacks personal jurisdiction to issue a preliminary injunction against Defendants. The "district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid jurisdiction," and an order granting an interlocutory injunction in these circumstances "is erroneous as a matter of law." *Enterprise Int'l, Inc.* 762 F.2d at 470. The Preliminary Injunction Order should be vacated as to all Defendants. *Enterprise Int'l, Inc.* 762 F.2d at 476 (vacating injunction ordered entered against defendant before determining whether jurisdiction over defendant existed). Plaintiffs bear the burden of making a *prima facie* showing that the defendant has had minimum contacts with the forum state. *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3D 602, 609 (5th Cir. 2008) (citing *Wilson v. Benlin*, 20 F.3d 644, 648 (5th Cir. 1994)). Plaintiffs here simply did not present any sufficient evidence at the hearing to convince the Court that they are likely to overcome Defendant's personal jurisdiction arguments.

Defendants had also argued that jurisdiction over the Defendants have not been established during the hearing; however, the Court did not address this argument in anyway in its Report and Recommendations. Without addressing the jurisdiction issue, it simply runs afoul of Due Process and the US Constitution. The court issuing the injunction must enjoy subject matter and personal jurisdiction over the controversy otherwise the order is unconstitutional. *United States. v. Dickinson*, 465 F.2d 496, 511 (5th Cir. 1972). *Like Dickinson*, the preliminary injunction is

unconstitutional in this case because the Court has no personal jurisdiction over the Defendants. Defendants were never served in the case for the Court to acquire jurisdiction.

In addition, the Court even failed to adequately balance "(1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effect relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies." *Sangha v. Navig8 ShipManagement Private Ltd.,* 882 F.3d 96, 102 (5th Cir. 2018). This Court erroneously disregarded the burden of the foreign based Defendants to come defend themselves in Texas as well as the substantial cost and burden on Defendants of defending themselves in Texas, where they maintain no presence, particularly when weighed against the lack of any convenience or efficiency to Plaintiffs-whose interest in this forum is purely strategic of litigating this case in Texas, where Plaintiffs likewise maintains no presence. Moreover, given that neither party and none of the relevant discovery or witnesses are located in Texas, the interstate judicial system's interest in the most efficient resolution of controversies further weighs against the exercise of jurisdiction here.

Consideration of all relevant circumstances compels a finding that the exercise of jurisdiction over Defendants does not further the goals of convenience and efficiency and would offend traditional notions of fair play and substantial justice. *Cf. Hargrove v. Underwriters at Llyod's, London*, 937 F. Supp. 595, 607 (S.D. Tex. 1996) (finding exercise of jurisdiction fair where plaintiffs were Texas residents, and defendant had "many Texas clients" and "made many business trips to Texas," providing "the most convenient and efficient resolution of the case"). Thus, Defendants are likely to succeed on the merits of their appeal.

ii.      **The Court Erred in Ordering Preliminary Injunction Without Requiring**
**Plaintiff to Post Bond.**

The Order is insufficient on its face to serve as a preliminary injunction as contemplated by the Federal Rules of Civil Procedure. In particular, Rule 65(c) expressly requires in pertinent part that "the Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Bond would be necessary if there is a risk of monetary loss to Defendant as a result of preliminary injunction. *Gordon v. City of Houston, Tex.,* 79 F. Supp. 3d 676, 695 (S.D. Tex 2015). Bond is also necessary in granting preliminary injunction if Defendant was already selling a machine allegedly employing plaintiff's materials. *Mobius Med. Sys., LP v. Sun Nuclear Corp*. No. 413-CV-3182, 2013 U.S. Dist. LEXIS 175026 (S.D. Tex. Dec. 10, 2013). Here, Defendants can no longer sell their products upon the Preliminary Injunction Order. There is no doubt that Defendants will lose significant revenues if they stop selling their products. Making the matter worse, the Order required Defendants to destroy all of the alleged infringing products without any explanation or reasonings for doing so. Destroying all of the alleged infringing products will cause imminent and irreparable harm to Defendants. All of the alleged infringing evidence and non-infringing evidence would disappear.  What's more troubling is that this Court did not order Plaintiffs to post any bond in the event of significant monetary loss because of the preliminary injunction. In considering the likelihood to success on the merits of this case, Plaintiffs shall post significant amount of bonds to secure the loss of Defendants. Like *Morbius*, Defendants are being accused of selling mixers that allegedly use Plaintiff's marks which signify that bond is necessary in granting the preliminary injunction. However, no bond has been posted for the preliminary injunction

sought by Plaintiff, nor has there been any expression by the Court that why a bond is unnecessary. Accordingly, the entry of any preliminary injunction herein would be contrary to the Federal Rules of Civil Procedure. This Court abused its discretion on issuing the Preliminary Injunction Order and requested no bonds from Plaintiffs.

### iii.        The Court Erred in Finding that Plaintiff's trademark is valid.

Defendants are likely to succeed in arguing that Plaintiff's marks are functional and invalid. An incontestable trademark is subject to the defenses and defects that the mark is functional. *See* 15 U.S.C. § 1115(b)(8). This Court clearly erred in find that Plaintiffs have registered incontestable Trademark rights simply because the design stand for over 80 years and is still a market leader today. *See* Report and Recommendation, p. 3, at ¶6. (Dkt. No. 18). "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of an article." *Eppendorf Netheler Hinz GmbH v. Ritter GmbH,* 289 F.3d 351, 355 (5th Cir. 2002) (citing *Traffix Devices, Inc. v. Marketing Displays, Inc.,* 523 U.S. 23, 28 (2001)). "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional." *Id.*

Plaintiffs' marks consist of three parts, and all of the three parts are functional like any stand food mixer. *See* Defs.' Objection, p. 3, at ¶13. "The availability of alternative designs is irrelevant." *Eppendorf Netheler Hinz GmbH,* 289 F.3d 351, 355. Defendants also provided serval utility patent of Plaintiffs to show the functionality of Plaintiffs' marks. *See* Defs.' Objectiion, p. 3, at ¶14. However, this Court totally overlooked Defendants' argument.

iv.    **The Court Erred in Finding Likelihood of Confusion and Irreparable Harm to Support Entry of a Preliminary Injunction.**

In assessing Plaintiffs' likelihood of success on the merits of their infringement claim, the Court also erred in crediting Plaintiffs' arguments on several factors underlying its finding of a likelihood of success. First, in finding Plaintiffs' marks were strong, the Court erred in concluding that evidence of length of use of the mark at issue (represents unrebutted evidence that third-party use by twelve competitors does not diminish the association of the mark with Plaintiffs in the public's mind. Plaintiffs' evidence, however, does not demonstrate that the public has a reasonable basis to assume that the marks at issue could only be used with approval of Plaintiffs. *Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082–85 (5th Cir. 1982) (no likelihood of confusion when, because of unauthorized third-party uses of mark, public had no reasonable basis to assume that mark could only be used with approval of mark owner).

Furthermore, in assessing the degree of care of potential purchasers, the Court erred by not considering Defendants' evidence that the parties' related licenses cost thousands of dollars, which compels potential purchasers to exercise a higher degree of care and thereby reduces the likelihood of any confusion. *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (overturning verdict of infringement in part because potential purchasers are "buying for professional and institutional purposes at a cost in the thousands of dollars," and thus "virtually certain to be informed, deliberative buyers"); *Sally Beauty Co. v. Beautyco, Inc.*, *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) (stating when consumers exercise heightened care, "courts have found there is not a strong likelihood of confusion."). For these reasons, at a minimum, the Court also erred in finding a likelihood of confusion and thus a likelihood of success on the merits of Plaintiffs' infringement claim. In light

of these erroneous findings, Defendants have made a strong showing of likelihood of success on appeal. Where Plaintiffs have failed to meet its heavy burden of establishing irreparable harm and likelihood of success, the Court's entry of a preliminary injunction was erroneous. Thus, Defendants have demonstrated a high likelihood of success on the merits of their appeal of the Court's findings on the preliminary injunction, favoring entry of a stay of the preliminary injunction.

### B.        Defendants Will Suffer Serious Irreparable Harm

Defendants will suffer irreparable harm absent a stay of enforcement of the Order. First, the Court's preliminary injunction prohibits Defendants from selling their products, which they have spent many years developing, promoting, and investing in—with Plaintiffs full knowledge—and which have consequently developed invaluable customer goodwill. Absent a stay of this injunction, Defendants will continue to suffer loss of the valuable customer goodwill associated with their products and serious reputational harm, in addition to lost revenue from not being able to market their brand and reduced demand. *Smith and Nephew, Inc., v. Arthrex, Inc.*, No. 2:07–cv–335–TJW–CE, 2010 WL 2522428 (E.D. Tex. June 18, 2018) (staying injunction where the enjoined party "will suffer immediate and irreparable loss of goodwill from its customers," which will be "difficult, if not impossible, to recover" even on a successful appeal and likely result in permanent and irreparable reputational damage), *rev'd on other grounds*, 453 F. App'x 977, 987 (Fed. Cir. 2011); *Tinnus Enters., LLC v. Telebrands Corp.,* No.6:16-CV-0033 RWS-JDL, 2016 WL 9131960, at *2 (E.D. Tex. Nov. 21, 2016) ("Loss of revenue and goodwill may also be incalculable and irreparable."), *report and recommendation adopted*, No. 6:16-CV-0033 RWS-JDL, 2017 WL 24147 (E.D. Tex. Jan. 3, 2017), *aff'd,* 708 F. App'x 1019 (Fed. Cir. 2018); *Arch-Con Corp. v. Archcon Architecture*, Ltd., No. 5-18-CV-00821-OLG, 2019 WL 422662,

at *9 (W.D. Tex. Feb. 1, 2019) (balance of equities favored defendant where injunction would require amendment of written materials and name change, which would cause loss of customers), *report and recommendation vacated*, No. SA-18-CV- 00821-OLG, 2019 WL 2521276 (W.D. Tex. Apr. 9, 2019). For example, to comply with the Court's preliminary injunction order, Defendants have had to contact all of its customers, including its manufacturers and product owners, and requested that they remove all reference to the Defendants brand from their website, social media pages, and marketing materials. Absent a stay, it would cause irreparable damage to Defendants' customer goodwill and reputation within the industry.

Second, according to the Preliminary Injunction Order, the Court ordered Defendants to "recall and destroy and provide proof to the Court of recall and destruction (or recall and deliver to the Court for destruction) all Infringing Mixers and any packaging that includes images or other materials pertaining to the Infringing Mixers". *See* Prelim. Inj. Order, p.2, at §2 (b) (Dkt. 23). This Order is extremely disproportional as well as outside the scope of a preliminary injunction in addition to being miscarriage of justice, and not tailored to the harm that occasions it. *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004). One of the purposes of a preliminary injunction is to preserve the status quo until the merits have been resolved. However, the preliminary injunction order in this case does not preserve the status quo but rather destroy it. As stated, the Order requires Defendants to provide proof of destruction of all alleged infringing mixers meaning all evidence would be gone prior to trial. Destroying all evidence would not only cause substantial economic loss to the Defendants but also lead to substantial injustice since Defendants cannot use any evidence for defense later on. Defendants would be left with no evidence for defenses of noninfringement and loss of business and livelihood while Plaintiffs get to continue to dominate

the mixer market with no repercussions. The loss of evidence is irreparable harm to the Defendants as well as to justice.

In addition, it is inconceivable that this Court ordered Defendants to recall and destroy all the products based on Plaintiffs' likelihood of success on the merits. There has been no trial or judgment that points to Defendants' infringement. They are alleged infringement by Plaintiffs which in no way indicative of actual infringement. If Defendants comply with the Order and recall and destroy all their products, Defendants will suffer imminent and irreparable harm as discussed above. It is also waste of judicial resource to order Defendant to destroy all the evidence without a final judgement. There is no way for Defendants to recover to loss and the products if Defendants complied with the Preliminary Injunction Order. Ironically, this Court did not even order Plaintiff to post any bond to secure Defendants' loss.

The preliminary injunction also threatens the economic viability of Defendants' business model, which also constitutes irreparable harm favoring a stay, in addition to the significant loss of revenue from not being able to use its global brand to attract or retain customers, and the loss of all the products. *AtwoodTurnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (finding irreparable harm where "the potential economic loss is so great as to threaten the existence of the movant's business"). Defendants can no longer continue their businesses even if the Court find there is no infringement. As a result, not only are Defendants suffering substantial economic loss discontinuing all use of their globally recognized mixer and loosing associated invaluable goodwill, but the injunction has arbitrarly ordered Defendants destroy all of their products, Defendantsare facing with imminent and irreparable harm if the injunction is not stayed.

### C.      A Stay of Injunction Will Not Substantially Injure Plaintiffs

The third factor in the Court stay analysis also compels staying the injunction where Plaintiffs will not be harmed, let alone substantially, by such a stay. As discussed above, the Court's finding that Plaintiffs have met their heavy burden of establishing irreparable harm on its application for preliminary injunction is conclusory and unsupported by sufficient evidence and, accordingly, bears little weight on this factor. Indeed, the parties' history belies any claim of harm to Plaintiffs arising from a stay of the preliminary injunction. As the record reflects, Defendants' mixers have coexisted with Plaintiff's business model without issue, confusion, or any claimed harm for many years. A stay pending appeal, which will likely be resolved within a matter of months, will not alter these facts. Most importantly, Plaintiffs will not be injured if Defendants do not destroy the alleged infringing products before a final judgment.

### D.      The Public Interests Favor Staying the Injunction

Finally, the public interest will also be served by staying the preliminary injunction pending appeal. Given the irreparable harm Defendants will experience absent a stay of the Order, and the lack of any identifiable harm to Plaintiffs, the public interest here is served by staying enforcement of the preliminary injunction pending appeal. This is particularly so where Defendants have made a strong showing on the merits of their appeal, because the public has a strong interest in the correct application of the law and the ability to redress harm through appellate review. *Cf. In re Revel AC, Inc.*, 802 F.3d 558, 566 (3d Cir. 2015).

Moreover, the larger public interest favors supporting fair competition, especially here where Plaintiffs have attempted to use this Court's orders to interfere with Defendants' legitimate business operations. Defendants sell the accused mixers bearing their own patent. The Court's preliminary injunction will not further the purpose inherent in patent law to foster innovation by

granting an inventor a period of market exclusivity. Instead, a stay would serve the public interest in promoting fair and robust competition.

Most importantly, the public interest favors effectuating public and judicial resources.  It is a complete waste of judicial resource for this Court ordered Defendants to recall and destroy all the products of alleged infringement which are crucial components of this case. Destroying pieces of critical evidence not only is contrary to justice but also would indicate to the public that Defendants did infringe Plaintiffs' mark without any support. The public interest also favored a fair litigation and trial process for both parties on the claims.

Accordingly, given that all four stay factors tip decidedly in favor of a stay of the preliminary injunction, the Court should stay enforcement of the preliminary injunction pending appeal.

## IV.  CONCLUSION

For all the reasons set forth above, Defendants respectfully request that their motion to stay the preliminary injunction be granted in all aspect.


Dated: June 23, 2022                                  Respectfully Submitted,

                                  By:      /s/ Yu Hao Yao
                                           Yu Hao Yao, Esq.
                                           Glacier Law LLP
                                           9660 Flair Dr., Ste 328
                                           El Monte, CA 91731
                                           mickey.yao@glacier.law
                                           Tel: +1 (323) 208-8882
                                           Fax: +1 (312)-801-4587
                                           *Attorney for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with notice of the filing of this document via the

Court's CM/ECF system pursuant to Local Rule CV-5(a) on June 23, 2022.

/s/ Yu Hao Yao
Yu Hao Yao, Esq.

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Court Rule CV-7(h), Yu Hao Yao, Esq., counsel for Defendants,

conferred with Plaintiffs' counsels, Marc Lorelli, Melissa Smith, and Chelsea Pasquali on June

23, 2022. Plaintiffs' counsels stated that they oppose the motion.

/s/ Yu Hao Yao
Yu Hao Yao, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRPOOL CORPORATION AND | § | |
| WHIRPOOL PROPERTIES, INC., | § | CASE No: 2:22-CV-00027-JRG-RSP |
| | § | |
| *Plaintiffs*, | § | Honorable Judge: Rodney Gilstrap |
| | § | |
| v. | § | |
| | § | |
| SHENZHEN SANLIDA ELECTRICAL | § | |
| TECHNOLOGY CO., LTD. and | § | |
| SHENZHEN AVOGA TECHNOLOGY | § | |
| CO. LTD., | § | |
| *Defendants*. | § | |

**DEFENDANTS' REPLY TO PLAINITFFS' OPPOSITION TO DEFENDANT'S
EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

Without waiving any Rule 12(b) defenses, Defendants file this reply in support of their Emergency Motion to Stay Preliminary Injunction Pending Appeal. Nothing in Plaintiffs' Opposition changes the conclusion that the Court should grant an immediate stay of the Preliminary Injunction Order ("PI Order") pending appeal. Rather, Plaintiffs' Opposition further warrants that an immediate stay must be granted in order to preserve the status quo and prevent injustice. An immediate stay of the PI Order pending appeal is necessary since this Court does not have personal jurisdiction over Defendants in the absence of service of process and a PI Order calls for the recall and destruction of alleged infringing mixers which would lead to irreparable and substantial damages to Defendants. Further, lack of bond, invalidity of Plaintiff's trademark, no likelihood of confusion, and public interest favor a stay.

## A.    The Court Shall Not Issue A PI Order Against Defendants While the Court Does Not Have Personal Jurisdiction Over Defendants In the Absence of Service of Process.

In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."   *mni Capital Int'l v. Rudolf Wolff & Co*., 484 U.S. 97, 104 (1987). The "district court has no power to grant interlocutory or final injunction against a party whom it has not acquired valid jurisdiction", and an order granting an interlocutory injunction in these circumstances is "erroneous as a matter of law." *Royal Lace Paper Works, Inc. v. Pest-Guard Prods*., 240 F.2d 814, 816 (5th Cir. 1957).

It is well-established principle that service of process is necessary for a Court to acquire personal jurisdiction over Defendants. Defendants have raised the issue of no personal jurisdiction since the very beginning. There is no dispute in this case that service of process has not been

2

effectuated. Plaintiffs in their Opposition again admitted that there was no service of process. *See* Dkt. 28, Pls.' Opp'n., p. 4. Further, contrary to Plaintiffs' argument that only notice is required for issuing a preliminary injunction, the Fifth Circuit ruled that "[r]ule 65 confers no jurisdiction, the 'district court must have both the subject matter jurisdiction and in personam jurisdiction over the party against whom the injunction runs…'" *Enter. Int l, Inc. v. Corporacion Estatal Petroler Ecuatoriana*, 762 F.2d 464, 470 (5th Cir. 1985).

In the absence of the service of process over Defendants, this Court shall not issue a PI Order against Defendants due to lack of personal jurisdiction. Therefore, Defendants' Emergency Motion to Stay must be granted.

**B.     Failure to require the posting of a bond or other security constitutes grounds for reversal. *See Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).**

The movant for a preliminary injunction must "give security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Forcing Defendants to recall and destroy all alleged infringing mixers meaning all the evidence of "alleged infringement" and evidence of noninfringement will be completely lost without any remedy. While district courts have discretion over the amount of security, posting bond is necessary here since the absence of security would cause more damages to the Defendants if they were wrongfully enjoined or restrained. Therefore, the PI Order should be reversed. At least, Defendants' Emergency Motion to Stay should be granted to prevent further harm and injustice.

**C.     Plaintiffs' Trademarks Are Invalid Since They Are Functional.**

Contrary to Plaintiffs' allegation that "Defendants' position consisting solely of attorney argument," Defendants have provided two utility patents to show the utilitarian advantages of the designs of Plaintiffs' trademarks. *See* Dkt. 20, Defs.' Objection, Ex. 1 and Ex. 2; *See* Dkt. 28, Pls.'

Opp'n, p. 7. The utility patent U.S. Patent 2,185,155 issued in 1939 bore extremely similar exterior shape compared to Plaintiffs' mixers which allegedly incorporated Plaintiffs' trademarks.

Moreover, the evidence of other stand mixer designs provided by Plaintiffs, like the "overall shape of the KitchenAid Stand Mixer design", consist of a mixer head, an L-shaped pedestals including a base portion and an upstanding support arm, without exception. This further confirms that the above-mentioned components constitute how a stand mixer works. In fact, all varieties of the stand mixers incorporated this design because it is essential to the use and function of a stand mixer and is the most efficient and concise design for a stand mixer.

Like the design in *Eppendorf Netheler Hinz GmbH*, Plaintiffs' design of a stand mixer is functional because the design itself affects the cost and quality of a stand mixer if any substantial changes to this structure. *Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002). Here, Plaintiffs' design of "sleek design, rounded edges, signatures bullet-shaped head, protruding attachment hub and rounded base" incorporates a utility patent and is merely alternative designs which is irrelevant to the functionality as well invalidity of a trademark. *Id*. Since Plaintiffs' alleged alternative designs are irrelevant, therefore, Plaintiffs' trademarks are functional.

**D.     The Court Erred in Finding Likelihood of Confusion.**

To establish a likelihood of confusion, Plaintiffs must show "a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). District courts may weigh those digits "differently from case to case, depending on the particular facts and circumstances involved." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017).

"[W]here items are relatively inexpensive, a buyer may take less care in selecting the item," *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465,

478 (5th Cir. 2008). Here, unlike the relatively inexpensive items in *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, a buyer would take much more care and time in selecting a pricy standing mixer with a price over $300 USD dollar. *Id.* The consumers pay much attention, care and price to the brand when purchasing an expensive and fancy standing mixer, so it would be highly unlikely that consumers would be confused about the source or origin of this standing mixer. "There is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed."  *isher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194 (1st Cir. 1980). Aside from Plaintiffs' mere allegation that Defendants used their trademarks in bad faith, Plaintiffs have never provided any evidence in support of this allegation. Notwithstanding the fact that Defendants' mixers bear their own brands and designed their mixer in accordance with the registered design patent US D901,234 S, Plaintiffs' mixers are clearly branded with "Kitchen-Aid." Therefore, no ordinary consumer would confuse these two kinds of distinctive brands.

E.     **The Irreparable Harm and Public Interest Analysis Favor Defendants.**

Plaintiffs tried to use the excuse of "ambiguity in the Order" to cover up their intention to cause irreparable harm to Defendants through the PI Order. Ironically, on June 22, 2022, Plaintiffs' counsel sent a letter to Defendants' counsel stating that "**all Infringing Mixers must be 'recall[ed] and destroy[ed]' pursuant to the Order.**" *See* Exhibit 1, p.3, Letter from Plaintiffs' counsel. There is no doubt that Plaintiffs are attempting to enforce Defendants to recall and destroy all the alleged infringing products implying Defendants' infringement before trial or judgment.

An amended PI Order proposed by Plaintiffs in their Opposition to recall all alleged infringing products should be denied. The district court must consider additional factors since a heightened standard shall be applied to justify a recall in a trademark infringement case:

(1) the willful or intentional infringement by the defendant; (2) whether the risk of confusion to the public and injury to the trademark owner is greater than the burden of

the recall to the defendant; and (3) substantial risk of danger to the public due to the defendant's infringing activity. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir.2009) (cited *Gucci Am., Inc. v. Daffy s, Inc.*, 354 F.3d 228, 233 (3d Cir.2003).

Here, Defendants registered their trademarks in 2017 and started to sell standing mixers incorporated with a valid design patent since 2020. Since Defendants' mixers have coexisted for with Plaintiffs' business model without issue for years, there could be no danger to the public due to the recently raised alleged infringement allegation. Selling other models stand mixers does not mean that Defendants' businesses, reputation and goodwill will not be impacted by the recall, especially where the basis of the recall is alleged infringement. Defendants will lose their business completely; no monetary compensation would make up for the loss of Defendants in the event that the Court ultimately rules in favor of Defendants. This PI Order is far from the purpose to preserve the status quo and tailored to the harm that occasions it while being a final judgment order.

Furthermore, the preliminary injunction in cases regarding trademark infringement either protects consumers from deception or whether it will impede the free market. *Savage Tavern, Inc. v. Signature Stag, LLC,* No. 5:21-CV-078-H, 2022 WL 686870 (N.D. Tex. Mar. 8, 2022). The public interest favors Defendants' right to vindicate their conducts at trial; the preliminary injunction deprives Defendants of that right by destroying Defendants' businesses, evidence of alleged infringement and evidence of non-infringement and preventing them from operating through trial. At the same time, restraining competition in a way to destroy Defendants' legitimate businesses by forcing a destroy and recall of Defendants' alleged infringing products will obviously constrains the market and yielding ewer options. Therefore, the public interest factors Defendants.

For the foregoing reasons, and those stated in Defendant's Motion, Defendants respectfully request the Court to grant the stay of preliminary injunction pending appeal.

Dated: July 5, 2022                                         Respectfully Submitted,

By:      /s/ Yu Hao Yao
         Yu Hao Yao, Esq.
         Glacier Law LLP
         9660 Flair Dr., Ste 328
         El Monte, CA 91731
         mickey.yao@glacier.law
         Tel: +1 (323) 208-8882
         Fax: +1 (312)-801-4587
         ***Attorney for Defendants***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with notice of the filing of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a) on July 6, 2022.

/s/ Yu Hao Yao
Yu Hao Yao, Esq.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| WHIRLPOOL CORP. and WHIRLPOOL PROPERTIES, INC., | Case No. 2:22-cv-00027-JRG-RSP |
| Plaintiffs, | |
| v. | |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO. LTD., and | JURY DEMAND |
| SHENZHEN AVOGA TECHNOLOGY CO. LTD., | |
| Defendants. | |

## PLAINTIFFS' SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

## <u>TABLE OF CONTENTS</u>

A.      Foreign Defendants Cannot Hide Behind Service Under The Hague
        Convention To Avoid Preliminary Relief ................................................................. 1

B.      Foreign Manufacturers that Infringe KitchenAid's Rights to the Iconic
        Stand Mixer Design Require No Security From This Court ..................................... 2

C.      Defendants' Stand Mixers Do Not NEED To Infringe The Iconic
        KitchenAid Stand Mixer Design ............................................................................. 2

D.      Defendants New Non-Infringement Arguments Can Be Ignored ........................... 3

E.      The Order Does Not Require Immediate Destruction ............................................. 4

## <u>TABLE OF AUTHORITIES</u>

### Cases

*A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,*
    470 F.2d 689 (2d Cir. 1972)........................................................4

*Am. Rice, Inc. v. Producers Rice Mill, Inc.,*
    518 F.3d 321 (5th Cir. 2008)......................................................3

*American Chicle Co. v. Topps Chewing Gum, Inc.,*
    208 F.2d 560 (2d Cir. 1953)......................................................3

*Bd. Of Supervisors for La. State Univ. Agric. & Mech. College,*
    No. 07-30580/07-30887, 550 F.3d 465 (5th Cir. 2008) ......................4

*Chevron Chem. Co. v. Voluntary Purch. Grp., Inc.,*
    659 F.2d 695 (5th Cir. 1981)......................................................3

*Continuum Co. v. Incepts, Inc.,*
    873 F.2d 801 (5th Cir. 1989)......................................................2

*Corrigan Dispatch Co. v. Casa Guzman, S.A.,*
    569 F.2d 300 (5th Cir. 1978)......................................................1

*Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985)......................................................1

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.,*
    694 F.827 (7th Cir. 2012)..........................................................1

*Kaepa, Inc. v. Achilles Corp..,*
    76 F.3d 624 (5th Cir. 1996)........................................................2

*ODonnel v. Harris Cnty.,*
    260 F. Supp. 3d 810  (S.D. Tex. 2017) ......................................2

*Quantum Fitness Corp. v. Quantum Lifestyle Ctrs. L.L.C.,*
    83 F. Supp. 2d 810 (S.D. Tex. 1999) ........................................5

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003)......................................................2

*Royal Lace Paper Works, Inc. v. Pest-Guard Prods.,*
    240 F.2d 814 (5th Cir. 1957)......................................................1

*United States v. Jackson*,
    426 F.3d 301 (5th Cir. 2005)...............................................................................5

*Xtreme Lashes, LLC v. Xtended Beauty, Inc*.,
    576 F.3d 221 (5th Cir. 2009)..............................................................................4

## Statutes

15 U.S.C. § 1115(a)...................................................................................................3
15 U.S.C. § 1116(a)...................................................................................................5

## Rules

Fed. R. Civ. P. 65(a)................................................................................................1

Defendants seek a stay of the Preliminary Injunction Order. (DN23.) As made clear in Defendants' reply (DN 30), there is no basis for such relief. Defendants' Motion to Stay the Preliminary Injunction (DN 26) should be DENIED.

## A.   Foreign Defendants Cannot Hide Behind Service Under The Hague Convention To Avoid Preliminary Relief

Whirlpool's response fully addressed Defendants' arguments. Service of process is not required for issuance of a preliminary injunction. Fed. R. Civ. P. 65(a); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300 (5th Cir. 1978). As aptly noted by the Seventh Circuit, Defendants' argument to the contrary is "preposterous." *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.827, 842 (7th Cir. 2012).

Defendant continues to cite inapposite cases that have all been previously distinguished. In *Royal Lace Paper Works, Inc. v. Pest-Guard Prods.*, 240 F.2d 814, 816 (5th Cir. 1957), the district court issued a ***final judgment*** on the merits after the defendants were only provided notice of a preliminary injunction hearing. And in *Enterprise Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985), the question was whether district court improperly postponed considering "personal jurisdiction over C.E.P.E. under the foreign Sovereign Immunities Act" before entry of a preliminary injunction. *Id*. at 471. Importantly, however, the *Enterprise* court held that only a "a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits" is required before entry of a preliminary injunction. *Id*. at 471. Here, there is no question that Whirlpool has a "reasonable probability" of succeeding on the question of personal jurisdiction. This is confirmed by the fact that Defendants have not presented any substantive reasons why this Court does not have personal jurisdiction over them. And while Defendants attempt to argue that they "have raised the issue of no personal jurisdiction from the very beginning," (DN 29 at PageID#108), the truth is that they have only argued about service—not about the merits of personal jurisdiction.

1

**B.      Foreign Manufacturers that Infringe KitchenAid's Rights to the Iconic Stand Mixer Design Require No Security From This Court**

Defendants' Reply completely ignores two dispositive points. *First*, Defendants did not previously request or even mention security, and a motion to stay cannot "raise arguments which could or should, have been made before the judgment issued." *ODonnel v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003). *Second*, Defendants provided no information or basis from which a proper bond could be calculated. (DN 28 at 1025.) In fact, Defendants still have not provided this information. Based on these failures, Defendants' bond argument is meritless.

Now, Defendants raise a yet another new argument that "posting a bond or other security constitutes grounds for reversal" citing *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989). *Continuum*, however, does not stand for the proposition that a bond is always required. Rather, the question in *Continuum* was whether the district court's decision to increase a bond was proper. *Continuum*, 873 F.2d at 802. And *Continuum* expressly states that "Courts have waived the bond requirement." *Id*. Moreover, the Fifth Circuit has continued to find that courts can enter a preliminary injunction without requiring a bond post-*Continuum*. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ( "the district court did not violate Rule 65(c) [by] failing to compel Kaepa to post a bond.").

Defendants' argument regarding bond ultimately collapses to its misunderstanding that "destruction" must be immediate. As explained in Whirlpool's Opposition, this can be clarified. (DN 28 at 1033.)  An Amended Preliminary Injunction Order in redline which clarifies the timing of the destruction is attached as Exhibit A.

**C.      Defendants' Stand Mixers Do Not NEED To Infringe The Iconic KitchenAid Stand Mixer Design**

Defendants' functionality arguments fail to address the trademark at issue. Instead,

Defendants assert that the Preliminary Injunction enjoins any mixer with "a mixer head, and L-shaped pedestals including a base portion and upstanding support arm" meaning that the asserted trade dress is functional. (DN 30 at 1060.) Not so. (DN 28 at 1031.) The Preliminary Injunction is tailored to the Infringing Mixers, similar mixers, and "counterfeit, copy, or colorable imitation of Plaintiffs' Trademark." (DN 23 at 989.) Moreover, the mere citation of patents does not render the trademark functional, particularly where Defendants provide no comparison whatsoever between the patents and the trademark at issue.

Perhaps realizing the weakness of their arguments, Defendants now state: "this design of a stand mixer is functional because the design itself affects the cost and quality of a stand mixer if any substantial changes to this structure." (DN 29 at 1046.) But again, this statement is unsupported by any evidence or explanation. And unlike any of the decisions cited by Defendants, the Preliminary Injunction here involves a Registered Trademark which provides *prima face* evidence of non-functionality as this issue was already considered by a Trademark Examiner. 15 U.S.C. § 1115(a).

## D.   Defendants New Non-Infringement Arguments Can Be Ignored

While Defendants claim there is no evidence of bad intent (DN 30 at 1061), Defendants cannot escape their copying of a market leader (which has never been denied). This ***alone*** justifies a finding of likely confusion. (DN 6 at #71-72.) *Am. Rice, Inc. v. Producers Rice Mill, Inc*., 518 F.3d 321, 332 (5th Cir. 2008) (*quoting Chevron Chem. Co. v. Voluntary Purch. Grp., Inc*., 659 F.2d 695, 703-04 (5th Cir. 1981); *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 563 (2d Cir. 1953) ("As soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is 'likely' to succeed.") (L. Hand, J.).

Defendants also resort to twice-rejected arguments. ***First***, Defendants argue "a buyer would

take much more care and time in selecting a pricy standing mixer with a price over $300 USD." (DN 29 at 1047.) But the Fifth Circuit recognizes that "a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar." *Xtreme Lashes, LLC v. Xtended Beauty, Inc*., 576 F.3d 221, 231 (5th Cir. 2009) (citations omitted). Moreover, the record does not reflect Defendants selling stand mixers over $300 USD. Instead, the record shows Infringing Mixer prices markedly lower. (DN 9-1 at 689.) *Second*, Defendants argue that its products include "Cooklee" or "Phisinic." As repeatedly held, this does not dispel confusion. *Bd. Of Supervisors for La. State Univ. Agric. & Mech. College*, No. 07-30580/07-30887, 550 F.3d 465, 482 n. 66 (5th Cir. 2008), citing with favor *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir. 1972) (addition of junior user's name to product "does not save the day; a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus 'an aggravation, and not a justification'").

### E.    The Order Does Not Require Immediate Destruction

Defendants' irreparable harm argument boils down to its assertion that the Order requires *immediate* destruction of existing and recalled products in the United States. (DN 30 at 1061.) Knowing its argument is based on a misreading, Defendants eliminated its previous argument (in its withdrawn reply) that "an amended preliminary injunction cannot cure the defect of the original Preliminary Injunction Order to prevent the irreparable harm." (DN 29 at 1049.) Defendants never explained the basis for this assertion, and now apparently concede that a clarifying amendment is all that is required, which is attached as Exhibit A in redline.

Now, for the first time, Defendants claim that the Court's "recall" was improper. (DN 30 at 1061-62.) Defendants did not raise this at or before the preliminary injunction hearing. (DN204.) Defendants did not raise this in their objections to Magistrate Judge Payne's Report and Recommendation that included the recall. (DN 22.) Defendants did not raise it in their current

motion. (DN 26.) Arguments raised for the first time in a reply are waived. *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005). Any such argument has been waived numerous times.

Defendants also now argue, for the first time, that Whirlpool must demonstrate three factors from the Third Circuit in order to justify the recall. Regardless, these factors have been met. The Defendants' infringement was willful. (DN 6 at 71-72.) The harm to Whirlpool and the public is substantial, *particularly* when compared to a recall when the Defendants have never advised the Court how many Infringing Mixers have been sold in the United States. (*Id.* at 74-76.) And "the public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs.* L.L.C., 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999).

Certainly, the harm to Whirlpool's reputation and trademark is immediate and paramount which forecloses any basis for Defendants' requested stay.  15 U.S.C. § 1116(a); *TGI Friday's, Inc. v. Great Northwest Rest., Inc.* 652 F. Supp. 2d 763 (N.D. Tex. 2009) ("[C]ourts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants."). Moreover, Defendants are overseas manufacturers which further lessens any harm to them.  Defendants have invested in no facilities in the United States, they have invested in no employees in the United States, and they have invested in no advertising or sales outside of a mere online presence.  According to the Preliminary Injunction Order, Defendants simply cannot ship and sell Infringing Mixers into the United States market which are intended to trade-off of the goodwill and reputation built by Whirlpool in the KitchenAid Stand Mixer Design for 80 years. Contrary to their assertions, Defendants are not prohibited from promoting their brand and selling their other stand mixers. Defendants' assertion that "Defendants will lose their business completely" is simply disingenuous. (DN 30 at 1062.)

Defendants' motion should be DENIED.

Respectfully submitted,

Dated: July 7, 2022

*/s/ Melissa R. Smith*
Melissa Richards Smith
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

Marc Lorelli (Michigan Bar No. P63156)
LEAD ATTORNEY
Chanille Carswell (Michigan Bar No. P53754)
**BROOKS KUSHMAN P.C.**
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone: (248) 358-4400
Facsimile: (248) 358-3351
Email: mlorelli@brookskushman.com
ccarswell@brookskushman.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 7th day of July, 2022 with a copy of this document via the Court's CM/ECF system per local Rule CV-5(a)(3).

/s/ Melissa R. Smith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION and | § | |
| WHIRLPOOL PROPERTIES, INC., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:22-CV-00027-JRG-RSP |
| SHENZHEN SANLIDA ELECTRICAL | § | |
| TECHNOLOGY CO., LTD. and SHENZHEN | § | |
| AVOGA TECHNOLOGY CO. LTD., | § | |
| | § | |
| *Defendants*. | § | |

## REPORT AND RECOMMENDATION

Before the Court, defendants Shenzhen Sanlida Electrical Technology Co., Ltd. ("Sanlida") and Shenzhen Avoga Technology Co. Ltd. ("Avoga") move, Dkt. No. 26, to stay an order of preliminary injunction previously imposed, Dkt. No. 23.  After consideration of the motion, responsive briefing, and the law, the motion should be **DENIED**.

### I.    BACKGROUND

Plaintiffs Whirlpool Corporation and Whirlpool Properties, Inc. (collectively "Whirlpool") filed the instant suit against Defendants alleging trademark infringement of U.S. Trademark Nos. 1,711,158 and 5,510,871 (collectively "Asserted Marks"), Dkt. No. 1, and moved for preliminary injunction, Dkt. No. 6.  Whirlpool subsequently moved for a preliminary injunction hearing.  Dkt. No. 9.  Therein, Whirlpool averred that (1) Whirlpool sent Sanlida and Avoga copies of the complaint and of the motion for preliminary injunction via email, personal service, and text messages, (2) Whirlpool received a read receipt responsive to said email sent to Sanlida, (3) a legal representative of Sanlida accepted and signed receipt of personal service, and (4) a legal representative of Avago accepted and signed receipt of personal service.  *Id.* at pp 5-8.

The Court set a hearing date and ordered Whirlpool to again notify Defendants via email, personal service, and text.  Dkt. No. 10.  Whirlpool complied.  Dkt. No. 11.  Counsel for Defendants was present for the hearing and admitted that the Defendants had received notice of the hearing.  Dkt. No. 20-4 7:16-18.  After the hearing, the undersigned issued a Report and Recommendation to grant Whirlpool's motion for preliminary injunction, Dkt. No. 18, which was adopted by the Court, Dkt. No. 23.  Defendants filed a notice of appeal, Dkt. No. 24, and filed the instant motion to stay, Dkt. No. 26.

## II.   LAW

"[A]n interlocutory … judgment in an action for injunction" is "not stayed after being entered, even if an appeal is taken" "[u]nless the court orders otherwise."  Fed. R. Civ. P. 62(c). Upon consideration of a motion to stay pending appeal, the Court considers the following factors: (1) the movant's likelihood of success on the merits, (2) the harm to the movant if the stay is not granted, (3) the harm to the nonmovant if the stay is granted, and (4) the public interest implicated in the outcome.  *Prudential Mortg. Cap. Co. v. Faidi*, 444 F. App'x 732, 737 (5th Cir. 2011) (citing *Arnold v. Garlock*, 278 F.3d 426, 438-39 (5th Cir. 2010)).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

Defendants contend their appeal of the preliminary injunction is likely to succeed by arguing that the Court erred in finding that service of process was not necessary to impose an injunction, by not requiring Whirlpool to post security, and by finding that Whirlpool is likely to succeed on the merits of its trademark infringement claim.  Regarding the latter, a trademark holder must show possession of a legally protectable trademark and a likelihood of confusion as to source, affiliation or sponsorship resulting from the alleged infringer's use of a competing mark.

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017).  Defendants

argue that the trademark is invalid as functional and that there is no likelihood of confusion.  We

address separately service, security, validity, and likelihood of confusion below.

### i.      Service of Process

During the hearing, in its objection to the Report and Recommendation, and once again in

its motion to stay, Defendants argue that a preliminary injunction is invalid without perfected

service of process. Dkt. No. 21 7:4-25; Dkt. No. 20 p 3; Dkt. No. 26 p 8 ("Defendants are likely to

succeed in challenging the Court's finding that preliminary injunction is valid without perfected

service of process on Defendants."); Dkt. No. 30 p 2 ("In the absence of service of process (or

waiver of service by the defendant), a court ordinarily may not exercise power over a party the

complaint names as defendant.").  However, "Rule 65(a) does not require service of process."

*Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 302 (5th Cir. 1978).  Defendants do

not expressly argue that the Court is without personal jurisdiction, but personal jurisdiction is not

dependent upon service of process.  As a result, this is not a case involving a "challenge to

jurisdiction … interposed on an application for preliminary injunction."  *Enter. Int'l, Inc. v.*

*Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985) (quoting *Visual*

*Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 59 (2d Cir.1981) (internal

quotation marks omitted).

### ii.     Security

Defendants argue for the first time that an injunction is improper without Whirlpool posting

security in the event of a wrongfully issued injunction.  Fed. R. Civ. P. 65(c).  Whirlpool replies

that Defendants never raised the issue of security before the injunction was entered and have thus

waived the requirement.  Whirlpool further argues that Defendants have failed to provide the Court with any information upon which to determine a value sufficient for security.

Interpreting the language contained in Federal Rule of Civil Procedure 65(c), the Fifth Circuit has determined that the imposition of security and the value thereof is within the discretion of the court. *Corrigan Dispatch*, 569 F.2d at 303 (5th Cir. 1978) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."); see also *Kaepa, Inc. v. Achilles Corp*., 76 F.3d 624, 628 (5th Cir. 1996) (finding that "the district court did not violate Rule 65(c) by failing to compel Kaepa to post a bond.").

While there is little information from which to determine a value sufficient to remedy Defendants' potential losses from a wrongful injunction and the Defendants offer none, the Court will order Whirlpool to post a bond in the sum of $10,000.  The record does contain information about the products at issue but little about the volume of infringing sales. In the unlikely event of wrongful injunction, Whirlpool may challenge Defendants' claim to the sum. *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989), *on reconsideration sub nom. Continuum Co. v. Incepts, Inc.*, 901 F.2d 1111 (5th Cir. 1990) (posting security "assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured").

### iii.        Validity of Trademark

Defendants argue that the Asserted Marks are invalid as functional.  "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 165 (1995).

"Expanding upon the meaning of this phrase, [the Supreme Court has] observed that a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Qualitex*, 514 U.S. at 156).  "It is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of esthetic functionality" where there is "no indication that" a design feature "had any bearing on the use or purpose of the product or its cost or quality."  *Id*. at 33; see also *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355-56 (5th Cir. 2002) (citing *TrafFix*, 532 U.S. at 33-35).

Defendants argue that Whirlpool's marks are functional because "a) a mixer head; and b) an L-Shape pedestal including a base portion (which holds the mixing bowl) and an upstanding support arm (which connects the base to the mixer head) … are the reasons a stand food mixer works." Dkt. No. 20 p 4.  Whirlpool responds that the market includes several non-infringing but functionally equivalent competing designs.  *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1341 ("Since the effect upon competition is really the crux of the matter, it is, of course, significant that there are other alternatives available.") (internal quotation marks omitted); *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (2002) ("the availability to competitors of functionally equivalent designs"); *Id.* at 1274-76 (holding that *TrafFix* "does not render… the *Morton-Norwich* factors erroneous").

Defendants' description of the Asserted Marks focuses on the functional features of a food mixer and fails to recognize that these functional features can have a variety of forms. *Morton-Norwich*, 671 F.2d at 1342 ("[A] molded plastic bottle can have an infinite variety of forms or designs and still function to hold liquid. No one form is necessary or appears to be 'superior.' "). For example, the Asserted Marks depict (1) a flat base with smooth logarithmic-like surfaces rising from the base and approaching in a tapered manner to form the L-shaped pedestal and (2) and a

capsule atop the taper to form the support arm.  On the other hand, the competing but non-infringing mixers include (1) a flat base with parallel surfaces rising from the base without approach or taper to form the L-shaped pedestal and (2) a support arm bearing the same profile as the base and parallel surfaces. Despite these esthetic differences, there is no evidence that the competing but non-infringing mixers are of lesser quality, more cost prohibitive, or functionally different because of the esthetic difference. In other words, there is no evidence that the design embodied in the Asserted Marks is "essential to the use or purpose of the article." *TrafFix*, 532 U.S. at 32.

Defendants' argument that there is no likelihood of confusion based upon the price differences, *infra* III.A.iv, precludes an argument that the Asserted Marks affect the cost or quality. *Id.*  Finally, Defendants do not argue that the Asserted Marks put competitors at a significant non-reputation-related disadvantage.  If anything, the presence of non-infringing competing mixers with rectilinear design motifs supports a conclusion that the Asserted Marks do not functionally limit the field. Defendants' reliance on *Eppendorf* for the proposition that "[t]he availability of alternative designs is irrelevant" is misleading without additional context from the portion of the opinion in which this text is found. 289 F.3d 351, 355 (5th Cir. 2002).  Upon a closer inspection, the cited text is clearly limited to functional features.  *Id.*  Defendants also argue that the existence of now expired utility patents which display a mixer bearing a design substantially similar to that of the Asserted Marks.  However, the claim elements do not require any particular esthetic form or that form depicted by the Asserted Marks.

### iv.    Likelihood of Confusion

Defendants first argue that the Court failed to consider evidence of unauthorized third party uses of the mark or related licenses.  Dkt. No. 26 p 12.  However, Defendants fail to present any

such evidence for our consideration. *Id.* Defendants next argue that because of the attention and care consumers give disparate pricing, it is highly unlikely that a consumer would confuse Whirlpool's relatively more expensive food mixer with Defendants' relatively cheaper alternative. Dkt. No. 30 p 4-5. *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (listing "the degree of care exercised by potential purchasers" as one of eight "nonexhaustive" factors for courts to consider when assessing the likelihood of confusion). Again, the Defendants fail to point to any evidence in the record of Whirlpool's or Defendant's pricing for our consideration. Even if Defendant had presented pricing evidence for this Court's consideration, "[n]o single factor is dispositive," *Smack Apparel*, 550 F.3d at 478, and "a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar," *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 231 (5th Cir. 2009).

In the absence of evidence bearing on the Defendants' intent, advertising, and actual confusion, other indica of likelihood of confusion include "(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, [and] (4) the identity of the retail outlets and purchasers." *Smack Apparel*, 550 F.3d at 478 (citing *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000). In the instant suit, the Asserted Marks are of the trade dress type, the design of Defendants' allegedly infringing products includes very similar curves and geometries to those curves and geometries embodied in the Asserted Marks, the Defendants' allegedly infringing products and Whirlpool's products bearing the Asserted Marks are in direct competition in that they are both personal (as opposed to commercial) food mixers and are both available for purchase on Amazon and Wayfair. These factors support a conclusion that there is a likelihood of confusion.

### B.     Balance of Harms

The Lanham Act entitles Whirlpool to a presumption of irreparable harm upon a finding that Whirlpool is likely to succeed on the merits of its trademark infringement claim.  15 U.S.C. § 1116(a).  As already discussed *supra* III.A.iii-iv, Defendants' arguments are not persuasive, and as a result, Whirlpool is likely to succeed on the merits.  Whirlpool is thus entitled to a rebuttable presumption of irreparable harm.

Defendants argue that they will suffer irreparable harm in the form of lost profits and lost customer goodwill by following the preliminary injunction's prohibition from further sales of the allegedly infringing products.  However, "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.12 (5th Cir. 1991).  Accordingly, such hardship is insufficient to outweigh the presumption of irreparable harm Whirlpool will endure to its reputation and goodwill.   *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n,* 532 F.Supp. 1376, 1389 (S.D.Tex.1982), *aff'd,* 701 F.2d 408 (5th Cir.1983).

To the extent that Defendants argue that irreparable harm flows from the preliminary injunction's requirement to destroy allegedly infringing product, Whirlpool has conceded that such a requirement is not necessary at this time.   Accordingly, the preliminary injunction should be modified to remove that requirement and direct that the items be held by Defendants pending further order.

### C.     Public Interest

Finally, the Court finds that the entry of a preliminary injunction will not disserve the public.  Defendants contend otherwise arguing that they are likely to succeed on the merits and

that Whirlpool has not suffered any irreparable harm.  We disagree.  *Supra* III.A.  Further, there exists a strong public interest in the protection of trademarks to minimize confusion as to source, affiliation, and sponsorship.  See, *e.g.*, *TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 763, 773 (N.D. Tex. 2009).  Accordingly, the public will not be disserved by a preliminary injunction prohibiting the sale of the allegedly infringing products in the United States.

## IV.     Conclusion

For the reasons discussed above, **IT IS RECOMMENDED** that Defendants' motion to stay the preliminary injunction be **DENIED,** but that the injunction be modified to provide that Defendants are required to recall and hold all allegedly infringing mixers and related matters and provide proof of such recall and hold until otherwise ordered by this Court.

Whirlpool is hereby **ORDERED** to post a bond or security in the amount of $10,000 with the Clerk of Court within 10 days.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); see *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendations [cv, resp oth]" or it may not be considered by the District Judge.

**SIGNED this 15th day of July, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

9

**IN THE UNITED STATES DISTRICT COURT
FOR TH EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRPOOL CORPORATION AND | § | |
| WHIRPOOL PROPERTIES, INC., | § | CASE No: 2:22-CV-00027-JRG-RSP |
| | § | |
| *Plaintiffs*, | § | Honorable Judge: Rodney Gilstrap |
| | § | |
| v. | § | |
| | § | |
| SHENZHEN SANLIDA ELECTRICAL | § | |
| TECHNOLOGY CO., LTD. and | § | |
| SHENZHEN AVOGA TECHNOLOGY | § | |
| CO. LTD., | § | |
| *Defendants*. | § | |

**DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATIONS <u>DENYING
DEFENDNATS' EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION
PENDING APPEAL</u>**

Without waiving any Rule 12(b) defenses, pursuant to F.R.C.P. 72(b)(2) and L.R. 72(b),

Defendants Shenzhen Sanlida Electrical Technology Co., Ltd. and Shenzhen Avoga Technology

Co. Ltd., (together "Defendants") hereby file their objections to the Report and Recommendations

of Magistrate Judge dated July 15, 2022 (the "Magistrate's Report") (Dkt. 32).

## **INTRODUCTION**

Contrary to the findings, conclusions and recommendations in the Magistrate's Report,

Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal (the "Emergency

Motion to Stay") must granted in that **1)** this Court lacks personal jurisdiction over Defendants to

issue a preliminary injunction; **2)** Plaintiffs' marks are functional and invalid; **3)** there is no

likelihood of confusion; **4)** Defendants will suffer irreparable harm if the injunction is not stayed;

**5)** a stay of the preliminary injunction serves the public interest.

## **PROCEDURAL BACKGROUND**

On June 14, 2022, this Court entered a preliminary injunction order. (Dkt. 23). On the same

day, Defendants file their notice of appeal of the preliminary injunction. (Dkt. 24). On June 23,

2022, Defendants filed their Emergency Motion to Stay. (Dkt. 26). On July 1, 2022, Plaintiffs filed

opposition. (Dkt. 28). On July 6, 2022, Defendants filed reply. (Dkt. 30). On July 7, 2022, Plaintiffs

filed sur-reply. (Dkt. 31). On July 15, 2022, the Magistrate's Report was issued recommending

Defendants' Emergency Motion to Stay be denied. (Dkt. 32).

## **ARGUMENTS**

### A.  Standard of Review

 F.R.C.P. 72(b)(3) provides that "the district judge must determine *de novo* any part of the

magistrate judge's disposition that has been properly objected to." *United States v. Wilson*, 864

F.2d 1219, 1221 (5th Cir. 19a89). For non-dispositive motions, the district courts must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Fed. R. Civ. P. 72(a)*.

### B.  Defendants' Specific Objections

1. <u>Objection to that "Defendants argue that a preliminary injunction is invalid without service of process… However, 'Rule 65(a) does not require service of process.'</u> *<u>Corrigan Dispatch Co. v. Casa Guzman, S. A.</u>*<u>, 569 F.2d 300, 302 (5th Cir. 1978)."</u> (Magistrate's Report, p. 3)

The Magistrate's Report relied on *Corrigan* finding that preliminary injunction pursuant to Rule 65(a) does not require service of process, however, *Corrigan* is distinguishable from the present case. The plaintiff in *Corrigan* brought an interpleader action under 28 U.S.C. § 1335, which has its own rules for preliminary injunctions. *See* Fed. R. Civ. P. 65(e)(2) (stating that Rule 65 does not modify "28 U.S.C. § 2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader"). *3M Co. v. Christian Investments LLC*, No. 1:11CV627, 2011 WL 3678144, *4 (E.D.Va. Aug. 19, 2011). In fact, the Fifth Circuit was clear that "[b]ecause Rule 65 confers no jurisdiction, the district court must have both subject matter jurisdiction and "in person-am jurisdiction over the party against whom the injunction runs," and, when that party is the defendant, this "implies either voluntary appearance by him or effective service of process." *Enter. Int'l, Inc. v. Corporation Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470 (5th Cir. 1985).

2. <u>Objection to the finding that "Defendant does not expressly argue that the Court is without personal jurisdiction, but personal jurisdiction is not dependent on service of process."</u> (Magistrate's Report, p. 3)

Contrary to Magistrate's finding, Defendants raised the personal jurisdiction issue as to the absence of service of process and never waived this argument. *See Hearing Tr.*, p.7, at ¶¶7-12, 19-25, p.13, at ¶¶7-21, p.15, at ¶¶3-11, *Def's Obj. to Recommendation and Report.*, p.2. (Dkt. 20).

2

Unlike the Magistrate's finding that "personal jurisdiction is not dependent on service of process," the Fifth Circuit held that "[w]ithout personal service of process … the court is without jurisdiction to render a personal judgment..." *Royal Lace Paper Works, Inc. v. Pest-Guard Prods.*, 240 F.2d 814, 816 (5th Cir. 1957), *see Audio Enters., Inc. v. B & W Loudspeakers of Am*., 957 F.2d 406, 410 (7th Cir. 1992) (preliminary injunction vacated due to insufficient service).

Since service of process is in absence, Defendants never waived this argument and contested the absence of service of process, this Court lacks personal jurisdiction to issue a preliminary injunction order against Defendants. Therefore, Defendants' motion to stay must be granted to avoid further irreparable harm to Defendants as a direct result of a preliminary injunction order that should have been unenforceable.

3.  Objection to the recommendation that "the Court will order Whirlpool to post a bond in the sum of $10,000." (Magistrate's Report, p.4)

Even if the Court order a bond to be posted, the preliminary injunction must be stayed because the preliminary injunction should not have been granted at the first place. Not only the amount of the bond is extremely insufficient to compensate Defendants for damages caused by the wrongful injunction but imposing a bond also fails to cure wrongfully issued injunction.

4.  Objection to the finding that there is no evidence that the design in the Asserted Marks is "essential to the use or purpose of the article." (Magistrate's Report, p.6)

Defendants have provided two utility patents to show the utilitarian advantages of the designs of Plaintiffs' trademarks. *See* Defs.' Objection, Dkt. 20, Ex. 1 and Ex. 2; *See* Pls.'Opp'n, Dkt. 28, p. 7. The utility patent U.S. Patent 2,185,155 issued in 1939 bore extremely similar exterior shape compared to Plaintiffs' mixers which allegedly incorporated Plaintiffs' trademarks.

As described in the Magistrate's Report, all of the standing mixers incorporated a flat base, a L-shaped pedestal and a support arm parallel to the base. *See Magistrate's Report*, Dkt. 32, pp. 5-

6. It is true that the design for a standing mixer has not changed in the past decades, which also shows that the three parts of the mixer are functional features. Any reasonable person can find that the standing mixer cannot work without any of the three parts. As a result, all of the three parts of the standing mixer are functional features. Moreover, Plaintiffs' allegation that the market includes several non-infringing but functionally equivalent competing designs should be given no weight, as "[a] design is legally functional, and thus not protectable, if it is one a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 775. Therefore, Plaintiffs' trademarks are invalid because of functionality.

    5.  <u>Objection to the finding "there is a likelihood of confusion."</u>(Magistrate's Report, p. 7)

Where the items are relatively expensive as Plaintiffs' products bearing their trademark "Kitchen Aid", a buyer may take more care in selecting the item. Moreover, since Defendants' products bear with their own trademarks and much lower prices, which means that an ordinary consumer would not confuse Defendants' products as Plaintiffs'. In addition, mere a possibility of confusion is insufficient to create a probability of confusion.  "*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). Therefore, the Magistrate's finding of existence of likelihood of confusion should be rejected.

    6.  <u>Objection to the finding that "Whirlpool is likely to succeed on the merits; and Whirlpool is thus entitled to a rebuttal presumption of irreparable harm."</u> (Magistrate's Report, p. 8)

Defendants disagree that Plaintiffs are likely to succeed on the merits. Moreover, whether Plaintiffs are likely to succeed on the merits is not a dispositive factor in the irreparable harm analysis when deciding whether to grant a motion to stay. The Magistrate's Report should not rely on *Lakedreams* in weighing the irreparable harm factor against Defendants. *Lakedreams v. Taylor*,

932 F.2d 1103, 1109 n.12 (5th Cir. 1991). Unlike the defendant in *Lakedreams* who only suffers loss of profits, here, Defendants will suffer loss of profits, loss of reputation, current and potential customers, and will incur unnecessary, irreparable cost in recalling and destroying.

Moreover, Plaintiffs cannot meet the heightened standard to require Defendants recall any products where one of the requirements for recall is "substantial risk of danger to the public," meaning the unsafe for human consumption or the product was hazardous for public consumption. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir.2009). Therefore, the irreparable harm analysis favors grating Emergency Motion to Stay.

7. <u>Objection to the conclusion and recommendation that "preliminary injunction should be modified to remove that requirement and direct that the items be held by Defendants pending further order."</u> (Magistrate's Report, p. 8)

Even if the Court modifies the Preliminary Injunction removing the requirement to destroy allegedly infringing product, Defendants' Emergency Motion to Stay must be granted because the preliminary injunction should not have been granted in the first place. Any modification is insufficient to cure the wrongful injunction.

8. <u>Objection to the finding that "the Court finds that the entry of a preliminary injunction would not disserve the public."</u> (Magistrate's Report, p. 8)

The public interest is also served from lawful and free competition in the marketplace in addition to expanded choices of products. Free competition also benefits the economy while judicial intervention could lead to restraint on free trade as well as destruction of livelihood. The public interest is clearly served by staying the preliminary injunction.

## **<u>CONCLUSION</u>**

For the reasons set above, a stay of the preliminary injunction is warranted. Defendants respectfully request the Court sustain their objections to the Magistrate's Report and grant Defendants' Emergency Motion to Stay.

Dated: July 28, 2022.                          Respectfully Submitted,

                                        By:    /s/ Yu-Hao Yao
                                               Yu-Hao Yao, Esq.
                                               Glacier Law LLP
                                               9660 Flair Dr., Suite 328
                                               El Monte, CA 91731
                                               mickey.yao@glacier.law
                                               Tel: +1 (323) 208-8882
                                               Fax: +1 (312) 801-4587
                                               ***Attorney for Defendants***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WHIRLPOOL CORP. and WHIRLPOOL PROPERTIES, INC. | |
| Plaintiffs, | Case No. 2:22-cv-00027-JRG-RSP |
| v. | |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO., LTD., and | JURY DEMAND |
| SHENZHEN AVOGA TECHNOLOGY CO. LTD. | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
OBJECTION TO REPORT AND
RECOMMENDATION DENYING DEFENDANTS'
EMERGENCY MOTION TO STAY PRELIMINARY
INJUNCTION PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

A.     Rule 65 Does Not Require Service of Process..........................................................1

B.     Defendants Only Contested Service of Process; Not Personal Jurisdiction ..........2

C.     The Required Bond is Appropriate .........................................................................3

D.     Whirlpool's Trade Dress is Not Functional ...........................................................3

E.     There is a Likelihood of Confusion .......................................................................3

F.     Whirlpool is Likely to Succeed on the Merits and is Entitled to a
Presumption of Irreparable Harm ..........................................................................4

G.     The Court May Clarify that the Preliminary Injunction Does Not Require
the Infringing Products be Destroyed at this Time ................................................5

H.     The Public Interest is Served by the Injunction ....................................................5

# TABLE OF AUTHORITIES

## Cases

*Corrigan Dispatch Co. v. Casa Guzman, S. A.*,
 569 F.2d 300 (5th Cir. 1978) .......................................................................... 1, 2

*Dixon v. Toyota Motor Credit Corp.*,
 794 F.3d 507 (5th Cir. 2015) .............................................................................. 4

*Enter. Int'l. Inc. v. Corp. Estatal Petrolera Ecuatoriana*,
 761 F.2d 464 (5th Cir. 1985) .............................................................................. 2

*Quantum Fitness Corp. v. Quantum Lifestyle Ctrs.* L.L.C.,
 83 F. Supp. 2d 810 (S.D. Tex. 1999) ................................................................. 5

*TGI Friday's, Inc. v. Great Northwest Rest., Inc.*,
 652 F. Supp. 2d 763 (N.D. Tex. 2009) ............................................................... 5

## Statutes

28 U.S.C. §1335 ......................................................................................................... 1
28 U.S.C. §2361 ...................................................................................................... 1, 2

## Rules

Fed. R. Civ. P. 62 ...................................................................................................... 5
Fed. R. Civ. P. 65 ................................................................................................... 1, 2

On June 23, 2022, Defendants Shenzhen Sanlida Electrical Technology Co., Ltd.'s and Shenzhen Avoga Technology Co., Ltd.'s (collectively, "Defendants") filed a motion to stay the Court's preliminary injunction pending appeal. (DN 28.)  Plaintiffs objected to this motion (DN 30), and on July 15, 2022, Magistrate Judge Roy S. Payne issued a Report and Recommendation recommending that the Motion be denied. On July 28, 2022, Defendants filed objections to the Report and Recommendation. (DN 35.)  Plaintiffs Whirlpool Corporation and Whirlpool Properties, Inc. (collectively, "Whirlpool") respond to Defendants' objections as follows:

## A.    Rule 65 Does Not Require Service of Process

Defendants object to Magistrate Judge Payne's finding that Rule 65(a) requires only notice, not service of process. (DN 35, PageID#1108.) In his Report and Recommendation, Magistrate Judge Payne held that Rule 65(a) does not require service of process, citing *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 302 (5th Cir. 1978) which states "Rule 65(a) does not require service of process" but instead only requires notice. (DN 32, PageID#1085.) While not raised previously, Defendants now object on the basis that *Corrigan* involved an interpleader action and interpleader actions have their "own rules for preliminary injunctions" because injunctions in interpleader actions are governed by 28 U.S.C. §2361, and Fed. R. Civ. P. 65 does not modify 28 U.S.C. §2361 (DN 35, PageID#1108.) Defendants' argument is misplaced. This is because the injunction in *Corrigan* was issued under Rule 65, not 28 U.S.C. §2361. *Corrigan*, 569 F.2d at 302 ("The interlocutory order in question was issued in connection with a statutory interpleader filed by Corrigan under 28 U.S.C. §1335 ***and Rule 65 of the Federal Rules of Civil Procedure***.") (emphasis added). This makes sense as 28 U.S.C. §2361 only applies to injunctions "restraining them from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court."  28 U.S.C. §2361.  The injunction in *Corrigan* was directed to releasing the claimed property and

1

requiring one of the claimants to deposit the price of the property with the registry of the court—not to preventing the claimants from pursuing other proceedings. *Corrigan*, 569 F.2d at 302. That the injunction in *Corrigan* was not solely governed by 28 U.S.C. §2361 is confirmed by the fact that the court invoked Rule 65—not 28 U.S.C. §2361—to determine whether service of process was required. *Id.* Based on the foregoing, there can be no question that Magistrate Judge Payne was correct that *Corrigan* supports the proposition that Rule 65 does not require service of process.

Defendants then cite *Enter. Int'l. Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 761 F.2d 464, 470 (5th Cir. 1985) claiming that service of process is required before a court can issue a preliminary injunction. (DN 36, PageID#1108.) But, as Whirlpool explained in opposition to Defendants' motion to stay, this decision involved a challenge to personal jurisdiction over "the official state-operated oil company of the republic of Ecuador." *Id*. at 467. Judge Payne's Report and Recommendation correctly noted "Defendants do not expressly argue that the Court is without personal jurisdiction," so the present case "is not a case involving a 'challenge to jurisdiction … interposed on an application for preliminary injunction'" like *Enter. Int'l*. (DN 32 at PageID#1085.) Defendants do not contend otherwise, so this objection should be summarily overruled.

## B. Defendants Only Contested Service of Process; Not Personal Jurisdiction

Defendants next object to the Court's statement that Defendants did "not expressly argue that the Court is without personal jurisdiction, but personal jurisdiction is not dependent upon service of process." (DN 35, PageID#1108-09.) The crux of Defendants' objection appears to be that because they objected to service of process, they also necessarily objected to personal jurisdiction based on service of process. (*Id.*) Frankly, there does not appear to be anything inconsistent between Magistrate Judge Payne's statement and Defendants' objection. As Magistrate Judge Payne noted, Defendants objected to the lack of service of process. (DN 32 at PageID#1085.)

Defendants never made any other objections to personal jurisdiction.  (*Id.*)  And for the reasons explained above regarding service of process, this objection should also be overruled.

## C.    The Required Bond is Appropriate

In his Report and Recommendation, Magistrate Judge Payne required Whirlpool to post a $10,000 bond, which Whirlpool promptly did. (DN 32, PageID#1086.) Defendants now object on two bases—first, that the injunction should not have issued without a bond and cannot now be cured by requiring a bond, and second, that the $10,000 bond is insufficient. (DN 35, PageID#1109.) But, as Whirlpool explained in its opposition to Defendants' motion to stay, a bond was waived by Defendants but is also not required for a court to enter a preliminary injunction. (DN 28, PageID#1025.) Defendants have no basis whatsoever to object to the amount of the bond. Defendants have had multiple opportunities to introduce evidence regarding what they deem the appropriate bond amount but have failed to do so. (DN 32, PageID#1091.)  As such, this objection should be overruled.

## D.    Whirlpool's Trade Dress is Not Functional

Defendants next object to Magistrate Judge Payne's finding that the asserted  trade dress is not functional. (DN 35, PageID#1109-10.) Again, Defendants present no new arguments but instead merely repeat the fact that there are patents involving the KitchenAid Stand Mixer. (*Id.*) Magistrate Judge Payne rightly disregarded Defendants' attorney arguments that utterly fail to address the actual "design embodied in the Asserted Marks."  (DN 32, PageID#1087-88.)  This objection should thus be overruled.

## E.    There is a Likelihood of Confusion

In a single paragraph, Defendants claim that their "products bear [] their own trademarks and [have] much lower prices" there is no likelihood of confusion. (DN 35 at PageID#1110.) Defendants present no evidence to support these arguments, instead merely relying on attorney

argument. Further, Whirlpool has already fully rebutted these arguments. (DN 28, PageID#1027-29; DN 31, PageID#1074-75.)  As Magistrate Judge Payne correctly noted, "Defendants fail to point to any evidence in the record" to support their argument that this prevents a likelihood of confusion. (DN32, PageID#1089.)  Therefore, Defendants' objection should be overruled.

## F.   Whirlpool is Likely to Succeed on the Merits and is Entitled to a Presumption of Irreparable Harm

Defendant objects to Magistrate Judge Payne's findings regarding irreparable harm. (DN 35, PageID#1110-11.)  According to Defendants, Magistrate Judge Payne was wrong to afford Whirlpool a rebuttable presumption of irreparable harm, although Defendants do not explain the basis for the argument (indeed, this argument only appears in a heading). (*Id.*) Yet whether Whirlpool is entitled to a presumption of irreparable harm is beyond the point, as Whirlpool has introduced extensive evidence showing that it will suffer irreparable harm absent an injunction. (DN 28, PageID#1029-34.)  Defendants, on the other hand, have not produced any such evidence. While Defendants say that they will suffer "loss of profits, loss of reputation, current and potential customers, and will incur unnecessary, irreparable cost in recalling and destroying," this is nothing more than attorney argument. (DN 35, PageID#1111.) Attorney argument is certainly insufficient to overcome Whirlpool's actual showing of irreparable harm.

Defendants also argue that Whirlpool has not met the heightened showing required for a recall order because Defendants' stand mixers are not a risk to the public. (DN 35, PageID#1111.) As an initial matter, Defendants did not raise the recall in any objection (DN 20) to Judge Payne's Report and Recommendation (DN 18) that first recommended a recall to Judge Gilstrap, and Defendants did not even raise the recall in their Emergency Motion for a Stay. (DN 26.) The argument showed up for the first time in Reply (DN 29) and therefore, now waived again. *Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015).  Even with this waived argument,

4

Defendants propose a Ninth Circuit test that does not appear to have been adopted in the Fifth Circuit. Nonetheless, as explained in Whirlpool's sur-reply, the Ninth Circuit test (the same as the Third Circuit test) has been met. (DN31, PageID#1075-76.) This objection should be overruled.

## G.    The Court May Clarify that the Preliminary Injunction Does Not Require the Infringing Products be Destroyed at this Time

Defendants object to Magistrate Judge Payne's clarification that the infringing products need not be destroyed immediately because, according to Defendants, the injunction was invalid when it was issued. (DN 35, PageID#1111.) Defendants provide no support for their argument that the injunction was improper beyond the fact that Defendants disagree with it. That is simply not enough especially where this argument was previously waived. Moreover, courts may clarify and modify injunctions even when they are the subject of an appeal, especially where Defendants requested to maintain the status quo. *See* Fed. R. Civ. P. 62(d). This objection must therefore be overruled.

## H.    The Public Interest is Served by the Injunction

Defendants' final objection is that the public interest is disserved by the injunction because the public benefits from expanded product choices and competition. (DN 35, PageID#1111.) Defendants wholly ignore, however, that the public benefits from trademark laws, *TGI Friday's, Inc. v. Great Northwest Rest., Inc.,* 652 F. Supp. 2d 763 (N.D. Tex. 2009), as well as Judge Payne's Report and Recommendation. (DN32 at PageID#1090-91.) Indeed, as Whirlpool previously explained, the public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks. *Id.* (citing *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs.* L.L.C., 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999). Defendants provide nothing but attorney argument to the contrary. This objection should be overruled.

For the reasons set forth above, the Court should overrule all of Defendants' objections and adopt Magistrate Judge Payne's Report and Recommendation in its entirety.

Respectfully submitted,

Dated: August 11, 2022        */s/ Melissa R. Smith*
Melissa Richards Smith
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
melissa@gillamsmithlaw.com

Marc Lorelli (Michigan Bar No. P63156)
LEAD ATTORNEY
Chanille Carswell (Michigan Bar No. P53754)
**BROOKS KUSHMAN P.C.**
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone: (248) 358-4400
Facsimile: (248) 358-3351
Email: mlorelli@brookskushman.com
       ccarswell@brookskushman.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are

being served this 11th day of August, 2022 with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).

*/s/ Melissa R. Smith*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| WHIRPOOL CORPORATION AND WHIRPOOL PROPERTIES, INC., | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | Case No. 2:22-CV-00027-JRG-RSP |
| SHENZHEN SANLIDA ELECTRICAL TECHNOLOGY CO., LTD. and SHENZHEN AVOGA TECHNOLOGY CO. LTD., | § § § § § | |
| *Defendants*. | § § | |

## <u>ORDER</u>

Defendants Shenzhen Sanlida Electrical Technology Co., Ltd. and Shenzhen Avoga Technology Co., Ltd. (collectively, "Defendants") previously moved to stay the preliminary injunction pending appeal ("Motion"). Dkt. No. 26. Magistrate Judge Payne entered a Report and Recommendation, Dkt. No. 32, recommending denial of the Motion and ordering Plaintiffs to post a $10,000 bond. Plaintiffs have posted the bond. Dkt. No. 34. Defendants objected to the Report and Recommendation. Dkt. No. 35.

After conducting a *de novo* review of the Motion, the Report and Recommendation, and Defendants' briefing and objections, the Court agrees with the reasoning provided within the Report and Recommendation and concludes that the objections fail to show that the Report and Recommendation was erroneous. Consequently, the Court **OVERRULES** Defendant's objections and **ADOPTS** the Report and Recommendation and orders that the Motion is **DENIED**.

**So Ordered this**

**Aug 12, 2022**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE